**DEELEY KING PANG & VAN ETTEN**
ALAN VAN ETTEN        1279
TRISTAN S.D. ANDRES      10066
1003 Bishop Street, Suite 1550
Honolulu, Hawaii 96813
Telephone:    (808) 533-1751
Facsimile:    (808) 599-2908
E-mail:      ave@dkpvlaw.com
          ta@dkpvlaw.com

Attorneys for Plaintiff
FIRST HAWAIIAN BANK

**Electronically Filed**
**FIRST CIRCUIT**
**1CCV-25-0001011**
**18-JUN-2025**
**03:07 PM**
**Dkt. 1 CMPS**

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI`I

| | |
|---|---|
| FIRST HAWAIIAN BANK,<br><br>              Plaintiff,<br><br>    vs.<br><br>AIG SPECIALTY INSURANCE COMPANY,<br><br>              Defendant. | CIVIL NO. _____<br>(Declaratory Relief)<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT; EXHIBITS A-C; SUMMONS TO ANSWER CIVIL COMPLAINT** |

## COMPLAINT FOR DECLARATORY JUDGMENT

Comes now Plaintiff FIRST HAWAIIAN BANK, by and through its undersigned attorneys, and alleges as follows:

### PARTIES

1.      Plaintiff FIRST HAWAIIAN BANK ("First Hawaiian" or "Plaintiff") is and was, at all times relevant to the allegations in this Complaint, a corporation organized and existing under the laws of the State of Hawai`i with its principal place of business in the City and County of Honolulu.

I do hereby certify that the foregoing is a full, true and correct copy of the official court record of the Courts of the State of Hawai`i.
Dated at: Honolulu, Hawai`i 18-JUN-2025, /s/ Lori Ann Okita, Clerk of the First Judicial Circuit, State of Hawai`i

**EXHIBIT A**



2.      Upon information and belief, Defendant AIG SPECIALTY INSURANCE COMPANY ("AIG" or "Defendant") is and was, at all times relevant to the allegations in this Complaint, a corporation organized and existing under the laws of the State of New York with its principal place of business in the City of New York.

## JURSDICTION AND VENUE

3.      This claim is for declaratory judgment against AIG and is brought pursuant to Hawai`i Revised Statutes ("HRS") § 632-1.

4.      Venue for this claim is appropriate in the Circuit Court of the First Circuit under HRS § 603-36(5), as all or a portion of the claims for relief herein arose in the City and County of Honolulu, State of Hawai`i.

## FACTUAL BACKGROUND

### *The AIG Insurance Policy*

5.      AIG issued a Financial Institution Professional Liability Insurance Policy to First Hawaiian, covering the period from September 1, 2020 to September 1, 2021, policy number 01-766-56-08 ("AIG Policy").  Attached hereto as Exhibit A is a true and correct copy of the AIG Policy.

6.      Among other coverages, the AIG Policy provides coverage for any allegations of a "Wrongful Act" committed by First Hawaiian in the "rendering or failure to render Professional Services."

7.      As set forth in the AIG Policy, "Judgments, Settlements and Defense Costs" incurred by First Hawaiian for "Loss . . . arising from a Claim . . . for any actual or alleged Wrongful Act of any Insured in the rendering or failure to render Professional Services" is subject to a $1,000,000 retention.

2

### *The Underlying Action Against First Hawaiian*

8.     This action involves coverage of the AIG Policy for the claims alleged in, and for the settlement of, an underlying lawsuit brought by Hawaiian Host, Inc. ("HH") against First Hawaiian and Citadel Pacific, Ltd., and related Citadel entities ("Citadel), in the Circuit Court for the First Circuit, State of Hawaii ("HH Lawsuit"), as alleged in a complaint filed October 31, 2020.  Attached hereto as Exhibit B is a true and correct copy of the HH Lawsuit complaint.

9.     As alleged in the HH Lawsuit, First Hawaiian was HH's primary creditor and held over $65,000,000 in HH's debt.  In mid-2020, HH was in financial distress and began soliciting offers from potential third-party investors, including Citadel, a customer of First Hawaiian.

10.    Prior to negotiations and disclosures of financial and business information, HH required that Citadel agree to a formal confidentiality agreement.

11.    As alleged in the HH Lawsuit, on August 5, 2020, Citadel proposed a "Non-Binding Offer," which was materially less than HH's debt to First Hawaiian and would require First Hawaiian to forgive some of the debt balance, which Citadel would be responsible for negotiating with First Hawaiian.

12.    On August 20, 2020, HH directed First Hawaiian and two potential investors, Citadel and Rowell, to negotiate directly for the sale of HH's debt, without HH's involvement.

13.    On September 21, 2020, HH notified First Hawaiian that it had another investor in the wings, the potential new investor was HHML Acquisition, LLC ("HHML").  As alleged, HH informed First Hawaiian that it preferred HHML to Citadel, and that First Hawaiian refused to proceed with the new investor.  HH alleged that First Hawaiian continued to negotiate with Citadel to sell HH's debt.

14.    In the HH Lawsuit, HH alleges that in breach of the confidentiality agreement, Citadel used confidential information to purchase HH's debt, and First Hawaiian Bank aided and abetted such breach.  HH further alleges that First Hawaiian notified HH that it had sold the debt to Citadel over HH's objections.

15.    With regard to First Hawaiian, HH brought the following causes of action: (1) *Tortious interference with contract*, alleging that First Hawaiian intentionally induced Citadel to breach the Confidentiality Agreement without justification; (2) *Tortious interference with prospective business opportunity*, alleging that First Hawaiian intentionally interfered with the proposed investment agreement between HH and HHML; and (3) *Unfair method of competition under Hawaii Revised Statute § 480-2*, alleging that First Hawaiian conspired with Citadel to use HH's confidential information to allow Citadel to purchase the First Hawaiian loans and block HHML from purchasing the loans, giving First Hawaiian and Citadel an unfair competitive advantage.

16.    AIG has acknowledged coverage for the claims in the HH lawsuit.

17.    AIG and First Hawaiian dispute the retention amount applicable to the HH lawsuit, pursuant to the Policy.

18.    Endorsement 34—entitled "Lender Liability Extension"—was added to extend coverage under the AIG Policy for a "Lending Act," which "means any act performed by an Insured for: (i) a customer or client of the Company relating to an extension of credit, a refusal to extend credit or an agreement to extend credit, or, (ii) the servicing of any loan, lease or extension of credit, including but not limited to: record keeping, billing and disbursements of principal and interest, insurance premium and taxes, . . . ."  The HH Lawsuit does not allege a

4

"Lending Act" and, therefore, Endorsement 34 does not affect the HH Lawsuit and the applicable retention here should be $1,000,000.

19.    The dispute as to the retention amount is whether Endorsement 34, the Lender Liability Extension found in the Policy, applies to the HH lawsuit.

20.    The claims in the HH Lawsuit allege covered "Wrongful Act[s]" in the "rendering or failure to render Professional Services," by First Hawaiian, as the terms "Wrongful Act[s]" and the "rendering or failure to render Professional Services," are defined in the Policy. Ex. A at PDF 8-9 of 98.

21.    AIG agrees with First Hawaiian that if Endorsement 34 does not apply to the HH Lawsuit, the retention amount applicable to the lawsuit is $1,000,000.

22.    By letter dated January 14, 2021, AIG erroneously contended that the HH Complaint qualifies as a claim in relation to a "Lending Act," which AIG contends is subject to a $5,000,000, as opposed to the original $1,000,000, retention, as set forth in Endorsement 34 of the AIG Policy.  Attached hereto as Exhibit C is a true and correct copy of AIG's January 14, 2021 letter.

23.    Plaintiff is not aware that this Court has ever addressed the issue of whether a complaint alleging tortious interference and violation of Hawaii Revised Statute § 480-2 can be considered a "Lending Act" under a Financial Institution Professional Liability Insurance Policy, like the AIG Policy at issue in this case.

<u>**COUNT I**</u>
<u>**DECLARATORY JUDGMENT**</u>

24.    Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 23 as though fully set forth herein.

25.     Because AIG continues to withhold insurance coverage to First Hawaiian for the HH Lawsuit because AIG contends that the $5,000,000 retention applies when the AIG Policy contains a $1,000,000 retention for claims such as the HH Lawsuit, there is an actual and ongoing substantial controversy between Plaintiff and AIG as to AIG's duties and obligations owed to Plaintiff under the AIG Policy.

26.     Plaintiff is entitled to a declaration as to AIG's obligation under the Policy including a declaration that the $1,000,000 retention applies to the HH Lawsuit and AIG must pay insurance benefits to Plaintiff, including, but not limited to, paying for, and providing Plaintiff with, the policy limits above the $1,000,000 retention.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully prays for the following relief:

A.     An order that AIG pay the benefits to First Hawaiian owed under the aforementioned AIG Policy;

B.     An award of reasonable attorneys' fees and costs of suit through trial and any appeal pursuant to HRS § 431:10-242; and

C.     Such other and further relief, at law or in equity, to which Plaintiff may show itself to be entitled.

DATED: Honolulu, Hawaii, June 18, 2025.

/s/ *Alan Van Etten*
ALAN VAN ETTEN, ESQ.
TRISTAN S.D. ANDRESS, ESQ.

Attorney for Plaintiff
FIRST HAWAIIAN BANK

6

# EXHIBIT A

This page is intentionally left blank

**EXHIBIT A**

**POLICYHOLDER NOTICE**

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG).  The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy.  You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producer-compensation or by calling 1-800-706-3102.

91222 (9/16)



**AIG Specialty Insurance Company**

A capital stock company

POLICY NUMBER: 01-701-30-68          REPLACEMENT OF POLICY NUMBER: 01-766-56-08

### FINANCIAL INSTITUTION PROFESSIONAL LIABILITY INSURANCE POLICY

### (BROAD FORM)

**NOTICE:** EXCEPT TOO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

**NOTICE:** THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

**NOTICE:** THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND; HOWEVER, THE INSURER SHALL ADVANCE DEFENSE COSTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.

### DECLARATIONS

**ITEM 1.**      NAMED INSURED:      First Hawaiian Inc. (fka BancWest Corporation)

               MAILING ADDRESS:   999 Bishop Street

                                  Honolulu, HI 96813

**ITEM 2.**      POLICY PERIOD:  From: September 01, 2020 To: September 01, 2021

               (12:01 A.M. standard time at the address stated in Item 1)

©All rights reserved.

**ITEM 3.**      LIMIT OF LIABILITY: **$10,000,000**      aggregate for all **Loss**

(including Defense Costs)


**ITEM 4.**      RETENTION and COINSURANCE:

(for Loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts)


Judgments, Settlements and Defense

Costs (non-Indemnifiable Loss):


Judgments, Settlements and Defense Costs (Indemnifiable Loss):


A.      **$1,000,000**      Retention Amount, plus 25% Coinsurance

subject to a maximum of


B.      **$1,000,000**      Retention Amount (no Coinsurance)


**ITEM 5.**      CONTINUITY DATE:    **August 29, 1996**


**ITEM 6.**      PREMIUM:      **$456,500**


**ITEM 8.**      NAME AND ADDRESS OF INSURER ("Insurer"):

(This policy is issued by the insurance company indicated below)


AIG Specialty Insurance Company

175 Water Street

New York, NY 10038-4969


©All rights reserved.

**IN WITNESS WHEREOF**, the **Insurer** has caused this Policy to be signed by its President, Secretary and Authorized Representative. This Policy shall not be valid unless signed below at the time of issuance by an authorized representative of the insurer.

_____
PRESIDENT
AIG Specialty Insurance Company

_____
SECRETARY
AIG Specialty Insurance Company

_____
**AUTHORIZED REPRESENTATIVE**

_____     _____     _____
**COUNTERSIGNED AT**          **DATE**          **COUNTERSIGNATURE**

MARSH USA INC.
4 EMBARCADERO CENTER SUITE 1100
SAN FRANCISCO, CA 94104-2679

1620505

©All rights reserved.

**FINANCIAL INSTITUTION PROFESSIONAL LIABILITY INSURANCE POLICY**

**(BROAD FORM)**

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer in the application attached hereto and made a part hereof, and its attachments and the material incorporated therein, and subject to the Limit of Liability and all other terms and conditions contained herein, the insurance company designated in Item 8 of the Declarations, herein called the "Insurer", agrees as follows:

1.   **INSURING AGREEMENT**

This policy shall pay the Loss of the Insured arising from a Claim first made against the Insured during the Policy Period or the Discovery Period (if applicable) and reported in writing to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act of any Insured in the rendering or failure to render Professional Services. The Insurer shall, in accordance with and subject to Clause 8, DEFENSE COSTS, SETTLEMENTS AND JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS), advance Defense Costs of such Claim prior to its final disposition.

2.   **DEFINITIONS**

(a)   "Claim" means:

(1)   a written demand for monetary or non-monetary relief; or

(2)   a civil or arbitration proceeding for monetary or non-monetary relief which is commenced by:

(i)   service of a complaint or similar pleading; or

(ii)   receipt or filing of a notice of charges.

(b)   "Company" means the Named Insured designated in Item 1 of the Declarations and any Subsidiary thereof.

(c)   "Defense Costs" means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a Claim against the Insureds, but excluding salaries of officers or employees of the Company.

(d)   "Insured" means:

©All rights reserved.

(1)    the Company;

(2)    any past, present or future director, officer or employee of the Company, but only while acting in the scope of his or her duties as such (sometimes hereinafter referred to as a "Natural Person Insured").

(e)    "Investment Banking" means, but is not limited to, the underwriting, syndicating or promotion of any debt or equity security; any actual, alleged or threatened merger, acquisition, divestiture, tender offer, proxy contest, leveraged buy-out, going private transaction, reorganization (voluntary or involuntary), capital restructuring, recapitalization, spin-offs, primary or secondary offerings of securities (regardless of whether the offering is a public offering or private placement), dissolution or sale of all or substantially all of the assets or stock of a business entity or any effort to raise or furnish capital or financing for any enterprise or entity, or any acquisition or sale of securities by the Company for its own account or any disclosure requirements in connection with any of the foregoing. Investment Banking also includes the rendering of advice or recommendations or the rendering of a fairness opinion in connection with any of the foregoing.

(f)    "Loan Servicing" means the servicing of any loan, lease or extension of credit (whether consumer, commercial, mortgage banking or otherwise, but not including financing for investment banking, or leveraged or management buy-outs). Loan Servicing includes but is not limited to the following servicing activities: record keeping, billing and disbursements of principal or interest, receipt or payment of insurance premiums and taxes, credit reporting or statements of a customer's creditworthiness, determination of the depreciation amount of property (but not projections of or an appraisal for residual or future value of property). Loan Servicing shall not include any act of restructure, termination, transfer, repossession or foreclosure, or any act arising out of the operation or control of any entity or property that the Insured acquired as security or collateral for any loan, lease or extension of credit.

(g)    "Loss" means damages, judgments, settlements and Defense Costs, and any payment made by the Insurer pursuant to Clause 19, COST OF CORRECTIONS; however, Loss shall not include:

(i)    salaries of any Insured;

(ii)    the cost of complying with any settlement for or award of non-monetary relief;

©All rights reserved.

      (iii)    loss of the actual money, securities, property or other items of value in the custody or control of the Insureds, or its agents, or in transit;

      (iv)    civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, taxes, any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds, or matters that may be deemed uninsurable under the law pursuant to which this policy shall be construed; notwithstanding the foregoing, Loss shall include awards of punitive or exemplary damages (where insurable by law) in an amount not greater than the amount of compensatory damages awarded;

      (v)    amounts actually reimbursed to the Insureds by the trust, estate, plan or fund or similar entity or the sponsor thereof;

      (vi)    principal, interest or other monies accrued or due (either now or in the future) but not yet paid to the Company as a result of any loan, lease or extension of credit; and

      (vii)    fees, commissions, or other compensation for any Professional Services rendered or required to be rendered by the Insured or that portion of any settlement or award in an amount equal to such fees, commissions, or other compensation.

(h)    "Policy Period" means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this policy.

(i)    "Professional Services" means those services of the Company permitted by law or regulation rendered by an Insured at any time whether before, on or after the inception date of this policy, pursuant to an agreement with the customer or client as long as such service is rendered for or on behalf of a customer or client of the Company: (i) in return for a fee, commission or other compensation ("Compensation"), or (ii) without Compensation as long as such non-compensated services are rendered in conjunction with services rendered for Compensation.

(j)    "Subsidiary" means:

      (1)    a corporation of which the Named Insured owns on or before the inception of the Policy Period more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its Subsidiaries;

©All rights reserved.

(2)    automatically a corporation whose assets total less than 10% of the total consolidated assets of the Company as of the inception date of this policy and which becomes a Subsidiary during the Policy Period. The Named Insured shall provide the Insurer with full particulars of the new Subsidiary before the end of the Policy Period;

(3)    a corporation which becomes a Subsidiary during the Policy Period (other than a corporation described in paragraph (2) above) but only upon the condition that within 90 days of its becoming a Subsidiary, the Named Insured shall have provided the Insurer with full particulars of the new Subsidiary and agreed to any additional premium and/or amendment of the provisions of this policy required by the Insurer relating to such new Subsidiary. Further, coverage as shall be afforded to the new Subsidiary is conditioned upon the Named Insured paying when due any additional premium required by the Insurer relating to such new Subsidiary.

A corporation becomes a Subsidiary when the Named Insured owns more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its Subsidiaries. A corporation ceases to be a Subsidiary when the Named Insured ceases to own more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its Subsidiaries.

In all events, coverage as is afforded under this policy with respect to a Claim made against a Subsidiary or any director, officer or employee thereof shall only apply for Wrongful Acts committed or allegedly committed after the effective time that such Subsidiary became a Subsidiary and prior to the time that such Subsidiary ceased to be a Subsidiary.

(k)    "Wrongful Act" means any act, error or omission in the rendering of or failure to render Professional Services; provided, however, the term "Wrongful Act" shall not mean any act, error or omission in connection with an Insured's service as a director, officer, trustee, employee or member of any entity other than the Company or any trust or estate administered by the Company pursuant to a written agreement.

3.    **EXTENSIONS**

Subject otherwise to the terms hereof, this policy shall cover Loss arising from a Claim made against the estates, heirs, or legal representatives of any deceased Natural Person Insured, and the legal representatives of such Insured in the event of incompetency, insolvency or bankruptcy, who were Insureds at the time the Wrongful Acts upon which such Claims are based were committed.

©All rights reserved.

Subject otherwise to the terms hereof, this policy shall cover Loss arising from a Claim made against the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) of a Natural Person Insured for a Claim arising solely out of his or her status as the spouse of such Insured, including a Claim that seeks damages recoverable from marital community property, property jointly held by such Insured and the spouse, or property transferred from such Insured to the spouse; provided, however, that this extension shall not afford coverage for any Claim for any actual or alleged Wrongful Act of the spouse, but shall apply only to Claims arising out of any actual or alleged Wrongful Acts of the Insured, subject to this policy's terms, conditions and exclusions.

4.    **EXCLUSIONS**

The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured:

(a)    arising out of, based upon or attributable to any in fact conflict of interest or the gaining in fact of any profit or advantage to which an Insured was not legally entitled;

(b)    arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act;

(The Wrongful Act of a Natural Person Insured shall not be imputed to any other Natural Person Insured for the purpose of determining the applicability of the foregoing exclusions 4(a) and 4(b))

(c)    alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(d)    alleging, arising out of, based upon or attributable to any pending or prior litigation as of the Continuity Date set forth in Item 5 of the Declarations, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation;

(e)    alleging any Wrongful Act which, as the Continuity Date set forth in Item 5 of the Declarations, any Insured knew or could have reasonably foreseen could lead to a Claim;

©All rights reserved.

(f)     brought by or on behalf of any Insured, or the successors or assigns of any Insured; or by or on behalf of any business enterprise that is operated or managed or owned, directly or indirectly, in whole or in part, by any Insured; provided, however, this exclusion shall not apply to any Claim brought by a Natural Person Insured or brought by any business enterprise operated, managed or owned by such Natural Person Insured as long as such Claim is brought solely in such claimant's capacity as a customer or client of the Company and is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any other Insured;

(g)     alleging, arising out of, based upon or attributable to the notarized certification or acknowledgment, or any guarantee of a signature without the physical appearance at the time of said notarization, acknowledgment or guarantee of the person who is or claims to be the person signing the instrument;

(h)     alleging, arising out of, based upon or attributable to:

  (1)   the purchase or sale of, or offer or solicitation of an offer to purchase or sell, any security of the Company; or

  (2)   any Claim brought by a securities holder of the Company whether directly, or derivatively on behalf of the Company, or by class action;

  provided, however, this exclusion shall not apply to any Claim brought solely in a claimant's capacity as a customer or client of the Company and instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any Insured;

(i)     brought by or on behalf of, or instigated or continued with the solicitation, assistance, participation or intervention of, any State or Federal regulatory or administrative agency or bureau or any other governmental, quasi-governmental or self-regulatory entity, whether directly or indirectly, and whether brought in its capacity as receiver, conservator, liquidator, securities holder or assignee of the Company, its security holders, its depositors or creditors or in any other capacity and whether brought in its own name or in the name of any other entity; however, this exclusion shall not apply to any Claim brought solely in such entity's capacity as a customer or client of the Company and instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any Insured;

©All rights reserved.

(j)     alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

   (1)     the actual, alleged, threatened or potential discharge, dispersal, release or escape of pollutants; or

   (2)     any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants,

   Pollutants include, but are not limited to, any solid, liquid, gaseous or thermal irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, lead paint, asbestos and waste. Waste includes, but is not limited to, materials to be recycled, reconditioned or reclaimed;

(k)     for bodily injury, sickness, emotional or mental distress, disease or death of any person, or loss or damage to or destruction of any property from any cause, including the loss of use thereof, or of material that violates a person's right of privacy;

(l)     for libel or slander or other defamatory or disparaging material; provided, however, this exclusion shall not apply to any Claim brought by a customer or client of the Company alleging Wrongful Acts in connection with statements by an Insured relating to such customer's or client's creditworthiness;

(m)     alleging, arising out of, based upon or attributable to the bankruptcy, insolvency, conservatorship, receivership or liquidation of, or suspension of payment by, any broker or dealer in securities or commodities, or any bank or banking firm, or any insurance or reinsurance entity, investment company or investment banker or any Insured; provided, however, this exclusion will not apply to Wrongful Acts solely in connection with an Insured's investment on the behalf of the claimant in the stock of any of the foregoing entities;

(n)     alleging, arising out of, based upon or attributable to the purchase, sale, participation, grant, commitment, restructure, termination, transfer, repossession or foreclosure of any loan, lease or extension of credit, or any failure to do any of the foregoing, or the rendering of advice in connection with any loan, lease or extension of credit; or arising out of the operation or control of any entity or property that the Insured acquired as security or collateral for any loan, lease or extension of credit; provided, however, this exclusion shall not apply to Claims solely alleging Wrongful Acts in connection with Loan Servicing;

©All rights reserved.

(o)     for violation(s) of any of the responsibilities, obligations or duties imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974, or amendments thereto or any similar provisions of state statutory law or common law, but solely with respect to any employee benefit plan sponsored or established by the Company for the benefit of the Company's employees;

(p)     alleging, arising out of, based upon or attributable to, or in any way involving, directly or indirectly, diminution in value of money, securities, property or any other item of value, unless such diminution in value is caused by a Wrongful Act of the Insured in the execution or implementation of investment advice or investment decisions;

(q)     alleging, arising out of, based upon or attributable to, or in any way involving, directly or indirectly, any Investment Banking or market maker activities, including but not limited to any disclosure requirements in connection with the foregoing;

(r)     alleging, arising out of, based upon or attributable to any mechanical or electronic failure, breakdown or malfunction of any machine or system of machines;

(s)     alleging, arising out of, based upon or attributable to any use by any Insured of, or aiding and abetting by any Insured in the use of, or participation after the fact by any Insured in the use of, non-public information in a manner prohibited by the laws of the United States including but not limited to the Insider Trading and Securities Fraud Enforcement Act of 1988 (as amended), Section 10(b) of the Securities Exchange Act of 1934 (as amended) and Rule 10(b)(5) promulgated thereunder, or prohibited by the laws of any state, commonwealth, territory or subdivision thereof, or prohibited by the laws of any other jurisdiction, or any rules or regulations promulgated under any of the foregoing;

(t)     alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, the hazardous properties of nuclear material including but not limited to the actual, alleged, threatened or potential ionizing radiations or contamination by radioactivity from nuclear fuel, nuclear waste or combustion of nuclear fuel, or the radioactive, toxic, explosive or hazardous properties of any explosive nuclear assembly or nuclear component thereof. Hazardous properties include, but are not limited to, radioactive, toxic or explosive properties.

5.      **LIMIT OF LIABILITY-(FOR ALL LOSS-INCLUDING DEFENSE COSTS)**

©All rights reserved.

The aggregate Limit of Liability stated in Item 3 of the Declarations is the limit of the Insurer's liability for all Loss arising out of all Claims first made against the Insureds during the Policy Period and the Discovery Period (if applicable) and reported to the Insurer in accordance with the terms herein; however, the Limit of Liability for the Discovery Period shall be part of, and not in addition to, the Limit of Liability for the Policy Period.

Further, a Claim which is made subsequent to the Policy Period or the Discovery Period (if applicable) which pursuant to Clause 7(b) or 7(c) is considered made during the Policy Period or the Discovery Period shall also be subject to the aggregate Limit of Liability stated in Item 3 of the Declarations.

Defense Costs are not payable by the Insurer in addition to the Limit of Liability. Defense Costs are part of Loss and as such are subject to the Limit of Liability for Loss.

6.    **RETENTION AND COINSURANCE CLAUSE**

The Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the applicable Retention Amount stated in Item 4 of the Declarations, such Retention Amount to be borne by the Insureds and shall remain uninsured, with regard to all Loss arising from any Claim: (i) against the Company or (ii) against a Natural Person Insured for which the Company has indemnified or is permitted or required to indemnify ("Indemnifiable Loss").

With respect to Item 4A of the Declarations only, the Insurer shall be liable to pay 75% of Loss excess of the Retention Amount set forth in Item 4A of the Declarations up to the Limit of Liability described in Clause 5 with regard to all Loss arising from any Claim: (i) against the Company or (ii) against a Natural Person Insured for which the Company has indemnified or is permitted or required to indemnify ("Indemnifiable Loss"), it being a condition of this insurance that the remaining 25% of each and every Loss excess of the Item 4A Retention Amount shall be borne by the Insureds and shall remain uninsured.

The amount of the Loss to be borne by the Insureds pursuant to this clause shall be the SMALLER of the following:

A.    the amount set forth in Item 4B of the Declarations, or

B.    the Retention Amount set forth in Item 4A of the Declarations plus an amount equal to: Loss excess of the Item 4A Retention Amount multiplied by the Coinsurance percentage set forth in Item 4A of the Declarations.

©All rights reserved.

In no event shall the Insured's obligation under this clause be greater than the Retention Amount set forth in Item 4B of the Declarations which shall remain the maximum amount of Loss to be borne by the Insureds under this clause. Further, a single Retention Amount (and Coinsurance percentage, if applicable) shall apply to Loss arising from all Claims alleging the same Wrongful Act or related Wrongful Acts.

7.    **NOTICE/CLAIM REPORTING PROVISIONS**

**Notice hereunder shall be given in writing to the Insurer named in Item 8 of the Declarations at the address indicated in Item 8 of the Declarations.**

**If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.**

(a)    The Company or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of a Claim made against an Insured as soon as practicable and either:

(1)    anytime during the Policy Period or during the Discovery Period (if applicable); or

(2)    within 30 days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim(s) is reported no later than 30 days after the date such Claim was first made against an Insured.

(b)    If written notice of a Claim has been given to the Insurer pursuant to Clause 7(a) above, then a Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim for which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, shall be considered made at the time such notice was given.

©All rights reserved.

(c)    If during the Policy Period or during the Discovery Period (if applicable) the Company or the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against the Insureds and shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, then a Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

8.    **DEFENSE COSTS, SETTLEMENTS AND JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)**

The Insurer shall advance, at the written request of the Insured, Defense Costs prior to the final disposition of the Claim. Such advance payments by the Insurer shall be repaid to the Insurer by the Insured, severally according to their respective interests, in the event and to the extent that the Insured shall not be entitled under the terms and conditions of this policy to payment of such Loss.

The Insurer does not, however, under this policy, assume any duty to defend. The Insureds shall defend and contest any Claim made against them. The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim.

The Insurer shall have the right to effectively associate with the Company and the Insureds in the defense of any Claim that appears reasonably likely to involve the Insurer, including but not limited to negotiating a settlement. The Company and the Insureds shall give the Insurer full cooperation and such information as it may reasonably require.

The Insurer may make any settlement of any Claim it deems expedient with respect to any Insured subject to such Insured's written consent. If any Insured withholds consent to such settlement, the Insurer's liability for all Loss on account of such Claim shall not exceed the amount for which the Insurer could have settled such Claim plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer.

©All rights reserved.

9.    **ACQUISITION OR DISPOSITION OF ASSETS**

If during the Policy Period the Company acquires the assets or assets under management of another organization, coverage as is afforded under this policy, subject to its terms, conditions and exclusions, shall apply to Professional Services rendered in connection with such acquired assets in accordance with the following:

(a)    automatically in the case where such acquired assets total less than 10% of the total consolidated assets or assets under management, as the case may be, of the Company as of the inception date of this policy. The Named Insured shall provide the Insurer with full particulars of the new assets before the end of the Policy Period;

(b)    in the case where such acquired assets total 10% or more of the total consolidated assets or assets under management, as the case may be, of the Company as of the inception date of this policy but only upon the condition that within 90 days of the acquisition, the Named Insured shall have provided the Insurer with full particulars of the new assets and agreed to any additional premium and/or amendment of the provisions of this policy required by the Insurer relating to such new assets. Further, coverage as shall be afforded to the new assets is conditioned upon the Named Insured paying when due any additional premium required by the Insurer relating to such new assets.

In all events, coverage as is afforded with respect to a Claim alleging Professional Services in connection with assets acquired by the Company shall only apply for Wrongful Acts committed or allegedly committed during the time such assets were owned by the Company.

10.    **DISCOVERY CLAUSE**

Except as indicated below, if the Insurer or the Named Insured shall cancel or refuse to renew this policy, the Named Insured shall have the right, upon payment of an additional premium of 75% of the "full annual premium", to a period of one year following the effective date of such cancellation or nonrenewal (herein referred to as the Discovery Period) in which to give to the Insurer written notice of Claims first made against the Insureds during said one year period for any Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy. As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period. The rights contained in this paragraph shall terminate, however, unless written notice of such election, together with the additional premium due is received by the Insurer within thirty (30) days of the effective date of cancellation or non-renewal.

©All rights reserved.

In the event of a Transaction, as defined in Clause 12, the Named Insured shall have the right, within thirty (30) days of the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction) for a period of no less than three years or for such longer or shorter period as the Named Insured may request. The Insurer shall offer such Discovery Period pursuant to such terms, conditions and premium as the Insurer may reasonably decide. In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

The additional premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

The offer by the Insurer of renewal terms, conditions, Limits of Liability and/or premiums different from those of the expiring policy shall not constitute a refusal to renew.

11.  **CANCELLATION CLAUSE**

This policy may be canceled by the Named Insured, or its agent, at any time only by mailing written prior notice to the Insurer stating when thereafter such cancellation shall be effective, or by surrender of this policy to the Insurer or its authorized agent. This policy may also be canceled by or on behalf of the Insurer by delivering to the Named Insured or by mailing to the Named Insured, by registered, certified, or other first class mail, at the Named Insured's address as shown in Item 1 of the Declarations, written notice stating when, not less than sixty (60) days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The Policy Period terminates at the date and hour specified in such notice, or at the date and time of surrender.

If this policy shall be canceled by the Named Insured, the Insurer shall retain the customary short rate proportion of the premium herein.

If this policy shall be canceled by the Insurer, the Insurer shall retain the pro rata proportion of the premium herein.

Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

©All rights reserved.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

12.    **CHANGE IN CONTROL OF NAMED INSURED**

If during the Policy Period:

a.    the Named Insured shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons and/or entities acting in concert; or

b.    any person or entity or group of persons and/or entities acting in concert shall acquire an amount of the outstanding securities representing more than 50% of the voting power for the election of Directors of the Named Insured, or acquires the voting rights of such an amount of such securities;

(either of the above events herein referred to as the "Transaction")

then, this policy shall continue in full force and effect as to Wrongful Acts occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged Wrongful Act occurring after the effective time of the Transaction. This policy may not be canceled after the effective time of the Transaction and the entire premium for this policy shall be deemed earned as of such time. The Named Insured shall also have the right to an offer by the Insurer of a Discovery Period described in Clause 10 of the policy.

The Named Insured shall give the Insurer written notice of the Transaction as soon as practicable, but not later than 30 days after the effective date of the Transaction.

13.    **SUBROGATION**

©All rights reserved.

In the event of any payment under this policy, the Insurer shall be subrogated to the extent of such payment to all the Company's and the Insureds' rights of recovery thereof, including salvage and any indemnification from a customer or client of the Company, and the Company and the Insureds shall execute all papers required and shall do everything that may be necessary to secure such rights including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the Company and/or the Insureds. The Insureds shall take no action, without the consent of the Insurer, to limit or negate the rights of the Insurer to recover any payments made under this policy from any person or entity that may be contractually obligated to reimburse the Insureds for the Insureds' loss. However, in no event shall the Insurer exercise its rights of subrogation against an Insured, other than in its capacity as a customer or client of the Company, under this policy unless such Insured has been convicted of a criminal act, or been judicially determined to have committed a deliberate fraudulent act, or obtained any profit or advantage to which such Insured was not legally entitled, or arising out of an act other than a covered Professional Service by such other Insured.

14.    **OTHER INSURANCE**

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance, as well as any indemnification from any customer or client of the Company ("Customer Indemnification") which the Insured has actually received. With respect to Customer Indemnification which is not paid by such indemnitor, this policy shall pay such Loss as is otherwise covered under this policy, however, the Insureds agree as a condition for such payment to provide whatever assistance and cooperation is required by the Insurer to enforce the Insurer's rights as subrogee.

15.    **NOTICE AND AUTHORITY**

It is agreed that the Named Insured shall act on behalf of its Subsidiaries and all Insureds with respect to the giving of notice of Claim or giving and receiving notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining to exercise any right to a Discovery Period.

16.    **ASSIGNMENT**

This policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

17.    **ALTERNATIVE DISPUTE RESOLUTION PROCESS**

©All rights reserved.

It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of Loss, shall be subject to the alternative dispute resolution process ("ADR") set forth in this clause.

Either the Insurer or the Insureds may elect the type of ADR discussed below; provided, however, that the Insureds shall have the right to reject the Insurer's choice of ADR at any time prior to its commencement, in which case the Insureds' choice of ADR shall control.

The Insurer and Insureds agree that there shall be two choices of ADR: (1) non-binding mediation administered by the American Arbitration Association, in which the Insurer and Insureds shall try in good faith to settle the dispute by mediation under or in accordance with its then-prevailing Commercial Mediation Rules; or (2) arbitration submitted to the American Arbitration Association under or in accordance with its then-prevailing commercial arbitration rules, in which the arbitration panel shall be composed of three disinterested individuals.

In either mediation or arbitration, the mediator(s) or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. The mediator(s) or arbitrators shall also give due consideration to the general principles of the law of the state where the Named Insured is incorporated in the construction or interpretation of the provisions of this policy; provided, however, that the terms, conditions, provisions and exclusions of this policy are to be construed in an even-handed fashion in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the policy. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the arbitrators' award shall not include attorneys fees or other costs. In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 120 days shall have elapsed from the date of the termination of the mediation. In all events, each party shall share equally the expenses of the ADR.

Either choice of ADR may be commenced in either New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1 of the Declaration's page as the mailing address for the Named Insured. The Named Insured shall act on behalf of all Insureds in deciding to proceed with ADR under this clause.

18. **ACTION AGAINST INSURER**

©All rights reserved.

Except as provided in Clause 17 of the policy, no action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the Insureds' obligation to pay shall have been finally determined either by judgment against the Insureds after actual trial or by written agreement of the Insureds, the claimant and the Insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Insurer as a party to any action against the Insureds or the Company to determine the Insureds' liability, nor shall the Insurer be impleaded by the Insureds or the Company or their legal representatives. Bankruptcy or insolvency of the Company or the Insureds or of their estates shall not relieve the Insurer of any of its obligations hereunder.

19.    **COST OF CORRECTIONS**

Subject to all other terms, conditions and exclusions of this policy, the Insurer will reimburse the Insured for the costs incurred by the Insured, with the Insurer's prior written consent, to correct direct monetary damages ("Damages") to a customer or client of the Company resulting from any Wrongful Act of an Insured in the rendering or failure to render Professional Services.

The Insureds shall, as a condition precedent to the obligations of the Insurer under this clause, give written notice to the Insurer pursuant to clause 7(c) of this policy of circumstances which has resulted in the Damages to the customer or client of the Company. Coverage under this clause is subject to the following additional conditions:

1.    such Wrongful Act occurs during or prior to the Policy Period or Discovery Period (if applicable); and

2.    such Wrongful Act arises out of the Insured's failure to follow directions from a customer or client in connection with the Non-discretionary Investment of the customer's or client's assets; and

3.    such Wrongful Act arises in the ordinary course of the Company's operations and, if not corrected, would automatically result in a Damages to the customer or client of the Company; and

4.    such Wrongful Act would, in the absence of any correction, have resulted in covered Loss under this policy; provided, however, that nothing contained herein shall obligate the Insurer to reimburse the Insured for Damages:

(a)    arising out of any known Wrongful Act; or

©All rights reserved.

    (b)      arising out of the wire or electronic transfer of funds; or

    (c)      for any costs, charges or expenses required to be incurred by the Insured pursuant to any contractual obligation to a customer or client of the Company, if such obligation does not otherwise constitute covered Loss under this policy and would not otherwise exist absent such contractual obligation (such uncovered Loss shall include, but not be limited to, the guaranteeing of any rate of return); or

    (d)      or that part of Damages, for which no coverage would have been afforded under this policy had the Wrongful Act resulted in a Claim.

In the event of coverage under this clause, the giving of the aforementioned notice of circumstances by the Insured shall be deemed to be notice of a Claim made against an Insured at the time the notice is reported to the Insurer. Coverage shall then apply to such "Claim" subject to the terms and conditions of this policy, except that the Retention Amount and Coinsurance percentage described in Clause 6 of this policy shall be modified as follows: (1) The Retention Amount set forth in Item 4A of the Declarations shall not be applicable, (2) the Retention Amount set forth in Item 4B shall apply, but it shall be equal to 400% of the amount set forth in Item 4B of the Declarations and (3) the Coinsurance percentage set forth in Item 4A of the Declarations shall apply.

If the Insurer determines that it lacks sufficient information to make a decision as to coverage, the Insured shall have no recourse under this policy against the Insurer until the Insurer determines that sufficient information has been provided or until an actual Claim has been filed under this policy.

The term Non-discretionary Investment shall mean an investment or transaction made at the specific direction or approval of the customer or client and in no event shall include any decision made pursuant to discretionary authority granted to an Insured even if such authority is subject to investment guidelines or general investment parameters or instructions.

Nothing in this policy shall be construed to compel the Insureds from requesting coverage under this clause.

20.    **HEADINGS**

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

©All rights reserved.

ENDORSEMENT # *1*

This endorsement, effective *12:01 am    September 1, 2020*    forms a part of
policy number   *01-701-30-68*
issued to *First Hawaiian Inc. (fka BancWest Corporation)*

by    *AIG Specialty Insurance Company*

## HAWAII CANCELLATION/NONRENEWAL ENDORSEMENT

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy; and 2) "you", "your", "named Insured", "First Named Insured", and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page.

In consideration of the premium charged, it is hereby understood and agreed that the cancellation provision of this policy is amended as follows:

The Insured may cancel a policy by mailing or delivering to the Insurer advance written notice of cancellation.

The Insurer may cancel a policy or renewal prior to the expiration date or one year from the effective date of the policy only under the following grounds:

1.    Failure to pay a premium when due;

2.    Fraud or material misrepresentations;

3.    The risk hazard increases substantially and the Insurer could not have reasonably foreseen the change when entering into contract;

4.    Substantial breaches of contractual duties, conditions, or warranties;

5.    Violation of any local fire, health, or safety statute or ordinance;

6.    Conviction of the named Insured for a crime having as one of its necessary elements an act increasing any hazard that is insured against;

7.    The insurance commissioner determines that the continuation of the policy places the Insurer in violation of chapter 431; or

8.    For any good faith reason with the approval of the commissioner.

Cancellation shall become effective thirty (30) days after the Insurer delivers written notice of cancellation to the policyholder.

The Insurer may refuse to renew a policy if notice is sent to the policyholder with the reasons for nonrenewal. The notice must be sent to the policyholder forty five (45) days prior to the intended nonrenewal date.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

Or Countersignature (In states where applicable)
© All rights reserved.

*END 001*

**ENDORSEMENT#** *2*

This endorsement, effective at *12:01 am    September 1, 2020*    forms a part of
Policy number *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### ECONOMIC SANCTIONS ENDORSEMENT

*This endorsement modifies insurance provided under the following:*

Coverage shall only be provided and payment of loss under this policy shall only be made
in full compliance with enforceable United Nations economic and trade sanctions and the
trade and economic sanction laws or regulations of the European Union and the United
States of America, including, but not limited to, sanctions, laws and regulations
administered and enforced by the U.S. Treasury Department's Office of Foreign Assets
Control ("OFAC").

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable)
© All rights reserved.

*END 002*

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

**BPL MANDATORY ENDORSEMENT NO COINSURANCE**

In consideration of the premium charged, it is hereby understood and agreed that ITEM 4.
RETENTION AND COINSURANCE of the Declarations is deleted in its entirety and replaced
with the following:

ITEM 4.          RETENTION

                 (for Loss arising from Claims alleging the same
                 Wrongful Act or related Wrongful Acts)
                 Judgments, Settlements and Defense
                 Costs (non-Indemnifiable Loss):                    **NONE**

                 Judgments, Settlements and Defense
                 Costs (indemnifiable Loss):                        **$1,000,000**

It is further understood and agreed that Clause 6. RETENTION and COINSURANCE is
deleted in its entirety and replaced with the following:

6.       Retention

         The Insurer shall only be liable for the amount of Loss arising from a Claim which
         is in excess of the applicable Retention Amount stated in ITEM 4 of the
         DECLARATIONS, such Retention Amount to be borne by the Insureds and shall
         remain uninsured, with regard to all Loss arising from any Claim: (i) against the
         Company or (ii) against a Natural Person Insured for which the Company has
         indemnified or is permitted or required to indemnify ("Indemnifiable Loss"). A
         single Retention amount shall apply to all Loss arising from all Claims alleging the
         same Wrongful Acts or related Wrongful Acts.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THE POLICY SHALL REMAIN.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 003*

**ENDORSEMENT #** 4

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### DELETE COST OF CORRECTIONS

In consideration of the premium charged, it is hereby understood and agreed that Clause
19. **COST OF CORRECTIONS** shall be deleted in its entirety.


ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS OF THE POLICY REMAIN
UNCHANGED.


_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 004*

MNSCPT                                        1

ENDORSEMENT # 5

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## DISCOVERY AMENDED

## (ONE, TWO OR THREE YEARS PRESET)

In consideration of the premium charged, it is hereby understood and agreed that Clause 10. DISCOVERY CLAUSE is deleted in its entirety and replaced with the following:

10.    DISCOVERY CLAUSE

Except as indicated below, if the Insurer or the Named Corporation shall cancel or refuse to renew this policy, the Named Insured shall have the right to a period of up to three (3) years following the effective date of such cancellation or nonrenewal (the "Discovery Period") upon payment of the respective "Additional Premium Amount" described below in which to give to the Insurer written notice of Claims first made against the Insureds during said Discovery Period for any Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy. The rights contained in this paragraph shall terminate, however, unless written notice of such election, together with the additional premium due is received by the Insurer within Thirty (30) days of the effective date of cancellation or non-renewal.

The Additional Premium Amount for: (1) one year shall be 100% of the "Full Annual Premium"; (2) two years shall be 125% of the "Full Annual Premium"; and (3) three years shall be 150% of the "Full Annual Premium". As used herein, "Full Annual Premium" means the premium level in effect immediately prior to the end of the Policy Period.

In the event of a Transaction, as defined in Clause 12, the Named Insured shall have the right, within Forty-five (45) days of the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction) for a period of no less than three years or for such longer or shorter period as the Named Insured may request. The Insurer shall offer such Discovery Period pursuant to such terms, conditions and premium as the Insurer may reasonably decide. In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

The Discovery Period is not cancelable and the additional premium charged shall be fully earned at inception of the Discovery Period. This Clause 10 shall not apply to any cancellation resulting from non-payment of premium.

©All rights reserved.

### *END 005*

**ENDORSEMENT#** 5    (Continued)

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

The offer by the Insurer of renewal terms, conditions, Limits of Liability and/or premiums different from those of the expiring policy shall not constitute a refusal to renew.

It is understood and agreed that nothing in this endorsement shall affect Clause 7.C. and that if during the Discovery Period (if applicable) the Company or the Insureds shall become aware of any circumstances which may be reasonably expected to give rise to a Claim being made against the Insureds the Insured shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, then a Claim which is subsequently made against the Insured and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances shall be considered made at the time such notice of such circumstances was given.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 005*

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiïan Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## PRO RATA CANCELLATION ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that Clause
7. **Notice and Authority** of the BASE Section is amended by appending the following to the
end thereof:

> Notwithstanding any other terms or conditions of this policy to the contrary, if this
> policy is canceled by the **Named Insured** for any reason, then the **Insurer** shall
> return the unearned pro rata proportion of the premium as of the effective date of
> cancellation and shall waive any minimum earned premium requirement specified
> herein.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 006*

ENDORSEMENT# 7

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## SEVERABILITY OF APPLICATION ENDORSEMENT

### (FULL INDIVIDUAL SEVERABILITY; TOP 3 POSITIONS IMPUTED TO COMPANY)

In consideration of the premium charged, it is hereby understood and agreed that the following Clause is added to the policy:

**SEVERABILITY**

In granting coverage under this policy, it is agreed that the Insurer has relied upon the statements, warranties and representations contained in the application as being accurate and complete. All such statements, warranties and representations are the basis for this policy and are to be considered as incorporated into this policy.

The Insureds agree that in the event that the particulars and statements contained in the application are not accurate and complete and materially affects either the acceptance of the risk or the hazard assumed by the Insurer under the policy, then this policy shall be void *ab initio* solely with respect to any of the following Insureds:

(1)    solely with respect to Loss other than Non-Indemnifiable Loss, any Natural Person Insured who knew as of the inception date of the Policy Period the facts that were not accurately and completely disclosed in the application,

(2)    a Company, to the extent it indemnifies any Natural Person Insured referenced in (1) above, and

(3)    a Company, if any past or present chief executive officer, chief financial officer or chief operating officer of the Named Insured knew as of the inception date of the Policy Period, the facts that were not accurately and completely disclosed in the application,

whether or not such Natural Person Insured knew that such facts were not accurately and completely disclosed in the application. The knowledge of any Natural Person Insured shall not be imputed to any other Natural Person Insured for the purpose of this paragraph.

For purposes of this endorsement, "Non Indemnifiable Loss" means Loss for which the Company has neither indemnified nor is permitted or required to indemnify a

©All rights reserved.
*END 007*

**ENDORSEMENT# 7**    (Continued)

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

> Natural Person Insured pursuant to law or contract or the charter, bylaws, operating
> agreement or similar documents of the Company.
>
> It is understood and agreed that this endorsement supersedes any inconsistent
> language contained in the application.

> ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
                                    AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 007*

**ENDORSEMENT# 8**

This endorsement, effective *at 12:01AM September 01, 2020*            forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## AMEND DEFINITION OF INSURED

In consideration of the premium charged, it is hereby understood that 2. Definitions,
Clause (d), "Insured", is deleted in its entirety and replaced with the following:

> "Insured" means the Company, and any past, present or future partner, officer,
> director, managing member of an LLC, Board of Managers, committee member,
> employee, trustee, independent contractor, leased employee or foreign equivalent
> titles of the Company against whom a claim is made in their capacity as such
> partner, officer, director, managing member of an LLC, Board of Managers,
> committee member, employee or foreign equivalent titles.  Provided, however, that
> the coverage afforded by this endorsement shall only apply for independent
> contractors or leased employees if the Company provides indemnification to such
> independent contractors or leased employees in the same manner as is provided to
> the Company's directors, officers or employees.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 008*

ENDORSEMENT# 9

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### DOMESTIC PARTNER COVERAGE

In consideration of the premium charged, it is hereby understood and agreed that such coverage as is afforded by this policy pursuant to Clause 3. EXTENSIONS to the lawful spouse of a Natural Person Insured under this policy shall also extend to any individual person "Domestic Partner" of such Natural Person Insured.

As used herein, the term "Domestic Partner" means any individual person qualifying as a domestic partner under: (1) the provisions of any applicable federal, state, or local law; or (2) the provisions of any formal program established by the Sponsor Organization.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____
                                                        AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 009*

MNSCPT                                        1

ENDORSEMENT# 10

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

**AMEND DEFINITION OF LOSS**

In consideration of the premium charged, it is hereby understood and agreed that Clause 2. DEFINITIONS (g) is hereby deleted in its entirety and replaced by the following:

(g)    "Loss" means damages, judgments, (including pre/post-judgment interest on a covered judgment), settlements and Defense Costs; however, Loss, except Defense Costs shall not include:

    (1)    salaries of any Insured;

    (2)    the cost of complying with any settlement for or award of non-monetary relief;

    (3)    loss of the actual money, securities, property or other items of value in the custody or control of the Insureds, or its agents, or in transit;

    (4)    civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, taxes, any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds, or matters that may be deemed uninsurable under the law pursuant to which this policy shall be construed; notwithstanding the foregoing, Loss shall include awards of punitive or exemplary damages (where insurable by law) in an amount not greater than the amount of compensatory damages;

    (5)    amounts actually reimbursed to the Insureds by the trust, estate, plan or fund or similar entity or the sponsor thereof;

    (6)    principal, interest or other monies accrued or due (either now or in the future) but not yet paid to the Company as a result of any loan, lease or extension of credit; and

    (7)    fees, commissions, or other compensation for any Professional Services rendered or required to be rendered by the Insured or that portion of any settlement or award in an amount equal to such fees, commissions, or other compensation.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
**END 010**

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## PUNITIVE DAMAGES COVERAGE

In consideration of the premium charged, it is hereby understood and agreed that Clause 2. DEFINITIONS (g) "Loss" paragraph (iv), is deleted in its entirety and replaced by the following:

(iv)    civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, taxes, any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds, or matters that may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Notwithstanding the foregoing, Loss shall include awards of punitive or exemplary damages, the multiplied portion of multiplied damages, if such damages shall be deemed insurable under:

(1)    the law of the state in which the claim or suit seeking such damage is or was pending;

(2)    the law of the state in which is located the principal place of business of the Insured against which such claim or suit is asserted; or

(3)    the law of the state in which the Insured is incorporated.

If there is no state law determining whether damages are insurable in a state whose law is applicable under this endorsement, such damages shall be deemed insurable under that law of such state.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

©All rights reserved.

*END 011*

ENDORSEMENT# 12

This endorsement, effective *at 12:01AM September 01, 2020*            forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiïan Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## AMENDED DEFINITIONS (i) PROFESSIONAL SERVICES

In consideration of the premium charged, it is hereby understood that Clause 2. DEFINITIONS, paragraph (i), "Professional Services," is deleted in its entirety and replaced with the following:

(i)    "Professional Services" means those services of the Company permitted by law or regulation rendered by or on behalf of an Insured at any time whether before, on or after the inception date of this policy, pursuant to an agreement with the customer or client as long as such service is rendered for or on behalf of a customer or client of the Company: (i) in return for a fee, commission or other compensation ("Compensation"), or (ii) without Compensation as long as such non-compensated services are rendered in conjunction with services rendered for Compensation.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 012*

ENDORSEMENT # 13

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

**AMEND DEFINITIONS (j) SUBSIDIARY**

**SUBSIDIARY DEFINITION**

In consideration of the premium charged, it is hereby understood that Clause 2. DEFINITIONS, paragraph (j), "Subsidiary," is deleted in its entirety and replaced with the following:

(j)      "Subsidiary" means:

(1)      an entity of which the Named Insured owns or Controls on or before the inception of the Policy Period, either directly or indirectly, through one or more of its Subsidiaries;

(2)      automatically a entity whose assets total less than 15% of the total consolidated assets of the Company as of the inception date of this policy and which becomes a Subsidiary during the Policy Period;

(3)      a entity which becomes a Subsidiary during the Policy Period (other than a entity described in paragraph (2) above) but only upon the condition that within 90 days of its becoming a Subsidiary, the Named Insured shall have provided the Insurer with full particulars of the new Subsidiary and agreed to any additional premium and/or amendment of the provisions of this policy required by the Insurer relating to such new Subsidiary. Further, coverage as shall be afforded to the new Subsidiary is conditioned upon the Named Insured paying when due any additional premium required by the Insurer relating to such new Subsidiary.

A entity becomes a Subsidiary when the Named Insured owns more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its Subsidiaries.   A entity ceases to be a Subsidiary when the Named Insured ceases to own more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its Subsidiaries.

In all events, coverage as is afforded under this policy with respect to a Claim made against a Subsidiary or any director, officer or employee thereof shall only apply for Wrongful Acts committed or allegedly committed after the effective time that such Subsidiary became a Subsidiary and prior to the time that such Subsidiary ceased to be a Subsidiary.

©All rights reserved.
*END 013*

**ENDORSEMENT#** 13    (Continued)

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

Solely for the purpose of this endorsement, the term "Controls" means: (1) owning more
than a 50% equity interest of the entity; (2) possessing the power to elect more than a
majority of the board of directors, the management committee members or the members
of the management board, but in all events owning at least 25% equity interest.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 013*

ENDORSEMENT# 14

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

**WRONGFUL ACT DEFINITION AMENDED ENDORSEMENT**

In consideration of the premium charged, it is hereby understood that Clause **2. DEFINITIONS**, paragraph (k), "Wrongful Act," is deleted in its entirety and replaced with the following:

> (k)    "Wrongful Act" means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by an Insured or any entity or person for whom the Insured is legally liable in the rendering of or failure to render Professional Services; provided, however, the term "Wrongful Act" shall not mean any act, error or omission in connection with an Insured's service as a director, officer, trustee, employee or member of any entity other than the Company or any trust or estate administered by the Company pursuant to a written agreement.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 014*

ENDORSEMENT# 15

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### AMEND CONDUCT EXCLUSIONS (a) AND (b) TO FINAL ADJUDICATION

In consideration of the premium charged, it is hereby understood and agreed that Clause 4. EXCLUSIONS (a) and (b) are deleted in their entirety and replaced with the following:

(a)    arising out of, based upon or attributable to any conflict of interest in which any final adjudication establishes the conflict of interest or the gaining of any profit or advantage to which any, final adjudication establishes an Insured was not legally entitled;

(b)    arising out of, based upon attributable to the committing of any criminal or deliberate fraudulent act, if any final adjudication establishes that such criminal or deliberate fraudulent act occurred.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS SHALL REMAIN THE SAME.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 015*

**ENDORSEMENT# 16**

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

**EXCLUSION (c) AMENDED**

In consideration of the premium charged, it is hereby understood and agreed that in Clause
4. EXCLUSIONS, paragraph (c) is deleted in its entirety and replaced with the following:

   (c)    alleging, arising out of, based upon or attributable to the facts alleged, or to
          the same or related Wrongful Acts alleged or contained, in any claim which
          has been reported, or in any circumstances of which notice has been given
          under any errors and omissions insurance policy of which this policy is a
          renewal or replacement or which it may succeed in time;


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 016*

This endorsement, effective *at 12:01AM September 01, 2020*                   forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## AMEND EXCLUSION (k) BODILY INJURY

In consideration of the premium charged, it is hereby understood and agreed that paragraph (k) of Clause 4, EXCLUSIONS, is deleted in their entirety and replaced by the following:

> for bodily injury, sickness, emotional or mental distress, disease or death of any person, or loss or damage to or destruction of any property from any cause, including the loss of use thereof, or of material that violates a person's right of privacy; provided, however, that this exclusion shall not apply to any Claim for emotional distress, mental distress and mental anguish. This exclusion shall not apply to covered **Defense Costs** incurred in connection with a **Claim** alleging a **Wrongful Act**.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 017*

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## EXTENSION: CERTAIN REGULATORY ACTIONS

In consideration of the premium charged, it is understood and agreed that the policy is amended as follows:

I.

In Clause **2. DEFINITIONS**, paragraph (a), "Claim," is deleted in its entirety and replaced with the following:

(1)    a written demand for monetary or non-monetary relief; or

(2)    a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by:

    (i)    service of a complaint or similar pleading;

    (ii)    return of an indictment, information or similar document (in the case of a criminal proceeding); or

    (iii)    receipt or filing of a notice of charges.

Clause **4. EXCLUSIONS**, paragraph (i) is deleted in its entirety and replaced with the following:

    (i)    brought by or on behalf of, or instigated or continued with the solicitation, assistance, participation or intervention of, any State or Federal regulatory or administrative agency or bureau or any other governmental, quasi-governmental or self-regulatory entity, whether directly or indirectly, and whether brought in its capacity as receiver, conservator, liquidator, securities holder or assignee of the Company, its security holders, its depositors or creditors or in any other capacity and whether brought in its own name or in the name of any other entity; however, this exclusion shall not apply to any Claim brought:

        (a)    in such entity's capacity as a customer or client of the Company; or

©All rights reserved.
### END 018

**ENDORSEMENT** # 18    (Continued)

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

      (b)     by such entity on behalf of a customer or client of the Company and arising from a Wrongful Act in the rendering or failure to render Professional Services,

provided, however, that in all cases such Claim shall be instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any Insured.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 018*

ENDORSEMENT# 19

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## PARENT/AFFILIATED ENTITY(IES) EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim(s) brought by, on behalf of or against: (i) any entity(ies) listed in the schedule of "Parent/Affiliated Entity(ies)" below; (ii) any subsidiary of a Parent/Affiliated Entity that is not a Company; or (iii) any directors, officers or employees (or any foreign equivalent) thereof.

**PARENT/AFFILIATED ENTITY(IES)**
BNP Paribas
BNP Paribas USA
BancWest Corporation (f.k.a. BWC Holding Inc.)

Notwithstanding the foregoing, this exclusion shall not apply to a Claim against the Parent/Affiliated Entity(ies) or any directors, officers or Employees thereof (or any foreign equivalents)) for a Wrongful Act committed by an Insured, provided that:

1. such Insured is and remains a defendant in such Claim; and

2. any coverage afforded under this policy for such Claim shall only apply during such time that BNP Paribas, BNP Paribas USA or BancWest Corporation (f.k.a. BWC Holding Inc.) has Management Control of the Named Insured.

As used herein, "Management Control" means (i) owning interests representing more than fifty percent (50%) of the voting, appointment or designation power for the selection of a majority of: the board of directors of a corporation, the management committee members of a joint venture or partnership, or the members of the management board of a limited liability company; or (ii) having the right pursuant to written contract or the by-laws, charter, operating agreement or similar documents of an entity, to elect, appoint or designate a majority of: the board of directors of a corporation, the management committee members of a joint venture or partnership, or the members of the management board of a limited liability company.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 019*

ENDORSEMENT# 20

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## PATENT INFRINGEMENT EXCLUSION ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that SECTION 4. EXCLUSIONS is amended by adding the following at the end thereof:

    (dd)    alleging, arising out of, based upon, or attributable to infringement of patent, trademark or misappropriation of "Trade Secrets"; or

    (ee)    alleging, arising out of, based upon, or attributable to an intellectual property dispute or suit.

    (ff)    alleging, arising out of, based upon, or attributable to any or alleged plagiarism or violation of copyright, patent, trademark, servicemark, "Trade Secret", slogan, title or intellectual property rights.

It is further understood and agreed that "Trade Secret" means information, including a formula, compilation, pattern, program, device, method, process or technique that derives independent economic value, actual or potential, from not being generally known and not readily ascertainable through proper means by other person who can obtain economic advantage from its disclosure or use.

      ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 020*

**ENDORSEMENT #** 21

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## MOLD EXCLUSION

The EXCLUSIONS section of the policy is amended by adding the following paragraph to the end thereof:

   This policy does not apply:

   to any claim for or alleging bodily injury, sickness, disease, or death of any person, or damage to or destruction of any property (including the loss of use thereof), personal and advertising injury, or any other damage, loss, cost or expense, including, but not limited to damages, losses, costs or expenses related to, arising from or associated with clean-up, remediation, containment, removal or abatement, caused directly or indirectly, in whole or in part, by:

   a.    Any Fungus(i), Molds(s), mildew or yeast, or

   b.    Any Spore(s) or toxins created or produced by or emanating from such Fungus(i), Mold(s), mildew or yeast, or

   c.    Any substance, vapor, gas, or other emission or organic or inorganic body or substance produced by or arising out of any Fungus(i) , Mold(s), mildew or yeast, or

   d.    Any material, product, building component, building or structure, or any concentration of moisture, water or other liquid within such material, product, building component, building or structure, that contains, harbors, nurtures or acts as a medium for any Fungus(i), Mold(s), mildew, yeast, or Spore(s) or toxins emanating therefrom,

regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that bodily injury, property damage, personal and advertising injury, loss, cost or expense.

The DEFINITIONS section of the policy is amended by adding the following to the end thereof:

Fungus(i) includes, but is not limited to, any of the plants or organisms belonging to the major group Fungi, lacking chlorophyll, and including Molds, rusts, mildews, smuts, and mushrooms.

©All rights reserved.
*END 021*

**ENDORSEMENT #** 21    (Continued)

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

Mold(s) includes, but is not limited to, any superficial growth produced on damp or decaying organic matter or on living organisms, and Fungi that produce Molds.

Spore(s) means any dormant or reproductive body produced by or arising or emanating out of any Fungus(i), Mold(s), mildew, plants, organisms or microorganisms.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 021*

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

**AMEND CLAUSE 7, NOTICE/REPORTING PROVISION**

In consideration of the premium charged, it is hereby understood and agreed that Clause
7.NOTICE/REPORTING PROVISIONS is deleted in its entirety and replaced by the
following:

Notice hereunder shall be given in writing to:
c-Claims for Financial Lines
AIG Domestic Claims, Inc.
175 Water Street 9th Floor
New York, NY 10038
Fax: (866) 227-1750
E-Mail: c-claim@aig.com

      If mailed, the date of mailing shall constitute the date that such notice was given
      and proof of mailing shall be sufficient proof of notice.

(a)     The Company or the Insureds shall, as a condition precedent to the obligations of
        the Insurer under this policy, give written notice to the Insurer of a Claim made
        against an Insured as soon as practicable after the Insured's General Counsel,
        Treasurer or CFO (or if no such position exists, then such equivalent position) first
        becomes aware of the Claim, but in all events no later than either:

        (1)     anytime during the Policy Period or during the Discovery Period (if
              applicable); or
        (2)     within 90 days after the end of the Policy Period or the Discovery Period (if
              applicable).

(b)     If written notice of a Claim has been given to the Insurer pursuant to Clause 7(a)
        above, then a Claim which is subsequently made against the Insureds and reported
        to the Insurer alleging, arising out of, based upon or attributable to the facts alleged
        in the Claim for which such notice has been given, or alleging any Wrongful Act
        which is the same as or related to any Wrongful Act alleged in the Claim of which
        such notice has been given, shall be considered made at the time such notice was
        given.

(c)     If during the Policy Period or during the Discovery Period (if applicable) the
        Company or the Insureds shall become aware of any circumstances which may
        reasonably be expected to give rise to a Claim being made against the Insureds and
        shall give written notice to the Insurer of the circumstances and the reasons for
        anticipating such a Claim, with full particulars as to dates, persons and entities
        involved, then a Claim which is subsequently made against the Insureds and

©All rights reserved.
***END 022***

**ENDORSEMENT#** 22    (Continued)

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

> reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 022*

ENDORSEMENT# 23

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### AMEND CLAUSE 8

In consideration of premium charged, it is hereby understood and agreed that Clause 8.
DEFENSE COSTS, SETTLEMENTS AND JUDGEMENTS (INCLUDING THE ADVANCEMENT
OF DEFENSE COSTS) is deleted in its entirety and replaced by the following:

**8.    DEFENSE COSTS, SETTLEMENTS AND JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)**

The Insurer shall advance, at the written request of the Insured, Defense Costs prior to the final disposition of the Claim. Such advance payments by the Insurer shall be repaid to the Insurer by the Insured, severally according to their respective interests, in the event and to the extent that the Insured shall not be entitled under the terms and conditions of this policy to payment of such Loss.

The Insurer does not, however, under this policy, assume any duty to defend. The Insureds shall defend and contest any Claim made against them. The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim.

The Insurer shall have the right to effectively associate with the Insureds in the defense of any Claim that appears reasonably likely to involve the Insurer, including but not limited to negotiating a settlement. The Insureds shall give the Insurer full cooperation and such information as it may reasonably require.

If the Insurer recommends a settlement within the policy's applicable Limit of Liability which is acceptable to the claimant (a "Settlement Opportunity"), the Insureds must consent to such settlement within thirty (30) days of the date the Insureds are first made aware of the Settlement Opportunity, or in the case of a Settlement Opportunity which arises from a settlement offer by the claimant, then within the time permitted by the claimant to accept such settlement offer, but in all events no later than thirty (30) days after the settlement offer was made.

©All rights reserved.
### *END 023*

ENDORSEMENT# 23    (Continued)

This endorsement, effective *at 12:01AM September 01, 2020*          forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

However, if a Settlement Opportunity arises and the Insureds do not consent to the settlement within the time frame described above, the retention amount shall remain the applicable amount set forth in Item 4 of the Declarations even if consent is given to a subsequent Settlement Opportunity.

Furthermore, in the event the Insureds do not consent to the Settlement Opportunity within the time frame described above, then, subject to the applicable limit of liability, the Insurer's liability for all Loss on account of such Claim shall not exceed: (1) the amount for which the Insurer could have settled such Claim plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer ("Settlement Opportunity Amount"), plus (2) 95% of covered Loss in excess of such Settlement Opportunity Amount, it being a condition of this insurance that the remaining 5% of such Loss excess of the Settlement Opportunity Amount shall be carried by the Company and the Insureds at their own risk and be uninsured.  Notwithstanding the foregoing, this paragraph shall not apply unless the Settlement Opportunity Amount exceeds the retention amount stated in Item 4 of the Declarations.


ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS OF THE POLICY REMAIN
UNCHANGED.


_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 023*

**ENDORSEMENT# 24**

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### AMEND CLAUSE 11, CANCELLATION

### (NON-PAYMENT OF PREMIUM)

In consideration of the premium charged, it is hereby understood and agreed that Clause
**11. CANCELLATION CLAUSE** (and any endorsement amending such **CANCELLATION
CLAUSE**, including but not limited to any state cancellation/non-renewal amendatory
endorsement attached to this policy), is deleted in its entirety and replaced with the
following:

B.    **CANCELLATION CLAUSE**

This policy may not be canceled by the Named Insured, or its agent, any
Insured or the Insurer, except as indicated below.

This policy may be canceled by or on the behalf of the Insurer only in the
event of non-payment of premium by the Named Insured.  In the event of
non-payment of premium by the Named Insured, the Insurer may cancel this
policy and this policy shall be null and void *ab initio*. The Insurer shall cancel
this policy by delivering to the Named Insured or by mailing to the Named
Insured, by registered, certified, or other first class mail, at the Named
Insured's address as shown in Item 1 of the Declarations, written notice of
its cancellation.  The mailing of such notice as aforesaid shall be sufficient
proof of notice.

If any period of limitation relating to the giving of notice for cancellation due
to non-payment of premium is set forth in any law controlling the
construction thereof, notice of cancellation as provided above will be given
in compliance with such controlling law.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.

*END 024*

**ENDORSEMENT #** 25

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## AMEND CLAUSE 14. OTHER INSURANCE AND INDEMNIFICATION

In consideration of the premium charged, it is hereby understood and agreed that Clause
14. **OTHER INSURANCE AND INDEMNIFICATION** is deleted in its entirety and replaced
with the following:

   Such insurance as is provided by this policy shall apply only as excess over:

   1)      any other valid and collectible insurance, unless such other insurance is
           written only as specific excess insurance over the Limit of Liability provided
           by this policy. Accordingly, such insurance as is provided by this policy shall
           apply    only    as    excess    over    Mortgage    Impairment    Policy    No.
           B1180D170001/007 and B111SP171623, issued by Lloyd's Underwriters
           to First Hawaiian Bank, or any renewals thereof; and

   2)      any indemnification from any customer or client of the Company ("Customer
           Indemnification") which the Insured has actually received. With respect to
           Customer Indemnification which is not paid by such indemnitor, this policy
           shall pay such Loss as is otherwise covered under this policy, however, the
           Insureds agree as a condition for such payment to provide whatever
           assistance and cooperation is required by the Insurer to enforce the Insurer's
           rights as subrogee.


   ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 025*

ENDORSEMENT # 26

This endorsement, effective *at 12:01AM September 01, 2020*          forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiïan Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## AMEND CLAUSE 17, DISPUTE RESOLUTION

In consideration of the premium charged, it is hereby understood and agreed that the
policy is hereby amended as follows:

> Include San Francisco, California and Los Angeles, California in the last paragraph
> of Clause 17, Alternate Dispute Resolution Process.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 026*

ENDORSEMENT# 27

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### AMEND RETENTION OF CERTAIN PROFESSIONAL SERVICES

In consideration of the premium charged, it is hereby understood and agreed that any Claim arising solely out of any 'PROFESSIONAL SERVICE' by the Company for any customer or client of the Company in the following designated areas or capacities:

    a)    Fiscal or paying agent, or tax withholding agent;
    b)    Custodian or depository, or a managing agent for securities or money;
    c)    Escrow agent;
    d)    Wire transfer agent;
    e)    Notary public;
    f)    Sale of travelers checks, certified checks or money orders;
    g)    Administration or sale of credit cards or credit card services;
    h)    Real estate broker or agent;
    i)    Electronic data processing services, data collection services or acting as a custodian for database or sensitive information stored electronically;
    j)    Performing securities safekeeping services for its member and non-member institutions.

The retention amount listed on ITEM 4., RETENTION, is amended by the following:

    Judgements, Settlements and Defense Costs
    (Company and Indemnifiable Loss)                $250,000

    ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
### END 027

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### INSURANCE BROKER/AGENT ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that:

1.  With respect to the Insured's Professional Services as an insurance broker or agent,
    the Insurer shall not be liable to make any payment for Loss in connection with any
    Claim made against an Insured:

    a)  arising out of, alleging, or in any way involving, directly or indirectly, the
        insolvency, receivership, bankruptcy, liquidation or financial inability to pay of any
        Insurance Company; provided, however, this exclusion shall not apply if the
        insurance company in which the Insured has placed or obtained any insurance had
        a A.M. Best rating of B+ or better at the time of original placement and at each
        renewal thereof;

    b)  arising out of, alleging, or in any way involving, directly or indirectly, the
        commingling of funds or accounts, nor to any Claim for sums received by any
        Insured or credited to any Insured's account, nor to any Claim for fees, premiums,
        taxes, commissions or brokerage monies;

    (c) brought by or on behalf of any insurance company or its successors or assigns
        arising out of such business for which any Insured was a Managing General Agent
        of such insurance company;

    (d) arising out of, alleging, or in any way involving, in fact, any actual or alleged refusal
        or intentional failure to pay or intentional delay in paying all or part of benefits due
        or alleged to have been due under any insurance contract or from any benefit plan
        if such refusal or intentional failure to pay or intentional delay in paying all or part of
        benefits due or alleged to have been due under any insurance contract or from any
        benefit plan is determined by final adjudication;

    (e) arising out of, alleging, or in any way involving, in fact, a lack of good faith or fair
        dealing in the handling of any Claim or obligation rising out of or under any
        insurance contract of from any benefit plan if such lack of good faith or fair dealing
        in the handling of any Claim or obligation rising out of or under any insurance
        contract of from any benefit plan is determined by final adjudication;

    (f) arising out of or connected with the performance or failure to perform services for
        any person or entity:

        (i)     which is owned by or controlled by any Insured, or

©All rights reserved.

*END 028*

**ENDORSEMENT #** 28    (Continued)

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

> (ii)    which owns or controls any Insured; or
>
> (iii)   which is affiliated with any Insured through any common ownership or control; or,
>
> (iv)   in which any Insured is a director, officer, partner, or principal stockholder;

however, this exclusion shall not apply to any Claim brought by a Natural Person Insured or brought by any business enterprise operated, managed or owned by such Natural Person Insured as long as such Claim is brought solely in such claimant's capacity as a customer or client of the Company and is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any other Insured;

2. As used herein, "Managing General Agent" means one who acts as an agent of an insurance company and whose authority goes beyond those of an ordinary insurance agent to include authority to manage all or part of the insurance business of such insurance company.   Such authority may include, but is not limited to, the management of a separate division, department or underwriting office, sub-line or class of business, whether or not limited geographically, whether or not having authority to appoint sub-agents or accept sub-production business, and whether or not having authority to cede or assume reinsurance on behalf of such insurance company.

3. In this endorsement, "Insurance Company" means insurers existing in any form, e.g. stock, mutual, Lloyd's, etc.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 028*

ENDORSEMENT # 29

This endorsement, effective *at 12:01AM September 01, 2020*                          forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### INSURANCE E&O EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that solely with respect to claims against BNP Paribas and its subsidiaries (other then Bancwest Corporation and its subsidiaries) SECTION 4. EXCLUSIONS is amended by adding the following at the end thereof:

(gg)    for premiums, return premiums, tax monies, fees or commissions, or that portion of any settlement or award in an amount equal to such fees, commissions or other compensation, or arising out of any commingling of funds;

(hh)    arising from, based upon, attributable to, or in any way involving the failure to establish or the inadequacy or inaccuracy of reserves;

(ii)    by any reinsurer of the Insured;

(jj)    arising from, based upon, attributable to, or in any way involving the insolvency, conservatorship, receivership, bankruptcy, liquidation or inability of the Insured to pay claims or perform Professional Services;

(kk)    arising from, based upon, attributable to, or in any way involving any Claim by, or on behalf of, or for the benefit of, or with the solicitation or assistance of:

(1)    any pool, association or syndicate (including any officer, director or employee thereof) in which the Insured is a participant; or
(2)    any participant (including any officer, director or employee thereof) in any pool, association or syndicate in which the Insured is a participant;

(ll)    for any obligation for which the Insured, or any carrier as its insurer, may be held liable under any workers' compensation, unemployment compensation, disability benefits law, or under any similar law;

(mm)    arising from, based upon, attributable to, or in any way involving the underwriting or marketing of any insurance policy or annuity, or any other insurance or investment product;


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED


_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 029*

PageID.76

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## MORTGAGE BANKING ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that with respect to the Professional Service of Acting as a Mortgage Broker, Clause IV of the policy, EXCLUSIONS, is amended, in part, by adding the following exclusions.

u)    arising out of any defect in title not disclosed of public record or of which such defect in title any Insured has actual or constructive knowledge at the date of issuance of insurance of such title;

v)    arising out of the guaranteeing of the availability of funds, or of guaranteeing a specified rate of return and/or interest;

w)    arising out of the failure of any real or personal property to have at any point or points in time any projected, estimated, represented, warranted or guaranteed economic value;

x)    arising out of or connected with the performance or failure to perform services for any person or entity which: (i) is owned by or controlled by any Insured: or (ii) owns or controls any Insured: or (iii) is affiliated with any Insured through any common ownership or control; or (iv) any Insured is a director, officer, partner or principal stockholder;

       however, this exclusion shall not apply to any Claim brought by a Natural Person Insured or brought by any business enterprise operated, managed or owned by such Natural Person Insured as long as such Claim is brought solely in such claimant's capacity as a customer or client of the Company and is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any other Insured;

y)    arising out of, based upon, alleging or in any way involving either directly or indirectly an earthquake, volcanic eruption, subterranean fire or any like disturbance of nature;

z)    arising out of, alleging, or in any way involving, directly or indirectly any security holder's/investor's interest in securities/obligations backed by mortgage loans,

©All rights reserved.
*END 030*

**ENDORSEMENT#** 30    (Continued)

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

      including but not limited to, mortgage backed securities, mortgage pass-through certificates and/or Collateralized Mortgage Obligations;

aa)    arising out of : (i) any transaction involving a loan funded in whole or in part with Insured's own funds; or (ii) any transaction in which any Insured has a financial interest as a buyer or real property;

bb)    arising the promoting of, syndication of, offering of or selling of any interest in any limited partnership:

cc)    arising out of or in any way involving (i) any transaction in which any Insured has a financial interest as a buyer or seller of real property; or (ii) any loan or loans that have been sold by the Insured which have been repurchased or are required to be repurchased by the Insured.

For the purpose of this endorsement, Mortgage Banker shall not include Customer Loan Officers of the Insured.

    ALL OTHER TERMS AND CONDITIONS OF THE POLICY SHALL REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 030*

ENDORSEMENT# 31

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## SECURITIES BROKER/DEALER ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim:

a)  arising out of any actual or alleged performance or failure to perform services for any Insured or for any parent, affiliate or subsidiary or any Insured, unless bringing suit as a customer;

b)  arising out of any function of any Insured as a specialist or market maker for any securities or arising out of failing to make a market for any securities;

c)  arising out of the actual or alleged inability to make any payment by any bank or banking firm or broker or dealer in securities or commodities;

d)  brought by or on behalf of any clearing agent or clearing agency; or alleging, arising out of, based upon or attributable to any function of any Insured as a clearing agency.

e)  alleging, arising out of, based upon or attributable to any bankruptcy, insolvency, conservatorship, receivership or liquidation of, or suspension of payment or refusal or inability to pay or perform Professional Services by any broker or dealer in securities or commodities, clearing agency, or any bank or banking firm, or any insurance or reinsurance entity or any Insured; provided, however, this exclusion will not apply to Wrongful Acts solely in connection with any Insured's investment on the behalf of the claimant in the stock of any of the foregoing entities;

f)  alleging, arising out of, based upon or attributable to the purchase or sale of (or failure to purchase or sell) any of the following, or any advice in connection therewith:

   1)  commodities, futures contracts, forwards contracts, derivatives or any type of option or futures contract, or any similar investment or investment product, with the exception of any commodities, futures contracts, forward contracts, derivatives or any type of option or futures contract, or any similar investment or investment product traded on a regulated exchange; or
   2)  any collectible, including but not limited to stamps, art, cards, jewelry, antiques or any other tangible personal property; or
   3)  promissory notes, i.e. an investment whereby the maker agrees to pay to the payee a specific sum of money either on demand or at fixed or determinable future date; or
   4)  viatical products including viatical settlement and viatical contracts; or
   5)  callable certificates of deposit; or
   6)  leases (including but not limited to ETS Pay Phones)

©All rights reserved.
### END 031

ENDORSEMENT# 31    (Continued)

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

      7)  callable certificates of deposit; or
      8)  leases (including but not limited to ETS Pay Phones)
      however, this exclusion shall not apply to any Claim related to Market-Linked
      Certificates of Deposit or Structured Notes;

g)  alleging, arising out of, based upon or attributable to rendering of or failure to render
any of the following services or activities:

      1)  accounting,
      2)  actuarial
      3)  legal,
      4)  real estate agent or broker, or
      5)  tax preparation or appearing before the Internal Revenue Service as an enrolled
      agent;

h)  for any actual or alleged Wrongful Act in rendering or failure to render Professional
Services to any securities broker/dealer; however this exclusion shall not apply if the
Professional Service is solely the purchase or sale of securities to such broker/dealer
for its own account;

i)  alleging, arising out of, based upon or attributable to any liability assumed by the
Insured under any indemnification contract or agreement, either oral or in writing;
however, this exclusion does not apply to liability that would exist in the absence of
such contract or agreement;

j)  arising out of, based upon, or attributable to a "Trade Error Correction";

For purposes of this endorsement, a "Trade Error Correction" is defined as any actual or
alleged act, error or omission by the Company, any director, officer, partner or employee
thereof, or by any "Registered Representative" in connection with the clearance,
settlement or execution of trades.

Solely for purposes of this endorsement, "Market-Linked Certificates of Deposit" shall
mean any certificate of deposit that is linked to the performance of one or more securities
or market indexes.

      ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS SHALL REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 031*

This endorsement, effective *at 12:01AM September 01, 2020*            forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

**SELLING AWAY EXCLUSION**

There shall be no coverage for the "Registered Representative" or the Insured for any "Security Broker Dealer Claim" based upon, arising out of, or attributable to any activity which is not an "Approved Activity".

"Security Broker Dealer Claim" shall mean any Claim first made against the Insured during the Policy Period or the Discovery Period (if applicable) and reported in writing to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act of any Insured in the rendering or failure to render "Securities Broker/Dealer Services".

The term "Securities Broker/Dealer Services" as used in this endorsement shall mean the following services if rendered in connection with an "Approved Activity" for or on the behalf of a customer or client of the Insured pursuant to a written agreement between the Insured and the customer or client:

(1)     purchase or sale of securities, including investment companies,

(2)     purchase or sale  of annuities or variable annuities,

(3)     purchase or sale of life or accident and health insurance,

(4)     providing brokerage services for  individual retirement accounts (IRA's), Keogh retirement plans and employee benefit plans (other than multiple employer or multi-employee welfare arrangements),

(5)     services performed as a registered investment advisor but only if and to the extent such coverage is afforded under this policy; and in connection with or incidental to any of the foregoing 5 activities:

  i)     providing economic advice, financial advice or investment advisory services, or

  ii)     providing financial planning advice including without limitation any of the following activities in conjunction therewith: the preparation of a financial plan or personal financial statements, the giving of advice relating to personal risk management, insurance, savings, investments, retirement planning or taxes.

Its further understood and agreed that solely with respect to a Security Broker Dealer Claim, the first paragraph of Clause 8 DEFENSE COSTS, SETTLEMENTS AND

©All rights reserved.
*END 032*

ENDORSEMENT# 32    (Continued)

This endorsement, effective *at 12:01AM September 01, 2020*                   forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS) is deleted in its
entirety and replaced by the following:

> Upon receipt by the Insurer of a copy of the written approval by the Insured of the
> activity which forms the basis of the Securities Broker/Dealer Services alleged in
> any Security Broker Dealer Claim the Insurer shall advance, at the written request
> of the Insured, Defense Costs prior to the final disposition of the Security Broker
> Dealer Claim. Such advance payments by the Insurer shall be repaid to the Insurer
> by the Insured, severally according to their respective interests, in the event and to
> the extent that the Insured shall not be entitled under the terms and conditions of
> this policy to payment of such Loss.

For purposes of this endorsement the following definitions shall apply:

"Approved Activity" means a service or activity performed by the Registered
Representative on behalf of the Insured which:

1)    has been approved in writing by the Insured to be performed by the
      Registered Representative, and is

2)    in connection with the purchase or sale of a specific security, annuity or
      insurance product which has been approved in writing by the Insured to be
      transacted through the Registered Representative, and for which the
      Registered Representative has obtained all licenses required by the Insured
      or applicable law or regulation.

"Registered Representative" means an individual who is registered with the National
Association of Securities Dealers, Inc., including a registered principal, or an individual
who maintains appropriate insurance licenses, and who for compensation engages in
the business of rendering Securities Broker/Dealer Services on behalf of the Insured.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 032*

ENDORSEMENT # 33

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

**PROFESSIONAL SERVICE**

In consideration of the premium charged, it is hereby understood and agreed that the term "PROFESSIONAL SERVICES" shall include services rendered or required to be rendered, for compensation, by the Company for any customer or client of the Company in the following designated areas or capacities:

1.       Acting as a securities broker/dealer for the account of others;

LIMIT OF LIABILITY

|  |  |
|---|---|
| For Damages arising from the same, | |
| related or repeated Wrongful Act(s) | $3,500,000 |
| Aggregate | $10,000,000 |
| Retention | $1,000,000 |

It is further understood and agreed that in the event of a claim involving more than one of the Professional Services, the highest retention listed above for any of the Professional Services involved in the Claim shall apply.

It is further understood and agreed that in the event of a claim involving more than one of the Professional Services for damages arising from the same, related or repeated Wrongful Act(s), only one such limit of liability as stated above shall apply, which shall be the highest of the above stated limits of liability.

It is further understood and agreed that such Professional Services shall be subject to the Limits of Liability and Retentions stated herein and that in no event shall such Limits of Liability be deemed to increase the Insured's aggregate Limit of Liability of $10,000,000.


      ALL OTHER TERMS, CONDITIONS AND EXCLUSION REMAIN UNCHANGED.

_____
                                                            AUTHORIZED REPRESENTATIVE

©All rights reserved.
                              *END 033*

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## LENDER LIABILITY EXTENSION

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

### I.

Clause 4., EXCLUSIONS (n), is deleted in its entirety.

### II.

Clause 2., DEFINITIONS (f), "Loan Servicing", is deleted in its entirety.

### III.

Clause 2., DEFINITIONS, is amended by addition of the following at the end thereof:

(l)     "Classified Loan" shall mean:

    (i)     any loan, or transaction in the nature of a loan or extension of credit, which at the time such Claim is made, or which at any time prior to the time such Claim is made, is or has been designated as substandard, doubtful or loss by any applicable state and/or federal regulatory or supervisory agency or authority; or

    (ii)    any false or genuine note, account, agreement, invoice, or other evidence of debt assigned or sold, discounted or otherwise acquired, whether or not involving the Company as lender or borrower, and whether procured in good faith or through fraud, artifice or false pretense, which at the time such Claim is made, or which at any time prior to the time such Claim is made, is or has been designated as substandard, doubtful or loss by any applicable state and/or federal regulatory or supervisory agency or authority.

(m)    "Lending Act" means any act performed by an Insured for:

    (i)     a customer or client of the Company relating to an extension of credit, a refusal to extend credit or an agreement to extend credit, or,

    (ii)    The servicing of any loan, lease or extension of credit, including but not limited to: record keeping, billing and disbursements of principal

©All rights reserved.
*END 034*

**ENDORSEMENT** # 34    (Continued)

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

> and interest, insurance premium and taxes, determination of the depreciation amounts for leased property (but not for projections of or an appraisal for residual value of leased property). Loans shall include all types of consumer or commercial lending activity, including consumer finance, commercial finance, consumer banking and mortgage banking (including mortgage backed securities or other securities representing pooled assets) except financing for Leveraged Buy-outs

> (n)    "Past Due Loan" shall mean:
>    (i)    any loan, or any transaction in the nature of a loan or extension of credit, which at the time such Claim is made, or which at any time prior to the time such Claim is made, is or has been more than ninety (90) days delinquent in repayment according to its terms; or
>    (ii)    any false or genuine note, account, agreement, invoice, or other evidence of debt assigned or sold, discounted or otherwise acquired, whether or not involving the Company as lender or borrower, and whether procured in good faith or through fraud, artifice or false pretense, which at the time such Claim is made, or which at any time prior to the time such Claim is made, is or has been more than ninety (90) days delinquent in repayment according to its terms.

The following exclusions shall only apply with respect to any Insured's performance of **Lending Acts**.

The Insurer shall not be liable to make any payment for Loss in connection with any Claim or Claims made against any Insured:

> for the principal and/or interest of any unrepaid, unrecoverable or outstanding credit; provided, however, this exclusion shall not apply to such principal and/or interest if:
>    1.    the Insured is legally accountable for a borrower's financial losses relating, directly or indirectly, to actions taken by the Insured with respect to such extension of credit ("lender liability"); and
>
>    2.    principal and/or interest is part of the overall damages awarded to the borrower.

> arising out of, alleging or in any way involving, directly or indirectly any extension of credit which was, at the time of its making, in excess of the legal lending limit of the Company; however, this exclusion shall not apply to Claims which fail to allege

©All rights reserved.
*END 034*

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

> that damages were incurred as a direct result of the Company's conduct of exceeding its legal lending limit;

> arising out of, alleging or in any way involving, directly or indirectly, any in fact willful violation of laws or regulations relating to extensions or denials of credit, including, but not limited to, truth-in-lending or usury laws or regulations when established through final adjudication the Insured willfully and intentionally violated such laws or regulations;

> arising out of, alleging or in any way involving, directly or indirectly any Past Due Loans or Classified Loans as of <u>09/01/2009</u>.

Furthermore, it is understood and agreed that with respect to the aforementioned professional service, Item 3, LIMIT OF LIABILITY and Item 4, RETENTION and COINSURANCE, of the DECLARATIONS are hereby amended to read as follows:

**ITEM 3**.   LIMIT OF LIABILITY:   $<u>10,000,000</u>   Single Loss Limit of Liability (including Defense Costs)

                                   $<u>10,000,000</u>   aggregate for all Loss (Including Defense Costs)

**ITEM 4**.   RETENTION and COINSURANCE
             (for loss arising from Claims alleging the same Wrongful Act or related Wrongful Acts)

             Judgments, Settlements and Defense Costs:

                    $<u>5,000,000</u> Retention Amount


   ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 034*

ENDORSEMENT # 35

This endorsement, effective at *12:01AM September 01, 2020*                     forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### PENDING & PRIOR LITIGATION EXCLUSION - LENDER LIABILITY - 09/01/2009

In consideration of the premium charged, it is hereby understood and agreed that, solely with respect to the Limit of Liability $10,000,000 for any Lending Act, the Insurer shall not be liable to make any payment for Loss in connection with any Claim(s):

    (1)    arising out of or in any way involving any lending act, error or omission which was committed prior to the inception date of this policy, if the Chief Executive Officer, Chief Financial Officer, General Counsel, and/or Head of Compliance of the Named Insured, as of 9/1/2009, had knowledge of any lending act, error or omission which could reasonably be expected to result in a Claim; or

    (2)    arising out of or alleging any pending or prior litigation as of 09/01/2009, or alleging or derived from the same or essentially the same facts or the same or related Wrongful Act as alleged or contained in such pending or prior litigation.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.

*END 035*

**ENDORSEMENT # 36**

This endorsement, effective *at 12:01AM September 01, 2020*                 forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### EXCLUSION Q AMENDED

In consideration of the premium charged, it is hereby understood and agreed that Clause **4.** EXCLUSIONS, PARAGRAPH (q) shall be deleted in its entirety and replaced with the following:

(q)    alleging, arising out of, based upon or attributable to, or in any way involving, directly or indirectly, any Investment Banking or market maker activities, including but not limited to any disclosure requirements in connection with the foregoing.  Provided, however, that this exclusion shall not apply to exclude coverage for any "Lending Act" as defined in Definition (m)(i) of Endorsement number 34 to this policy (Lender Liability Extension)


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 036*

ENDORSEMENT # 37

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## AMENDATORY CLARIFICATION ENDORSEMENT

### (MOST FAVORABLE)

In consideration of the premium charged, it is hereby understood and agreed that in the event that there is an inconsistency between a state amendatory or supplement attached to this policy and any term or condition of this policy, then it is understood and agreed that, where permitted by law, the Insurer shall apply those terms and conditions of either the amendatory or supplement or the policy which are more favorable to the Insured.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 037*

ENDORSEMENT# 38

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

**AMEND EXCLUSION (M) BANKRUPTCY/INSOLVENCY OF OUTSIDE SERVICE PROVIDER
EXCLUSION**

In consideration of the premium charged, it is hereby understood and agreed that
notwithstanding any other provision of this policy (including any endorsement attached
hereto whether such endorsement precedes or follows this endorsement in time or
sequence), Clause 4. EXCLUSIONS, is amended by deleting Exclusion (m) in its entirety
and replacing it with the following:

> (m)    alleging, arising out of, based upon or attributable to the bankruptcy,
> insolvency, conservatorship, receivership or liquidation of, or suspension of
> payment by, any broker or dealer in securities or commodities, or any bank
> or banking firm, or any insurance or reinsurance entity, investment company
> or investment banker or any Insured; provided, however, this exclusion will
> not apply to Loss which the Insured becomes legally obligated to pay by
> reason of any Claim for any Wrongful Act in the rendering or failure to
> render professional services.

_____
                                    AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 038*

ENDORSEMENT# 39

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## SETTLEMENT OF CLAIMS

In consideration of the premium charged, it is hereby understood and agreed that in Clause
**8. DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF
DEFENSE COSTS)**, the second paragraph is deleted in its entirety and replaced with the
following:

> The Insurer does not, however, under this policy, assume any duty to defend. The
> Insureds shall defend and contest any Claim made against them. The Insureds shall
> not admit or assume any liability, enter into any settlement agreement, stipulate to
> any judgment, or incur any Defense Costs without the prior written consent of the
> Insurer; provided, however, if all Insured defendants are able to dispose of all
> Claims which are subject to one Retention (inclusive of Defense Costs) for an
> amount not exceeding $250,000 then the Insurer's consent shall not be required
> for such disposition. Only those settlements, stipulated judgments and Defense
> Costs which have been consented to by the Insurer shall be recoverable as Loss
> under the terms of this policy. The Insurer's consent shall not be unreasonably
> withheld, provided that the Insurer shall be entitled to effectively associate in the
> defense and the negotiation of any settlement of any Claim.

AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 039*

ENDORSEMENT # 40

This endorsement, effective at *12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## ADDITIONAL INSURED ENDORSEMENT

## (VICARIOUS LIABILITY AND CO-DEFENDANT COVERAGE)

In consideration of the premium charged, it is hereby understood and agreed that that in
Clause 2. DEFINITIONS, paragraph  (d) "Insured" is  amended to  include the below  listed
"**ADDITIONAL INSUREDS**" (the "Additional Insured"):

### ADDITIONAL INSUREDS

1)    any person or entity who performs Professional Services on behalf of the
Company and for whom the Company is legally liable; and
2)    any independent contractor of the Company who performs Professional
Services on behalf of the Company and for whom the Company is legally
liable;

Notwithstanding the foregoing, coverage as provided by this endorsement shall only apply
with respect to a Claim made against the Additional Insured that:

1)    relates to a Wrongful Act committed by or on behalf an Insured (other than
the Additional Insured); and
2)    an Insured (other than the Additional Insured) is and remains a defendant in
the action along with such Additional Insured.

In no event shall coverage be provided for any independent Wrongful Act of the Additional
Insured.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 040*

ENDORSEMENT# 41

This endorsement, effective *at 12:01AM September 01, 2020*        forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## SPECIFIC ENTITY EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable for any Loss in connection with any Claim brought against any BNP Paribas USA Inc (other than First Hawaiian Inc. f.k.a. Bancwest Corporation and its Subsidiaries) or Claims brought by BNP Paribas USA Inc (other than First Hawaiian Inc. f.k.a. Bancwest Corporation and its Subsidiaries) or customers of BNP Paribas USA Inc (other than First Hawaiian Inc. f.k.a. Bancwest Corporation and its Subsidiaries) in their capacity as such.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.

*END 041*

ENDORSEMENT # 42

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## LOSS PAYEE ENDORSEMENT

### (FANNIE MAE)

In consideration of the premium charged, it is hereby understood and agreed that any payment in satisfaction of Loss of First Hawaiian Bank affecting the interest of the Federal National Mortgage Association, its successors and assigns (the "Loss Payee") shall be paid by an instrument issued to the Loss Payee and the Insured as joint loss payees, subject to the following conditions and limitations:

a.    the attached policy is for the sole use and benefit of the Insured as expressed herein; the Loss Payee named above shall not be considered an Insured under the policy, and shall not otherwise have any rights or benefits under said policy;

b.    should this bond be canceled, reduced, non-renewed or restrictively modified by the Underwriter, the Underwriter will endeavor to notify the Loss Payee within thirty (30) business days, but failure to do so shall not impair or delay the effectiveness of any such cancellation, reduction, non-renewal or restrictive modification, nor shall the Underwriter be held liable in any way.

c.    should this bond be canceled, reduced, non-renewed or restrictively modified by the Named Insured, the Underwriter will endeavor to notify the Loss Payee within ten (10) business days, but failure to do so shall not impair or delay the effectiveness of any such cancellation, reduction, non-renewal or restrictive modification, nor shall the Underwriter be held liable in any way.

d.    notwithstanding any payment made pursuant to the terms of this endorsement or the execution of more than one of such similar endorsements, the amount paid for any one Loss or otherwise in accordance with the terms, conditions and limitations of this policy shall be part of, and not in addition to, the Limit of Liability stated in the Declarations of this policy and in no way shall serve to increase the Limit of Liability as therein stated.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 042*

ENDORSEMENT# 43

This endorsement, effective *at 12:01AM September 01, 2020*          forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### TIE-IN OF LIMITS ENDORSEMENT

### (COMMON CLAIMS)

In consideration of the premium charged it is hereby understood and agreed that as respects any Claim (and/or all related Claims) for any Wrongful Act committed or allegedly committed prior to 09/01/2016 in which at least one person/entity claimed against is an Insured under this policy, and at least one person/entity claimed against is an insured under the Broad Form BPL Insurance Policy No 01-708-20-37, (or any renewal or replacement of such policy or any policy which succeeds it in time) ("Other AIG Policy"), issued by the Insurer to Bancwest Holding Inc., the combined aggregate limit of liability under both policies for all Loss arising from such Claims combined shall be $10,000,000. This limitation shall apply even if both policies have been triggered due to a Claim made against the same person/entity but alleging Wrongful Acts both in his/her/its capacity as an insured under the other policy and as an Insured under this policy.

Nothing in this endorsement shall be construed to increase the Insurer's Limit of Liability under this policy as stated in the Declarations of this policy, which shall remain $10,000,000.

It is further understood and agreed that in the event such a Claim triggers a Retention Amount both under this policy and also under the Other AIG Policy, the applicable Retention Amounts under each policy will be applied separately to each part of such Claim, but the sum of such Retentions Amount shall not exceed the largest applicable Retention Amount.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 043*

ENDORSEMENT# 44

This endorsement, effective at *12:01AM September 01, 2020*              forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## VICARIOUS LIABILITY EXTENSION

In consideration of the premium charged, it is hereby understood and agreed that the Definition of "Company" is amended to include the below listed "Additional Insured(s)", but solely with respect to Claims brought against the Additional Insured(s) for the Wrongful Act(s) of an Insured (other than the Additional Insured(s) or any Natural Person Insured thereof).

### <u>ADDITIONAL INSURED(S)</u>

    BancWest Corporation (fka BWC Holding Inc.) and its subsidiaries (other than First Hawaiian Inc. and its subsidiaries)

In no event shall coverage be provided under this policy for any independent Wrongful Act(s) of the Additional Insured(s) or any Natural Person Insured thereof.


    ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 044*

**ENDORSEMENT# 45**

This endorsement, effective at *12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## COMPANY DEFINITION AMENDED

In consideration of the premium charged, it is hereby understood and agreed that this policy is amended as follows:

1.    In Clause 2. DEFINITIONS of this policy, the definition of "Company" is deleted in its entirety and replaced with the following:

    (b)    "Company" means the Named Insured designated in Item 1 of the Declarations and any Subsidiary thereof, any entity General Partner and any FHI Business.

2.    Clause 2. DEFINITIONS of this policy is amended by adding the following definitions at the end thereof:

    (CD-1)    "BWHI Business" means: (i) the business and operations of Bank of the West and its subsidiaries; and (ii) the business and operations of BancWest Corporation prior to the Separation Time as a standalone entity; that are not related to the business and operations of First Hawaiian Bank or any subsidiaries thereof.

        It is further understood and agreed that for the purposes of this policy, BWHI Business is not and has never been a part of FHI Business.

    (CD-2)    "FHI Business" means: (i) the business and operations of First Hawaiian Bank and its subsidiaries; and (ii) the business and operations of BancWest Corporation prior to the Separation Time as a standalone entity; related solely to the business and operations of First Hawaiian Bank or any subsidiaries thereof.

        It is further understood and agreed that for the purposes of this policy, FHI Business is not and has never been a part of BWHI Business.

    (CD-3)    "Separation Time" means the "Separation Time" as defined in the "Master Reorganization Agreement" by and among BancWest Corporation, BancWest Holding Inc., BWC Holding, Inc. and BNP Paribas dated April 1, 2016.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.

***END 045***

This endorsement, effective *at 12:01AM September 01, 2020*                  forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### PROFESSIONAL SERVICE DEFINITION AMENDED TO INCLUDE SERVICES UNDER SPECIFIED CONTRACT

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1. In Clause 2. DEFINITIONS, the definition of "Professional Services," as amended by any other endorsement to this policy, is further amended by inserting the following at the end thereof:

   "Professional Services" also means and includes BancWest Services.

2. Clause 5. LIMIT OF LIABILITY-(FOR ALL LOSS-INCLUDING DEFENSE COSTS) is amended by inserting the following at the end thereof:

   Notwithstanding the foregoing:

   (a) the aggregate limit of the Insurer's Liability for all Loss arising out of any BancWest Services Claim is $2,500,000 (the "Per Claim BancWest Services Sublimit of Liability"). The Per Claim BancWest Services Sublimit of Liability is part of and not in addition to the Aggregate BancWest Services Claims Sublimit of Liability described below and the aggregate Limit of Liability stated in Item 3. of the Declarations; and

   (b) the aggregate limit of the Insurer's Liability for all Loss arising out of all BancWest Services Claims in the aggregate, regardless of the number of Claims, is $10,000,000 (the "Aggregate BancWest Services Sublimit of Liability"). The Aggregate BancWest Services Claims Sublimit of Liability is part of and not in addition to the aggregate Limit of Liability stated in Item 3. of the Declarations.

3. Clause 6. RETENTION and COINSURANCE CLAUSE is amended by inserting the following at the end thereof:

   Notwithstanding the foregoing, with respect to any BancWest Services Claim, the Insurer shall only be liable for the amount of Loss arising from such BancWest Services Claim which is in excess of a Retention Amount of $1,000,000. If more than one Retention Amount applies to a Claim, only the highest of such Retention Amount shall apply.

©All rights reserved.

### END 046

MNSCPT                                   1

**ENDORSEMENT #** 46   (Continued)

This endorsement, effective *at 12:01AM September 01, 2020*          forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

4.  Such insurance as is provided under this endorsement for any BancWest Services Claim shall apply only as excess of (a) any insurance provided under any valid and collectible insurance policy issued to any BancWest Entity; and (b) BancWest Indemnifiable Loss.

5.  Notwithstanding the foregoing, solely with respect to coverage as is otherwise afforded by virtue of this endorsement, the Insurer shall not be liable to make any payment for Loss in connection with any Claim brought by or on behalf of a BancWest Entity.

6.  The coverage otherwise afforded by this endorsement for any BancWest Services Claim as defined in subparagraph (2) of the definition of BancWest Services Claim shall only apply if a BancWest Entity is and remains a defendant in the action along with an Insured.

7.  As used in this endorsement:

    "BancWest Entity" means BancWest Investment Services, Inc. and its Subsidiaries.

    "BancWest Indemnifiable Loss" means any Loss which a BancWest Entity has indemnified or is permitted or required to indemnify an Insured pursuant to law or contract, including, without limitation, any indemnification required under the BancWest Investment Services Agreement, regardless of whether a BancWest Entity has actually provided such permitted or required indemnification.

    "BancWest Investment Services Agreement" means that certain Investment Services Agreement, dated November 4, 2003, between BancWest Investment Services, Inc. and First Hawaiian Bank as amended by amendments dated December 31, 2007 and January 1, 2011.

    "BancWest Services Claim" means any Claim alleging, arising out of, based upon or attributable to (1) BancWest Services; or (2) the BancWest Investment Services Agreement or any of the services contemplated to be provided by a BancWest Entity under the BancWest Investment Services Agreement; provided however, the term BancWest Services Claim shall not mean or include any Claim excluded or limited by paragraphs 5 or 6 of this endorsement.

©All rights reserved.
*END 046*

**ENDORSEMENT#** 46    (Continued)

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*


"BancWest Services" means the referral of any individual or entity by an Insured to
BancWest Entity for the provision by BancWest entity of those services described
under the BancWest Investment Services Agreement.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 046*

**ENDORSEMENT# 047**

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### ALTERNATIVE DISPUTE RESOLUTION PROCESS AMENDED

### (DELETE 120 DAY COOLDOWN, ADD 60 DAY COOL DOWN)

In consideration of the premium charged, it is hereby understood and agreed that in Clause 17. Alternative Dispute Resolution Process, the last two sentences of the fourth subparagraph are deleted in its entirety and replaced with the following:

In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the arbitrators' award shall not include attorneys' fees or other costs. In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least sixty (60) days shall have elapsed from the date of the termination of the mediation. In all events, each party shall share equally the expenses of the ADR.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.

*END 047*

ENDORSEMENT# 48

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### PROFESSIONAL SERVICE DEFINITION AMENDED TO INCLUDE SERVICES UNDER SPECIFIED CONTRACT

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1. In Clause 2. DEFINITIONS, the definition of "Professional Services," as amended by any other endorsement to this policy, is further amended by inserting the following at the end thereof:

   "Professional Services" also means and includes RJ Referral Services.

2. Clause 5. LIMIT OF LIABILITY-(FOR ALL LOSS-INCLUDING DEFENSE COSTS) is amended by inserting the following at the end thereof:

   Notwithstanding the foregoing:

   (a) the aggregate limit of the Insurer's Liability for all Loss arising out of any RJ Networking Agreement Claim is $2,500,000 (the "Per Claim RJ Sublimit of Liability").  The Per Claim RJ Sublimit of Liability is part of and not in addition to the Aggregate RJ Sublimit of Liability described below and the aggregate Limit of Liability stated in Item 3. of the Declarations; and
   (b) the aggregate limit of the Insurer's Liability for all Loss arising out of all RJ Networking Agreement Claims in the aggregate, regardless of the number of Claims, is $10,000,000 (the "Aggregate RJ Sublimit of Liability").  The Aggregate RJ Sublimit of Liability is part of and not in addition to the aggregate Limit of Liability stated in Item 3. of the Declarations.

3. Clause 6. RETENTION and COINSURANCE CLAUSE is amended by inserting the following at the end thereof:

   Notwithstanding the foregoing, with respect to any RJ Networking Claim, the Insurer shall only be liable for the amount of Loss arising from such RJ Networking Claim which is in excess of a Retention Amount of $1,000,000.  If more than one Retention Amount applies to a Claim, only the highest of such Retention Amount shall apply.

4. Such insurance as is provided under this endorsement for any RJ Networking Claim shall apply only as excess of (a) any insurance provided under any valid and collectible insurance policy issued to any RJ Entity; and (b) RJ Indemnifiable Loss.

5. Notwithstanding the foregoing, solely with respect to coverage as is otherwise afforded by virtue of this endorsement, the Insurer shall not be liable to make any payment for Loss in connection with any Claim brought by or on behalf of an RJ Entity.

©All rights reserved.

### *END 048*

**ENDORSEMENT #**48    (Continued)

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

6.  The coverage otherwise afforded by this endorsement for any RJ Networking Claim as defined in subparagraph (2) of the definition of RJ Networking Claim shall only apply if an RJ Entity is and remains a defendant in the action along with an Insured.

7.  As used in this endorsement:

    "RJ Entity" means Raymond James Financial Services, Inc. and its Subsidiaries.

    "RJ Indemnifiable Loss" means any Loss which an RJ Entity has indemnified or is permitted or required to indemnify an Insured pursuant to law or contract, including, without limitation, any indemnification required under the RJ Networking Agreement, regardless of whether an RJ Entity has actually provided such permitted or required indemnification.

    "RJ Networking Agreement" means that certain Non-Deposit Investment and Insurance Product and Brokerage Service Networking Agreement, dated December 24, 2016, between the Financial Institutions Division, Raymond James Financial Services, Inc. and First Hawaiian Bank.

    "RJ Networking Claim" means any Claim alleging, arising out of, based upon or attributable to (1)RJ Referral Services;  or (2) the RJ Networking Agreement or any of the services contemplated to be provided by an RJ Entity under the RJ Networking Agreement; provided however, the term  RJ Networking Claim shall not mean or include any Claim excluded or limited by paragraphs 5 or 6 of this endorsement.

    "RJ Referral Services" means the referral of any individual or entity by an Insured to RJ Entity for the provision by RJ entity of those services described under the RJ Networking Agreement.

    ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 048*

ENDORSEMENT# 49

This endorsement, effective *at 12:01AM September 01, 2020*                  forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## DEFENSE COSTS, SETTLEMENTS AND JUDGEMENTS

In consideration of the premium charged, it is hereby understood and agreed that Clause 8. DEFENSE COSTS, SETTLEMENTS AND JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS) is amended as follows:

1.  The first paragraph is deleted in its entirety and replaced with the following:

    The Insurer shall advance, at the written request of the Insured, Defense Costs on a current basis, but no later than sixty (60) days after the Insurer has received itemized bills for those Defense Costs. Such advance payments by the Insurer shall be repaid to the Insurer by the Insured, severally according to their respective interests, in the event and to the extent that the Insured shall not be entitled under the terms and conditions of this policy to payment of such Loss.

2.  The third paragraph is deleted in its entirety and replaced with the following:

    The Insurer shall have the right to effectively associate with the Company and the Insureds in the defense of any Claim that appears reasonably likely to involve the Insurer, including but not limited to negotiating a settlement. The Company and the Insureds shall give the Insurer full cooperation and such information as it may reasonably require. However, the failure of any Natural Person Insured to give the Insurer cooperation and information as required shall not impair the rights of any other Natural Person Insured.

    ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 049*

**ENDORSEMENT #50**

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### SEVERABILITY OF EXCLUSIONS AMENDED

### (LIMITED IMPUTATION TO ORGANIZATION)

In consideration of the premium charged, it is hereby understood and agreed that Clause 4. EXCLUSIONS is amended by adding the following at the end thereof:

   *Full Severability of Exclusions for Natural Person Insured*

   In determining whether any of the foregoing exclusions apply, the Wrongful Acts of any Natural Person Insured shall not be imputed to any other Natural Person Insured. For all coverage afforded to a Company, only the Wrongful Acts of any Senior Vice President or higher of a Company shall be imputed to such Company.


   ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 050*

122977 (01/17)                    1

**ENDORSEMENT# 051**

This endorsement, effective *at 12:01AM September 01, 2020*                forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### EXCLUSIONS (D) AND (E) AMENDED (DELETE "PENDING AND PRIOR" AND "KNOWN WRONGFUL ACTS" EXCLUSION)

In consideration of the premium charged, it is hereby understood and agreed that in Clause 4. EXCLUSIONS, paragraphs (d) and (e) are deleted in their entirety.

It is further understood and agreed that paragraphs (d) and (e) are intentionally left blank and all subsequent paragraphs (including any alphanumeric reference thereof) shall remain unaltered by this endorsement.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
***END 051***

ENDORSEMENT #52

This endorsement, effective *at 12:01AM September 01, 2020*                    forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

## CYBER EXCLUSIONS

In consideration of the premium charged, it is hereby understood and agreed that this
policy is amended as follows:

1. Clause 4. EXCLUSIONS is amended as follows:

    A. The following exclusions are added to the end thereof:

| | |
|---|---|
| *Security Failure of an Insured* | alleging, arising out of, based upon or attributable to any failure or violation of the security of (including, without limitation, any unauthorized use of or unauthorized access to, denial of service attack against or receipt or transmission of a malicious code by) any Computer System used by an Insured or under the ownership, operation, or control of an Insured; |
| *Privacy Event* | alleging, arising out of, based upon or attributable to any failure to protect, unauthorized use of, or unauthorized access to, Confidential Information; |
| *System Breakdown or Security Failure of Third Parties* | alleging, arising out of, based upon or attributable to any breakdown, malfunction, error, failure, or theft of, or any failure or violation of the security of (including, without limitation, any unauthorized use of or unauthorized access to, denial of service attack against or receipt or transmission of a malicious code by) any: (a) machine or system of machines; (b) device or system of devices; or (c) Computer System; not used by an Insured or not under the ownership, operation, or control of an Insured; |
| *Business Interruption* | alleging, arising out of, based upon or attributable to any interruption or suspension of an Insured's business caused by any breakdown, malfunction, error, failure, or theft of, or any failure or violation of the security of (including, without limitation, any unauthorized use of or unauthorized access to, denial of service attack against or receipt or transmission of a |

©All rights reserved.

### END 052

135649 (03/20)                                        1

**ENDORSEMENT** #52    (Continued)

This endorsement, effective *at 12:01AM September 01, 2020*        forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

 malicious code by) any:
 (a) machine or system of machines;
 (b) device or system of devices; or
 (c) Computer System;
 used by an Insured or under the ownership, operation, or control
 of an Insured;

   B.  Exclusion (r) is deleted in its entirety.

2.  In Clause 2. DEFINITIONS, the following definitions are added to the end thereof:

| Computer System | means: (1) any computer hardware or software, motor, electronic equipment, technology, voice or video communications system, computer network or network equipment, information system, wireless and mobile device, or data electronically stored thereon; or (2) cloud computing or other hosted resource including, but not limited to, any communications, conferencing, data sharing, and warehousing computer resources. |
|---|---|
| Confidential Information | means any of the following:<br>(1) information relating to an identified or identifiable person, including, without limitation, information from which a person may be identified or contacted, and a person's name, address, telephone number, social security number, account relationships, account numbers, account balances, account histories, passwords, and biometric information, biometric data, biometric identifiers, or unique or immutable information;<br>(2) information concerning a person protected under any federal, state, local, or foreign law; or<br>(3) any other information which is not available to the general public. |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 052*

135649 (03/20)                                    2

This endorsement, effective *at 12:01AM September 01, 2020*                 forms a part of
Policy number: *01-701-30-68*
Issued to: *First Hawaiian Inc. (fka BancWest Corporation)*

By: *AIG Specialty Insurance Company*

### SERVICE OF SUIT CLAUSE ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that, in the event of failure of the Insurer to pay any amount claimed to be due under this policy, the Insurer, at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States.  Nothing in this endorsement constitutes, or should be understood to constitute, a waiver of the Insurer's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.  It is further agreed that service of process in such suit may be made upon General Counsel, Legal Department at the address of the Insurer stated in Item 8 of the Declarations, or his or her representative, and that in any suit instituted against the Insurer upon this contract, the Insurer will abide by the final decision of such court or of any appellate court in the event of any appeal.  Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Insurer hereby designates the Superintendent, Commissioner, or Director of Insurance, or other officer specified for that purpose in the statute, or his or her successor or successors in office as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above-named General Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 053*

ENDORSEMENT# *54*

This endorsement, effective *12:01 am*    *September 1, 2020*              forms a part of
policy number  *01-701-30-68*
issued to *First Hawaiian Inc. (fka BancWest Corporation)*


by    *AIG Specialty Insurance Company*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| MNSCPT | | FINANCIAL INSTITUTION PROFESSIONAL LIABILITY INSURANCE POLICY - DECLARATIONS |
| MNSCPT | | FINANCIAL INSTITUTION PROFESSIONAL LIABILITY INSURANCE POLICY |
| 62519 | 05/95 | HAWAII AMENDATORY - CANCELLATION/NONRENEWAL |
| 119679 | 09/15 | ECONOMIC SANCTIONS ENDORSEMENT |
| MNSCPT | | BPL MANDATORY ENDORSEMENT NO COINSURANCE |
| MNSCPT | | DELETE COST OF CORRECTIONS |
| MNSCPT | | DISCOVERY AMENDED |
| MNSCPT | | PRO RATA CANCELLATION ENDORSEMENT |
| MNSCPT | | SEVERABILITY OF APPLICATION ENDORSEMENT |
| MNSCPT | | AMEND DEFINITION OF INSURED |
| MNSCPT | | DOMESTIC PARTNER COVERAGE |
| MNSCPT | | AMEND DEFINITION OF LOSS |
| MNSCPT | | PUNITIVE DAMAGES COVERAGE |
| MNSCPT | | AMENDED DEFINITIONS (i) PROFESSIONAL SERVICES |
| MNSCPT | | AMEND DEFINITIONS (j) SUBSIDIARY |
| MNSCPT | | WRONGFUL ACT DEFINITION AMENDED ENDORSEMENT |
| MNSCPT | | AMEND CONDUCT EXCLUSIONS (a) AND (b) TO FINAL ADJUDICATION |
| MNSCPT | | EXCLUSION (c) AMENDED |
| MNSCPT | | AMEND EXCLUSION (k) BODILY INJURY |
| MNSCPT | | EXTENSION: CERTAIN REGULATORY ACTIONS |
| MNSCPT | | PARENT/AFFILIATED ENTITY(IES) EXCLUSION |
| MNSCPT | | PATENT INFRINGEMENT EXCLUSION ENDORSEMENT |
| MNSCPT | | MOLD EXCLUSION |

Ⓒ All rights reserved.

*END 054*

ENDORSEMENT# *54*

This endorsement, effective *12:01 am*    *September 1, 2020*                forms a part of
policy number   *01-701-30-68*
issued to *First Hawaiian Inc. (fka BancWest Corporation)*

by     *AIG Specialty Insurance Company*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| MNSCPT | | AMEND CLAUSE 7, NOTICE/REPORTING PROVISION |
| MNSCPT | | AMEND CLAUSE 8 |
| MNSCPT | | AMEND CLAUSE 11, CANCELLATION |
| MNSCPT | | AMEND CLAUSE 14. OTHER INSURANCE AND INDEMNIFICATION |
| MNSCPT | | AMEND CLAUSE 17, DISPUTE RESOLUTION |
| MNSCPT | | AMEND RETENTION OF CERTAIN PROFESSIONAL SERVICES |
| MNSCPT | | INSURANCE BROKER/AGENT ENDORSEMENT |
| MNSCPT | | INSURANCE E&O EXCLUSION |
| MNSCPT | | MORTGAGE BANKING ENDORSEMENT |
| MNSCPT | | SECURITIES BROKER/DEALER ENDORSEMENT |
| MNSCPT | | SELLING AWAY EXCLUSION |
| MNSCPT | | PROFESSIONAL SERVICE |
| MNSCPT | | LENDER LIABILITY EXTENSION |
| MNSCPT | | PENDING & PRIOR LITIGATION EXCLUSION - LENDER LIABILITY - 09/01/2009 |
| MNSCPT | | EXCLUSION Q AMENDED |
| MNSCPT | | AMENDATORY CLARIFICATION ENDORSEMENT |
| MNSCPT | | AMEND EXCLUSION (M) BANKRUPTCY/INSOLVENCY OF OUTSIDE SERVICE PROVIDER EXCLUSION |
| MNSCPT | | SETTLEMENT OF CLAIMS |
| MNSCPT | | ADDITIONAL INSURED ENDORSEMENT |
| MNSCPT | | SPECIFIC ENTITY EXCLUSION |
| MNSCPT | | LOSS PAYEE ENDORSEMENT |
| MNSCPT | | TIE-IN OF LIMITS ENDORSEMENT |

© All rights reserved.

*END 054*

78859 (10/01)                    Page 2 of 3

ENDORSEMENT# *54*

This endorsement, effective *12:01 am    September 1, 2020*                forms a part of
policy number   *01-701-30-68*
issued to *First Hawaiian Inc. (fka BancWest Corporation)*

by     *AIG Specialty Insurance Company*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| MNSCPT | | VICARIOUS LIABILITY EXTENSION |
| MNSCPT | | COMPANY DEFINITION AMENDED |
| MNSCPT | | PROFESSIONAL SERVICE DEFINITION AMENDED TO INCLUDE SERVICES UNDER SPECIFIED CONTRACT |
| MNSCPT | | ALTERNATIVE DISPUTE RESOLUTION PROCESS AMENDED |
| MNSCPT | | PROFESSIONAL SERVICE DEFINITION AMENDED TO INCLUDE SERVICES UNDER SPECIFIED CONTRACT |
| MNSCPT | | DEFENSE COSTS, SETTLEMENTS AND JUDGEMENTS |
| 122977 | 01/17 | SEVERABILITY OF EXCLUSIONS AMENDED |
| MNSCPT | | EXCLUSIONS (D) AND (E) AMENDED (DELETE "PENDING AND PRIOR" AND "KNOWN WRONGFUL ACTS" EXCLUSION) |
| 135649 | 03/20 | CYBER EXCLUSIONS |
| MNSCPT | | SERVICE OF SUIT CLAUSE ENDORSEMENT |
| 78859 | 10/01 | FORMS INDEX ENDORSEMENT |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable)

© All rights reserved.

*END 054*



# CLAIM REPORTING FORM

Issuing Company: *AIG Specialty Insurance Company*

Reported under Policy/Bond Number:  *01-701-30-68*          Date: _____

Type of Coverage: D&O ⸻    E&O ⸻    Fidelity ⸻ (complete the Fidelity Supplemental on the next page)

Insured's Name, as given on Policy Declarations (Face Page):

*First Hawaiian Inc. (fka BancWest Corporation)* _____

_____

_____

Contact Person: _____

Title: _____

Phone: _(_____)_____-_____Ext_____

eMail: _____ @ _____

Case or Claimant Name: _____

_____

If the party involved is different from "Insured" Name (as given on Policy Declarations) state relationship:

_____

Insurance Broker/Agent: *MARSH USA INC.* _____

Address: *4 EMBARCADERO CENTER, SUITE 1100* _____

Address: *SAN FRANCISCO, CA 94104-2679* _____

Contact: *PAUL HUELBIG* _____      Phone:_____

eMail: *Paul.S.Huelbig@marsh.com* _____

Send Notice of Claims to:    AIG                       Phone: (888) 602-5246
                             Financial Lines Claims     Fax:   (866) 227-1750
                             P.O. Box 25947             Email: c-Claim@AIG.com
                             Shawnee Mission, KS 66225



# CLAIM REPORTING FORM
# FIDELITY SUPPLEMENTAL

**(Only complete this supplemental if the Claim is being reported under Fidelity Coverage)**

Issuing Company: *AIG Specialty Insurance Company*

Reported under Policy/Bond Number:  _01-701-30-68_

---

Date of Discovery: _____    Estimated Amount of loss: _____

Cause of Loss:  

| | | | |
|---|---|---|---|
| Employee Dishonesty | _____ | Computer Fraud | _____ |
| Funds Transfer | _____ | Robbery/Burglary | _____ |
| ID Theft | _____ | Forgery | _____ |
| Client Property | _____ | In Transit | _____ |
| ERISA | _____ | Credit Card Forgery | _____ |
| Other | _____ | if Other, describe: | _____ |

---

Send Notice Of Claims To:    AIG                     Phone:  (888) 602-5246  
                             Financial Lines Claims  Fax:    (866) 227-1750  
                             P.O. Box 25947          Email:  c-Claim@AIG.com  
                             Shawnee Mission, KS 66225

*centralized Customer Link and Information Management*

# EXHIBIT B

COX FRICKE
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOACHIM P. COX          7520
RANDALL C. WHATTOFF     9487
KAMALA S. HAAKE         9515
800 Bethel Street, Suite 600
Honolulu, Hawai'i  96813
Telephone:  (808) 585-9440
Facsimile:  (808) 275-3276

Attorneys for Plaintiff
HAWAIIAN HOST INC.

**Electronically Filed
FIRST CIRCUIT
1CCV-20-0001482
31-OCT-2020
06:34 PM
Dkt. 8 EXH**

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| HAWAIIAN HOST, INC.,<br><br>                    Plaintiff,<br><br>    vs.<br><br>FIRST HAWAIIAN BANK, CITADEL PACIFIC, LTD., CITADEL FOOD GROUP HAWAII LLC, AND CITADEL WINDBREAK, LLC; JOHN DOES 1–10, JANE DOES 1–10, DOE CORPORATIONS 1–10, DOE LIMITED LIABILITY COMPANIES 1–10, AND DOE PARTNERSHIPS 1–10,<br><br>                    Defendants. | CIVIL NO. _____<br><br>COMPLAINT; EXHIBITS "A"- "K"; DEMAND FOR JURY TRIAL; SUMMONS |

## **COMPLAINT**

1.     This case concerns the intentional breach of a confidentiality and non-circumvention agreement—and the norms of business in Hawai'i—by Defendant Citadel Pacific, Ltd., a foreign corporation organized in the Cayman Islands and with its principal place of business outside of the United States ("Citadel Pacific").  With the

**EXHIBIT B**

support and encouragement of Plaintiff's Hawai'i lender, and in derogation of each of their legal obligations, Defendant Citadel Pacific has acquired Plaintiff's debts over Plaintiff's explicit objections and is now attempting to convert Plaintiff's assets and business for its own use and advantage in a hostile takeover that was expressly prohibited by the confidentiality agreement.

**The Parties**

2.      At all times material herein, Plaintiff Hawaiian Host, Inc. ("Hawaiian Host") was a corporation organized under the laws of the State of Hawai'i with its principal place of business in Honolulu, Hawai'i.

3.      At all times material herein, Defendant First Hawaiian Bank ("FHB") was a corporation organized under the laws of the State of Hawai'i with its principal place of business in Honolulu, Hawai'i.

4.      On information and belief, at all times material herein, Citadel Pacific was a foreign entity organized in the Cayman Islands with its principal place of business in the Philippines.

5.      On information and belief, at all times material herein, Defendant Citadel Food Group Hawaii LLC ("Citadel FGH") was a limited liability company organized under the laws of Hawai'i and a controlled affiliate of Citadel Pacific.

6.     On information and belief, at all times material herein, Defendant
Citadel Windbreak LLC ("Citadel Windbreak") was a limited liability company
organized under the laws of Hawai'i and a controlled affiliate of Citadel Pacific.[1]

7.     Defendants John Does 1–10, Jane Does 1–10, Doe Corporations 1–
10, Doe Limited Liability Companies 1–10, and Doe Partnerships 1–10, are sued herein
under fictitious names for the reason that after diligent and good faith efforts to ascertain
their names and identities through review of applicable records and reports and through
interviews, their true names and identities are presently unknown to Plaintiff except that
they are connected in some manner with Defendants and/or were the agents, servants,
employees, employers, representatives, co-venturers, associates, vendors, supplies,
manufactures, sub-contractors or contractors and/or owners, lessees, assignees, and
licensees of the Defendants and/or were in some manner presently unknown to Plaintiff
engaged in the activities alleged herein and/or were in some manner and in some degree
responsible for the damages to Plaintiff alleged herein and/or were in some manner
related to Defendants, and Plaintiff prays for leave to insert herein their true names,
identities, capacities, activities and/or responsibilities when the same are ascertained.

## JURISDICTION AND VENUE

8.     Jurisdiction over Defendants is proper because the acts that are the
subject of this Complaint took place within the State of Hawai'i and within the territorial

---

[1] Citadel Pacific, Citadel FGH, and Citadel Windbreak are collectively referred to as
"Citadel," except when the identities of the individual entities are relevant.

3

limits of this Court.  Moreover, this Court has jurisdiction pursuant to Hawaiʻi Revised Statutes ("HRS") §§ 603-21.5 and 604-5 inasmuch as the amount in controversy exceeds forty thousand dollars ($40,000.00).

9.    Venue is proper in this Court under HRS § 603-36(5) inasmuch as the claim for relief arose in this Circuit.[2]

## STATEMENT OF FACTS

### Background Regarding Hawaiian Host and Its Financial Position

10.    For generations, plaintiff Hawaiian Host has been one of Hawaiʻi's most iconic brands and the largest manufacturer of chocolate-covered macadamia nuts in the world.

11.    In the 1980s, its founders, Mamoru and Aiko Takitani, transferred 100 percent of the stock of Hawaiian Host to the Mamoru and Aiko Takitani Trust (the "Takitani Trust").  The sole beneficiary of the Takitani Trust is the Mamoru and Aiko Takitani Foundation, Inc. (the "Takitani Foundation"), a non-profit, charitable organization that provides scholarships to students in Hawaiʻi and supports numerous educational programs for the islands' youth.

---

[2] Pursuant to the confidentiality agreement between Citadel and Hawaiian Host that Citadel has breached, Citadel may argue that the claims being brought against Citadel are subject to arbitration.  Accordingly, in an abundance of caution, Hawaiian Host is concurrently filing an action against Citadel with the American Arbitration Association. Nothing contained herein shall be deemed an admission by Hawaiian Host that any or all of the claims asserted against Citadel herein are subject to arbitration.  Hawaiian Host reserves all rights.  The Citadel entities are named as defendants in this action to the extent that they contest arbitrability of the claims.

12.     Under the Takitani Trust's governing documents, the Takitani Trust is prohibited from making or unable to make capital contributions or other investments into Hawaiian Host.

13.     Following the passing of first Mamoru and later Aiko Takitani, Hawaiian Host continued to grow and expand, all the time providing material support to the charitable mission of the Takitani Foundation.

14.     For decades, FHB had been the primary creditor of Hawaiian Host and, in return, Hawaiian Host had been a loyal customer with an exemplary history as a customer and borrower.  The fees, interests, and other payments FHB received over its decades of lending and banking with Hawaiian Host are significant.

15.     By 2018, however, the company had become highly levered, principally following its acquisition of Mauna Loa Macadamia Nut Corporation and the integration of the businesses.  Because of the limitations in the Takitani Trust's governing documents, the company was unable to raise operating capital from its shareholder.

16.     Hawaiian Host recognized the increasingly leveraged position of the company and recruited and appointed a new chief executive officer, Ed Schultz, who, with the company's support and approval, embarked on a robust restructuring effort that was designed to de-lever the company, centralize production and business in Hawaiʻi, improve its balance sheet, and improve profitability.  One aspect of this plan was to solicit new equity investment through a sale of the stock in Hawaiian Host.

17.     By mid-2020, FHB held over $75 million in debt on the company, of which FHB was the lender on over $60 million and acted as agent for Central Pacific

Bank which held, through a participation interest, less than $15 million. As Hawaiian Host's only secured creditor and banker, Hawaiian Host discussed with FHB a Chapter 11 restructuring for which FHB would, as the secured creditor, need to agree to provide debtor-in-possession financing or agree to allow another creditor to receive priority for its advances during the pendency of the bankruptcy. FHB advised Hawaiian Host that it would neither provide such financing nor would it allow Hawaiian Host's new lender to receive priority for its post-petition advances, at least one of which FHB knew and understood would be absolutely necessary for a successful reorganization plan. Simply stated, without such agreement or support from FHB, Hawaiian Host could not fund a reorganization plan.

18.    Also, in early 2020 and in the midst of its restructuring, Hawaiian Host's businesses were severely, adversely and unexpectedly impacted by the COVID-19 pandemic. This included the near total shutdown of tourism and social activity in Hawaiʻi, which markets accounted for the majority of Hawaiian Host's annual revenue. While the restructuring efforts continued and were in fact accelerated during the pandemic, including the sale of assets and the reduction of its debts to less than $35 million, it was apparent that the company would need to take more drastic measures if it were to avoid dissolution.

19.    Commencing in 2019 and continuing through 2020, Hawaiian Host sought potential investors who might acquire its shares or assets, contribute new capital, and commit to continue the businesses in Hawaiʻi for the benefit of its various stakeholders.

## **FHB Leads Hawaiian Host to Negotiate With Citadel**

20.     In July 2020, FHB Senior Vice President Darlene Blakeney requested that Hawaiian Host enter into discussions with longtime FHB-client Citadel regarding an investment by Citadel into Hawaiian Host's business or an acquisition of Hawaiian Host itself.

21.     Hawaiian Host had no prior knowledge of or experience with Citadel and relied upon FHB, who assured Hawaiian Host that Citadel would be a supportive partner that was interested in preserving Hawaiian Host's legacy.  Among other things, FHB, acting through Ms. Blakeney, vouched for Citadel and its principal Jose Richard Delgado as highly reputable and advised that Citadel would be an ideal fit for Hawaiian Host given its businesses and Citadel's desire to acquire and operate significant business interests in Hawaiʻi.

22.     At no time did Ms. Blakeney, or anyone else at FHB, suggest that FHB had shared information about Hawaiian Host or its loans to Hawaiian Host with Citadel or that it had discussed selling its loan positions to Citadel.  On the contrary, Ms. Blakeney identified Citadel as a well-financed operating company that may be uniquely suited to Hawaiian Host's needs because they both had ready access to capital and were used to operating complex businesses in island communities, including the Philippines where it was based and where it was the owner and operator of the largest airline catering company; Guam where it was a very significant customer of FHB and the operator of IT&E, a major telecommunications provider, as well as IP&E, a licensee of Shell Oil Company; and in other Pacific Islands.

23.    Upon FHB's introduction, and premised upon FHB's representations that to that point Citadel had no prior knowledge about Hawaiian Host's business or its financial position, including its debts, and was interested in investing in a substantial Hawai'i-based company that would remain in Hawai'i, Hawaiian Host initiated communications with Mr. Delgado of Citadel.

### The Confidentiality Agreement

24.    Promptly and before any information was shared, and so as to allow the parties to explore Citadel's investment, Hawaiian Host required that Citadel enter into a confidentiality and non-circumvention agreement before Hawaiian Host would agree to disclose its confidential corporate, financial and business information (the "Confidentiality Agreement"), a true and correct copy of which is attached as Exhibit A hereto.  The Confidentiality Agreement was executed by both Hawaiian Host and Citadel Pacific and was dated and effective as of July 13, 2020.

25.    The relevant portions of the Confidentiality Agreement include the following:

a.    The agreement covered not just Citadel Pacific, but its "affiliates and any entity which may be formed for the purpose of engaging in a Possible Transaction . . . ."  Ex. A at 1 ¶ 1.

b.    The Confidentiality Agreement also applied to Citadel's "Representatives," which are defined to "include its directors, officers, members, managers, partners, employees, agents, or professional advisors (including, without limitation, attorneys, accountants, and financial advisors) directly involved in the due

diligence investigation of the Company in connection with the evaluation of a Possible

Transaction." *Id.* § 1.

        c.        The Confidentiality Agreement specified that "the Company

[Hawaiian Host] is prepared to make available to you certain information concerning the

assets, properties, obligations, financial condition, and operations of the Company," but

only if

> the Receiving Party agrees to treat all information concerning the
> Disclosing Party (whether prepared by the Disclosing Party, its
> Representatives or otherwise) and irrespective of the form of
> communication, including, without limitation, oral, written,
> electronic. or any other form) which has at any time in the past
> been furnished to the Receiving Party or to its Representatives or
> which now or in the future is furnished to the Receiving Party or
> to its Representatives by or on behalf of the Disclosing Party
> (herein collectively referred to as the "Evaluation Material") in
> accordance with the provisions of this Confidentiality
> Agreement, and to take or refrain from taking certain other
> actions as hereinafter set forth.

*Id.* at 1 ¶¶ 1-2.

        d.        The term "Evaluation Material" is defined to include:

> any information not generally known to the public or recognized
> as standard industry practice, including, without limiting the
> generality of the foregoing, information which relates to the
> Disclosing Party's assets, properties, **debts, liabilities,
> obligations**, business and financial condition, results of
> operations, projections of operating results, personnel records,
> sales and marketing plans, employees, suppliers, trade secrets,
> know-how, technical data, product or service plans, business
> practices, agreement terms, products, services, litigation and
> settlement matters, environmental matters, customers, clients,
> technology or other strategic or business partners (past, current or
> future), shareholders, noteholders, members, managers, lenders,
> investors, contributors, markets, marketing, notes, analyses and
> studies, and all tangible and intangible embodiments thereof of

any kind or nature whatsoever. The term "Evaluation Material" also shall be deemed to include all notes, analyses, compilations, studies, reports, copies, summaries, reprints, descriptions, forecasts, opinions, interpretations and other documents prepared by the Receiving Party or its Representatives which contain, reflect or are based upon, in whole or in part, the information furnished to the Receiving Party or its Representatives pursuant hereto.

*Id.* § 1 (emphasis added).

      e.    Section 2 of the Confidentiality Agreement states:

Use of Evaluation Material and Confidentiality. The Receiving Party hereby agrees that it and its Representatives shall use the Evaluation Material of the Disclosing Party solely for the purpose of evaluating a Possible Transaction and for no other purpose, that the Evaluation Material of the Disclosing Party will be kept strictly confidential in accordance with the terms of this Confidentiality Agreement, that **the Receiving Party will not use the Evaluation Material of the Disclosing Party in connection with any transaction or proposed transaction to which the Disclosing Party does not give its written approval**[.] . . . In any event, the Receiving Party agrees . . . (2) **to accept responsibility for any violation or breach of this Confidentiality Agreement by any of the Receiving Party's Representatives**, and (3) **at the Receiving Party's expense to take all reasonable measures (including, but not limited to, court proceedings) to restrain the Receiving Party's Representatives from prohibited or unauthorized disclosure or uses of the Evaluation Material** of the Disclosing Party in violation or breach of the terms hereof. . . . **Without limiting the foregoing, the Receiving Party agrees that neither it nor any of its affiliates or Representatives will use any information obtained from the Evaluation Material of the Disclosing Party to divert or attempt to divert any business, supplier, customer, or client of the Disclosing Party, use any such information competitively against the Disclosing Party, or use any such information for any anticompetitive purpose**.

(emphasis added).

f.    The Confidentiality Agreement defines a Possible

Transaction as follows:

> "a possible financial investment in [Hawaiian Host] or some other
> **negotiated** transaction . . . .

(emphasis added).

### The Involvement of FHB Director Don Horner

26.    After executing the Confidentiality Agreement, on July 15, 2020,

Mr. Delgado emailed the Confidentiality Agreement back to Hawaiian Host CEO Ed

Schultz and copied FHB Board of Directors member Don Horner.  Mr. Horner, FHB's

most recent Chief Executive Officer, confirmed in his own email to Mr. Schultz shortly

thereafter that he was a current member of the Board of Directors of FHB and that he

intended to talk to FHB's corporate counsel about the Confidentiality Agreement that Mr.

Delgado had provided to him.  *See* Ex. B.

27.    In addition to Mr. Delgado having provided the Confidentiality

Agreement directly to FHB through his July 15, 2020 email to Mr. Horner (which Mr.

Horner then conveyed to FHB's corporate counsel), Mr. Schultz also updated Ms.

Blakeney that Citadel and Hawaiian Host had signed the Confidentiality Agreement and

that Hawaiian Host would be preparing and making available a secure diligence site that

would contain the detailed and confidential business information of Hawaiian Host.  This

was in addition to confidential presentations, analysis and restructuring plans that

Hawaiian Host provided directly to Citadel via email.

28.    Mr. Horner was not just on the FHB Board of Directors but was the immediate past CEO who maintained an office at FHB's corporate headquarters in downtown Honolulu.  Given that Mr. Delgado also disclosed to Mr. Schultz his intention that Mr. Horner participate as a partner in the investment with Mr. Delgado and/or Citadel, Hawaiian Host carefully considered whether it could be comfortable with a Board member of its primary creditor participating in negotiating the terms for the acquisition of Hawaiian Host, including detailed information on its assets and business.

29.    These actions occurred at a time when FHB was exerting financial pressure on Hawaiian Host to repay the loans immediately or enter into a transaction with Citadel—a favored customer of FHB—on information and belief, with certain insider(s) of FHB investing through Citadel.

30.    After discussing the matter with FHB's most senior executives, including current Chief Executive Officer Bob Harrison, Hawaiian Host determined that Mr. Horner's participation with Citadel would be improper and, over the objections of Mr. Horner, Mr. Schultz advised Citadel that Hawaiian Host objected to such participation and was advised that neither Mr. Horner nor any other FHB insider would be involved.

31.    Hawaiian Host understood and expected that Mr. Horner would cease participating in any way and only upon that understanding did it engage in the disclosures, negotiations and efforts with Citadel in July, August, and September.[3]

---

[3] As discussed further below, Hawaiian Host was later surprised to learn from Mr. Delgado, during his presentation to the Board of Directors of Hawaiian Host by Zoom on

**Citadel's Initial Proposal**

32.      After completing the preliminary disclosures and discussions, all

pursuant to the Confidentiality Agreement, Citadel proposed an acquisition of assets in a

"Non-Binding Offer" dated August 5, 2020.  This offer outlined how Citadel would

acquire all of the operating assets from Hawaiian Host, free of FHB's lien and any other

encumbrance, under a newly formed company it referred to as "CPL Hawaii" or

"NEWCO" as follows:

a.      Purchase the operating assets of Hawaiian Host, the proceeds

of which could then be used by Hawaiian Host to retire the balance of the FHB loans;

b.      Immediately fund additional working capital, taking into

account the current cost structure and market conditions;

c.      Obtain additional debt financing from FHB to accomplish

strategic objectives;

d.      Transition all necessary and existing Hawaiian Host

executives and employees at comparable compensation and benefits;

e.      Negotiate in good faith with the International Longshore and

Warehouse Union (the "Union") to "transfer or establish a new collective bargaining

agreement based on comparable compensation and benefits"; and

---

September 28, 2020, that Mr. Horner apparently continued to act as his advisor and/or
partner in the proposed acquisition of Hawaiian Host.  This involvement was contrary to
the assurances provided to Hawaiian Host by Citadel, FHB, and Mr. Horner himself that
he would not be involved.  *See*, *e.g.*, Ex. C.

       f.      Contribute "in perpetuity, 1% of net income to the [Takitani Foundation], or $60,000 per year starting from the date of acquisition, whichever is higher."

Ex. D.

33.     In addition, Citadel represented that it was committed to keeping business operations in Hawaiʻi.

34.     Citadel's offer was designed to induce Hawaiian Host, and did induce Hawaiian Host, to believe that Citadel would honor the legacy of the Takitani family and maintain substantial employment and business in Hawaiʻi.  In its offer, Citadel specifically referenced its reliance upon confidential information provided to it pursuant to the Confidentiality Agreement.  *See id.* at 1 ¶ 4.

35.     Citadel's proposed price for all of the assets of the company was, however, materially less than Hawaiian Host's debt with FHB, even after the proposed liquidation of certain non-operating assets then under contract and application of all net proceeds to such debts.  Thus, absent an agreement from FHB to accept a reduced payoff on its loans, there was no possibility the offer from Citadel could be effectuated.

36.     The amount of this offer was not surprising, however, as Hawaiian Host had shared with Citadel that FHB had indicated it may be willing to take a "haircut" on its debt under certain circumstances.  Hawaiian Host had provided such information to Citadel and, in discussing the loans, had also advised Citadel of potential weaknesses or strengths that Hawaiian Host had in defending against the various liens and other claims FHB would make.

**Hawaiian Host Explains the Essential Components of Any Possible Transaction, and Citadel Agrees to Those Essential Deal Terms**

37.    Because Citadel's proposal, if accepted, would result in a sale of Hawaiian Host's assets without a market offering or bankruptcy filing, and because Hawaiian Host may have been within the "zone of insolvency," the transaction had the potential to create significant risks to Hawaiian Host's board of directors (including shareholder trustees serving on the board) and others.  Thus, while the shareholders of Hawaiian Host were to receive no consideration, several aspects of this proposal were critical to Hawaiian Host, including Citadel's commitments to Hawaiian Host's unsecured creditors and employees, to negotiate in good faith with its union, and to retain Hawai'i operations.

38.    Without these components, Hawaiian Host would not have proceeded with the Citadel negotiations and would not have continued to deliver confidential information, including on a managed site called "Basecamp," where detailed and confidential information was provided on nearly every aspect of the company and its businesses.  Citadel interacted with the Basecamp materials thousands of times during the due diligence period.

39.    Given the components in the offer and in light of the strong support that FHB expressed for Citadel as the preferred acquirer, Hawaiian Host's Board authorized Hawaiian Host's management and counsel to enter into intensive negotiations with Citadel with the objective to reach executable agreements that would be consistent with the economic terms and protections contained in the proposal.

40.     As noted above, Citadel's proposal was premised upon FHB accepting a discounted payoff on the loans. It was always understood between the parties that the purpose of this discount was to benefit Hawaiian Host, and that the amount of the discount would be utilized to assist Hawaiian Host in its reorganization, including, without limitation, repaying Hawaiian Host's unsecured creditors without bankruptcy and in amounts no worse than they would receive in a liquidation.

41.     Citadel requested, and Hawaiian Host agreed, that Citadel would negotiate directly with FHB regarding the terms of a discounted payoff. Significantly, Citadel promised to keep Hawaiian Host informed of all such negotiations (and, in fact, appeared to do so through such time that Citadel advised that the material terms of agreement had been reached between Citadel and FHB consistent with its original offer to Hawaiian Host) and explained, including through its counsel, that any acquisition of the loans would be merely a step in a mutually-agreed process by which Citadel would thereafter foreclose in a strict foreclosure under the Uniform Commercial Code to take title to all of the non-real property assets and use a deed in lieu of foreclosure of its remaining real property so as to effectuate Citadel's acquisition of Hawaiian Host's business. At all times, Citadel represented that it would continue to honor its obligations under the proposal.

42.     Citadel explained that this approach to effecting the terms of the deal would put Citadel in a superior bargaining and legal position as to its other creditors and thus ensure that no objecting creditor could unreasonably interfere with their plans.

43.    Critically, Citadel and its counsel repeatedly assured Hawaiian Host on multi-party telephone calls involving multiple witnesses that its program would only be done with the consent and approval of Hawaiian Host, as was to be documented in an agreement later called the "Cooperation Agreement."

44.    During these negotiations that Citadel was now having with FHB, Citadel admitted that its knowledge of Hawaiian Host and its businesses, its knowledge of the amount, details and value of its debts to FHB, and its knowledge of the prospects of Hawaiian Hosts business as security for such debt were all obtained from the confidential information Hawaiian Host had provided.  In fact, FHB informed Hawaiian Host that FHB could not share Hawaiian Host's financial information with Citadel; rather, such information had to be shared directly from Hawaiian Host to Citadel.  In addition to the documentation provided, Hawaiian Host management and agents spent close to, or more than, a hundred hours in interviews and telephone conferences with Hawaiian Hosts executives and employees and agents.

45.    Hawaiian Host would not have authorized these discussions without the protections of the Confidentiality Agreement, without the covenants and agreements of Citadel relating to such discussions, and without its knowledge that FHB had received a copy of the Confidentiality Agreement at the time of its execution and was otherwise informed and aware of its existence.

**Citadel Reaches Agreement with FHB and**
**Negotiations Continue Between Citadel and Hawaiian Host**

46.    On or about August 26, 2020, Citadel announced that it had reached

agreement in principle with FHB on the material terms of its acquisition of Hawaiian

Host's debt, which Citadel again affirmed was only being contemplated in connection

with a binding agreement to be reached with Hawaiian Host for the conversion of such

debt into ownership of Hawaiian Host or its operating assets.

47.    Citadel provided a redacted copy of what its executive Jim Beighley

represented was substantively identical to the term sheet signed by Citadel and FHB, but

that Mr. Beighley could not provide the signed agreement itself or an unredacted copy

because it contained additional terms by which FHB had agreed to make available

significant loans and other funding to Citadel at very favorable rates and terms for use

both in connection with its acquisition of Hawaiian Host's loans and also other

investments that Citadel intended to make.  Mr. Beighley explained while the redacted

terms would help Citadel complete its acquisition of Hawaiian Host, they were

confidential to FHB and Citadel and could not be shared with Hawaiian Host.  However,

Mr. Beighley assured Hawaiian Host that every other material term relating to Hawaiian

Host's loans was and would be shared, and that Citadel would only proceed with the

purchase of Hawaiian Host's loans if Citadel and Hawaiian Host entered into binding

agreements for Citadel's acquisition of Hawaiian Host or its businesses and operating

assets.

48.     Counsel and executives from Citadel and Hawaiian Host commenced further negotiation and documentation of what was called the "Cooperation Agreement."  The Cooperation Agreement was intended to include the terms outlined in Citadel's initial offer and become the binding agreement that would ensure that Hawaiian Host, which would be agreeing to cooperate in the conveyance of its assets and businesses without any consideration to its shareholders, would protect its other stakeholders, such as its unsecured creditors, employees, union and trade partners.

49.     Counsel for Hawaiian Host made clear to counsel for Citadel that because of Hawaiian Host's financial condition, Hawaiian Host had legal duties to its unsecured creditors and, therefore, the protection of such creditors, directly through payment and indirectly through indemnity, was necessary for Hawaiian Host.

**Citadel Changes the Fundamental Structure of the Cooperation Agreement, but Continues to Recognize that Any Transaction Requires Hawaiian Host's Approval**

50.     Only after Hawaiian Host had provided Citadel with access to all of its confidential business information, spent collectively as much or more than a hundred hours in Zoom meetings, on calls, and/or in discussions with consultants, and after authorizing Citadel to communicate with FHB to effectuate a discounted loan payoff that Citadel represented was an essential part of its acquisition strategy, was Citadel able to reach an agreement with FHB.  Almost immediately after reaching that agreement with FHB, however, Citadel changed the fundamental structure of its proposed deal and reneged on its material commitments in the Cooperation Agreement.

51.　　On September 10, 2020, Citadel's attorney William Yuen sent a document titled "HH Acquisition Term Sheet v3(11469391_3).DOCX" to Mr. Schultz and Hawaiian Host's legal counsel Barry Sullivan.  Mr. Yuen wrote that, "Attached is a summary of the transaction we'd like you to present to the Board tomorrow.  **Assuming the Board agrees we'll prepare a cooperation agreement that that [sic] incorporates these terms for the board to approve and the officers to sign next week before we sign the bank agreement**."  Ex. E (emphasis added).

52.　　Mr. Yuen's email was clear and unambiguous as to the understanding the parties and their counsel had:  Citadel would not (and could not) sign a binding agreement with FHB unless and until it had signed its Cooperation Agreement first with Hawaiian Host.  Mr. Yuen had copied Mr. Delgado, Mr. Beighley, Citadel advisor Eric L. Davis, Philippine legal counsel Abigail Sese, Denton's insolvency partner in Chicago Robert Richards, Denton's litigation attorney Paul Alston, and Denton's attorney Amy Chiang.

53.　　Hawaiian Host and its counsel fully agreed with Mr. Yuen's understanding that Hawaiian Host's approval was a requirement of any transaction.  However, Hawaiian Host noticed that the terms Mr. Yuen and Citadel outlined in the attached summary were different in several critical respects than those originally proposed by Citadel.  Among other changes, Citadel had removed any financial commitment to the Takitani Foundation, reduced its commitment to remain in Hawai'i, scaled back its commitment to hire non-union employees, and among still other changes,

reneged on its commitments to Hawaiian Host's unsecured creditors and instead would only fund payments in its "sole discretion."

### Citadel Continues to Change the Terms of the Cooperation Agreement to its Advantage, but the Parties Appear to Be Close to an Agreement

54.     In response, Mr. Sullivan, as counsel for Hawaiian Host, sent a revised summary of terms on September 14, 2020.  This draft Cooperation Agreement was the first draft from either side that contained the customary detail for an executable agreement and reintroduced definitive commitments that Citadel would make to Hawaiian Host's non-union employees and unsecured creditors.  As to such unsecured creditors, however, the draft left the commitment blank pending further study by independent specialists engaged by Hawaiian Host to determine what such creditors would receive in an insolvency or liquidation proceeding.

55.     An essential component to the proposal had been the indemnification, at Citadel's expense, of the directors of Hawaiian Host and the trustees of the Takitani Trust from the potential claims of unsecured creditors.  Simply stated, subject only to certain minimum constraints on Citadel's direction of the business after its acquisition (such as, for example, a minimum aggregate financial commitment to Hawaiian Host's trade creditors), this indemnification would assure that Citadel would not and could not abuse the other stakeholders (individually or in aggregate) because if they did, such creditors could sue the directors of Hawaiian Host and/or the trustees of the Takitani Trust for not having adequately protected them, and Citadel would then have to pay the creditors the amounts a court may determine they were wrongfully denied.

56.    After further interim drafts were exchanged, Mr. Yuen provided a complete Cooperation Agreement on Thursday, September 17, 2020.  Mr. Sullivan notified Mr. Yuen that, while it was not consistent with the initial terms, it appeared to be close enough that, with some minor modification, may be such that the Board of Hawaiian Host could approve for execution.  Mr. Sullivan sent a revised draft back the very next day, Friday, September 18, 2020 at 2:04 p.m. with an email explaining that, in addition to final preparation of two schedules and some logistical issues, "We are near the end and I can represent that my draft is pre-approved on our side and, pending final agreement/corrections, can be executed (following a formal meeting to authorize same)."

### Citadel Attempts to Bait-and-Switch Hawaiian Host by Radically Changing the Terms of the Agreement Without Warning, and Negotiations Between the Parties Cease

57.    Unbeknownst to Hawaiian Host, sometime after Mr. Yuen had sent his Thursday, September 17, 2020 draft, Citadel determined that it no longer intended to honor any of the material commitments it made to Hawaiian Host—which had been the premise upon Hawaiian Host entering into intensive negotiations with Citadel—or even the commitments that were contained in Citadel's draft of that same date (Thursday, September 17).  Therefore, on Friday September 18, 2020, while Hawaiian Host was approving an executable draft based upon Mr. Yuen's September 17th draft, Citadel prepared a radically different draft and sent it also on Friday, September 18, 2020.

58.    Citadel's September 18th draft was remarkable in several respects.  First, it was provided with a redline that made it appear as if there were no substantive changes from Citadel's Thursday draft.  This is because, in a virtually unheard of move

and without explanation, the redline provided to Hawaiian Host was not against the prior draft Citadel had sent on Thursday but rather some unknown, internal Citadel draft. *See* Ex. F.  Second, Citadel rejected many of the terms that it had put in its own draft the day before.  Third, this draft was sent with no warning or discussion that Citadel no longer intended to proceed on the basis of the terms that the parties had been negotiating for more than a month.

59. After Mr. Sullivan notified Mr. Yuen that their appeared to be some disconnect, given that Mr. Sullivan had been working on an execution-ready draft based upon Citadel's Thursday draft, Mr. Yuen advised Mr. Sullivan that Citadel had changed its position and that the Friday draft was in fact a "take–it-or-leave-it" proposition.

60. Mr. Sullivan advised Mr. Yuen that they would not be doing further work on the agreements given Citadel's sudden change in position on many of the critical elements of the negotiated proposal.

### The Substance of Citadel's New Proposal

61. During this same period, Citadel or its counsel sent a series of emails to Hawaiian Host or its counsel essentially confirming that Hawaiian Host was not misinterpreting Citadel's intentions and that Citadel, since it had reached agreement with FHB on the terms by which it would acquire the loans or a substantial portion thereof, intended to disavow their prior commitments and offers to Hawaiian Host and intended to acquire Hawaiian Host, its assets or business through its new position as secured lender. This would leave Hawaiian Host with no assets, many if not most of its employees out of

work, its union pension obligation unfunded, its unsecured creditors unpaid, and its directors with no resources to pay claims that may be legitimately owed.

62.    Thus, by September 21st, the proposal from Citadel—which was presented on a take-it-or-leave-it basis—was unrecognizable from the initial proposal that had caused Hawaiian Host to pursue negotiations with Citadel.

a.    Citadel had deleted any obligation to provide working capital commitments to fund operations prior to takeover.

b.    There was no longer any commitment to hire Hawaiian Host's employees, and terminated employees would receive limited benefits.

c.    Citadel removed any commitment to keep the business in Hawaiʻi.

d.    Citadel set a ceiling on payments that could be made to unsecured creditors and allowed for downward adjustments at Citadel's discretion.

e.    Citadel inserted qualifications and conditions into its obligation to indemnify the trustees, directors, management, and remnant entities, which left them with significant exposure.

f.    Citadel also left Hawaiian Host's unsecured creditors without the indirect protection to ensure that Citadel would not abuse such creditors after having been given control over the assets and business of Hawaiian Host for no consideration at all to its shareholders.

       g.     Citadel removed any obligation (or even reference) to support for the Takitani Foundation, consistent with its retraction of meaningful commitments to try to keep the business in Hawaiʻi.

*See* Ex. G.

       63.     This proposal would allow Citadel to obtain the assets of Hawaiian Host that it deemed most valuable, while leaving Hawaiian Host's employees, owners, and directors with millions in liabilities and no way to pay any of them, having the effect of preserving the benefit of the discounted payoff entirely for the benefit of Citadel.

       64.     Hawaiian Host informed Citadel that its take-it-or-leave-it offer was unacceptable.

       65.     With little other option, and because it had expressly reserved the right to negotiate with another party, including without informing Citadel, Hawaiian Host began to investigate alternative investors that might provide the protections and commitments Citadel had made to induce Hawaiian Host to devote what by that time had been nearly three months of effort in concluding a deal.

       66.     Given how much time and effort Hawaiian Host had dedicated to Citadel, however, Hawaiian Host invited Citadel to revise their "take-it-or-leave-it" offer and to try to resurrect the deal.  Citadel twice submitted slightly revised drafts of the Cooperation Agreement but never materially changed their position and refused to go back to their position of just a few days earlier, Thursday, September 17, 2020.

## Hawaiian Host Identifies a Highly Qualified New Purchaser, but FHB Refuses to Work With the New Purchaser

67. Hawaiian Host thereafter expended substantial time and effort cultivating other potential investors, including initiating conversations or renewing conversations with investment bankers and utilizing their network of contacts in the industry to try to generate interest. At this time, and based upon Citadel's statements as well as its legal obligations, Citadel would not and could not close on the acquisition of the FHB loans because Hawaiian Host would not agree to a proposed transaction on the terms Citadel demanded.

68. Ultimately and after much effort, Hawaiian Host developed favorable discussions with a new investor, HHML Acquisition LLC ("HHML"). HHML was backed by a substantial business entity that, through its affiliates, had hundreds of millions invested in Hawai'i and through such investments was already a significant commercial client of FHB. HHML initiated extensive and immediate diligence, including flying its diligence team to Hawai'i, and indicated that, pending final diligence, it was willing to proceed with the same terms that had been proposed and then withdrawn by Citadel.

69. With the permission of Hawaiian Host, HHML contacted FHB CEO Bob Harrison to confidentially advise FHB that Hawaiian Host and HHML had reached an agreement in principle on how to proceed, that HHML was financially capable and ready to close on the same terms that FHB had offered to Citadel, and HHML may even be prepared to improve upon them as might be necessary to allow Citadel to receive

reimbursement for its diligence costs, that HHML would look forward to working with FHB on closing on the transaction and to providing whatever information FHB would need to proceed.

70.    On information and belief, Mr. Harrison immediately disclosed the confidential call he had received to Citadel.  Mr. Harrison appears not to have only advised Citadel of the fact of the call he received, but revealed the identity of the caller and other confidential information, as such was disclosed by Mr. Beighley in his call to Mr. Schultz shortly after the call with Mr. Harrison call.

### Citadel Requests a Meeting With Hawaiian Host's Board, but Citadel Refuses to Address the Fundamental Problems With its Proposal

71.    Hawaiian Host Board of Director member and trustee Colbert Matsumoto e-mailed Mr. Delgado on September 25, 2020, informing him that:

> We were quite confused and disturbed by the sequence of events that occurred over the last week.  Two weeks ago, we thought we had reached an understanding with Citadel regarding the terms of the Cooperation Agreement which outlines the proposed transaction. However, since that time we were informed that material changes were being made as late as last weekend by your lawyers.  I am not certain whether you were informed of or in agreement with all of the changes proposed by your lawyers. However, the materiality of the changes caught us by surprise and were inconsistent with what we were led to believe Citadel was prepared to accept.

> Those changes at such a late stage put us in a compromised position as your lawyers undoubtedly realized.  In a scramble, we were forced to seek out other options.  To be candid with you, we now have another interested party with whom we are engaged in substantive discussions.  We are working toward putting a mutually acceptable deal together.

72.     An hour after Mr. Matsumoto's e-mail was sent, Mr. Yuen emailed
Mr. Sullivan and Mr. Schultz that "[i]n connection with Citadel's purchase of the First
Hawaiian Bank's debt we have prepared the attached Notice and Estoppel Certificate that
we would like [Mr. Schultz] to sign."  Ex. H.

73.     On or about Monday, September 28, 2020, Mr. Schultz contacted
FHB regarding Mr. Yuen's email.  For the first time, Mr. Schultz and Hawaiian Host
were informed that, despite Hawaiian Host's explicit objections, and despite the clear
language of the Confidentiality Agreement, Citadel and FHB had decided to proceed with
the transaction, over the objections of Hawaiian Host.

74.     Despite Citadel's intent to proceed with the hostile acquisition, Mr.
Delgado requested to be permitted the opportunity to make a personal presentation to
Hawaiian Host's Board of Directors.  On September 28, 2020, Hawaiian Host conducted
a Board meeting by Zoom that was attended by Mr. Delgado and Jim Beighley, CEO of
Citadel's Pacific Islands Division.  During this meeting, Citadel stated that it had
continued to work with Mr. Horner on this transaction, that he was a valued partner of
Citadel in what Hawaiian Host understood was in reference to this transaction, and that
he would be a part of their future in Hawai'i.

75.     At the meeting, Citadel confirmed that it would not agree to the
terms that had been previously approved by Hawaiian Host.

### **FHB Refuses to Proceed With the Partner Identified by Hawaiian Host, and Conspires With Citadel to Pursue a Hostile Takeover of Hawaiian Host**

76.    On September 29, 2020, Hawaiian Host sent emails to FHB, both through Mr. Schultz and through Hawaiian Host's counsel, advising that HHML was ready to execute upon the same terms that had been approved by Hawaiian Host and FHB but rejected by Citadel. The email from Hawaiian Host's counsel to FHB's counsel stated:

> The important point is this: FHB committed to certain deal terms for the sale of its position as HH Group's lender (and as agent for its participating lenders) with Citadel and had finalized in all respects the terms of that transaction, including all deal documents. Citadel, however, was unwilling to complete a Cooperation Agreement with my clients, even upon the terms they themselves had proposed.
>
> . . .
>
> HHML Acquisition, LLC, similarly affiliated, is in position to step into the deal terms finalized with Citadel, which unquestionably would be in the best interests of HH Group. Given that FHB was prepared to immediately proceed with such terms with Citadel, we assume there is no reason why FHB would not be prepared to do the same with HHML - except to benefit certain other interests.

77.    Hawaiian Host requested that FHB provide final, execution ready documents and wire instructions for the non-refundable deposit. Hawaiian Host made clear that HHML was prepared to make a non-refundable deposit of a substantial amount the next day, in connection with execution of the documents, so that FHB could book the transaction in the current quarter if that was an important issue.

78.    Hawaiian Host emphasized, as HHML already had, that HHML was willing to proceed on the same terms and documents offered to Citadel.

29

79.    FHB refused and instead told Hawaiian Host that it would complete a transaction with Citadel over Hawaiian Host's clear objections.

80.    On September 30, 2020, Hawaiian Host sent an email to FHB's counsel informing FHB that its conduct constituted a breach of the Confidentiality Agreement:

> Your client's decision to continue any discussions, negotiations or even closing on any transaction concerning the debt of Hawaiian Host after Hawaiian Host informed FHB and I informed you that it would not proceed with Citadel would appear to constitute aiding or abetting Citadel's breach of contract, among other things. I make no comment on the conduct of FHB and the duties it has or may owe to Hawaiian Host directly. The actions have caused and are causing substantial harm to Hawaiian Host.

81.    That same day, Hawaiian Host CEO Mr. Schultz sent Mr. Delgado a letter further emphasizing Citadel's obligations under the Confidentiality Agreement:

> As there will be no Possible Transaction, Citadel's use of all or any of the materials provided, or information provided in any discussion, in connection with considering, learning of, negotiating, evaluating, or proceeding to close on any other transaction that is without Hawaiian Host's written approval is prohibited.  *See* Confidentiality Agreement, including without limitation, Section 2.  This would include all disclosures of the existence, nature, amount, security, and economic value, among other things, of Hawaiian Host's debt with First Hawaiian Bank and Central Pacific Bank.  As has been documented, the amount, nature and value of the lenders' interest was only provided pursuant to the Confidentiality Agreement.

> Hawaiian Host does not consent to Citadel seeking, negotiating for, or acquiring lenders' position in its debt.  Any such attempt would clearly be traceable to the Confidential Information and Citadel's illegal use of it.  Any continued attempt by Citadel to do so, or to contend that it has the right to do so, or such other actions which might increase the price of lenders' interest to any

> other party, is a clear violation of the Confidentiality Agreement,
> other duties undertaken by Citadel or imposed by agreement or
> law.

Ex. I.

82.    In that letter, Mr. Schultz affirmed Hawaiian Host's objection to

Citadel's acquisition of its debt, gave notice of the termination of any rights Citadel had

under the Confidentiality Agreement, and demanded the return or destruction of all

materials that had been provided.  Mr. Schultz also noted that since Citadel had

apparently shared with FHB extensive information that had been provided to it in

confidence under the Confidentiality Agreement, that too had been a material breach of

the terms of that agreement as FHB was its lender with interests at this point clearly

adverse to Hawaiian Host.

83.    On information and belief, despite these clear warnings and in

breach of the Confidentiality Agreement, Citadel and FHB thereafter conspired for FHB

to sell Citadel the loans at a discount so that Citadel could obtain first a substantial

collateral interest in Hawaiian Host's assets and, ultimately, full ownership of such

assets, on terms wholly unacceptable to Hawaiian Host.

**FHB Transfers Hawaiian Host's Loans to Citadel, in Clear Breach of the
Confidentiality Agreement and Hawaiian Host's Instructions to FHB and Citadel**

84.    On October 1, 2020, FHB provided what it called a "Notice of Debt

Sale", indicating that despite its own notice and knowledge of the Confidentiality

Agreement dating back to July, and despite the objection of its borrower, FHB had sold

some portion of its debt to a newly created Citadel affiliate and that, apparently, FHB had agreed to act as Agent for, and on behalf of, Citadel.  Ex. J.

85.    On October 1, 2020, Citadel's Mr. Beighley sent a letter to Mr. Schultz titled, "Notice of Termination of Discussions."  Ex. K.  In his letter, Mr. Beighley made numerous false claims and statements relating to the underlying transactions. Among other statements, Mr. Beighley claimed that, "In deciding to acquire the debt, we [Citadel] did not rely on any confidential information from you or your company."  This statement clearly demonstrates that Citadel knew that any acquisition that relied on Hawaiian Host's confidential information was barred by the Confidentiality Agreement.

86.    Citadel's purchase of the FHB loans was neither a financial investment in Hawaiian Host nor a negotiated transaction with Hawaiian Host and, accordingly, does not constitute a Possible Transaction within the meaning set forth in the Confidentiality Agreement.

### FHB and Citadel Continue to Thwart Hawaiian Host's Ability to Complete its Transaction With HHML

87.    Since selling the FHB loans, FHB and Citadel both have acted in breach of the loan documents and with the intent of furthering Citadel's goal of enriching Citadel and any of its partners at the expense of Hawaiian Host and its stakeholders. FHB and Citadel's actions have each and combined intentionally thwarted and frustrated Hawaiian Host's ability to complete its transaction with HHML.  These include, among other wrongful acts:

a.      FHB and Citadel, and each of them, have refused to timely

provide a loan payoff statement, despite written, repeated demand first sent on October 6,

2020.  Each of FHB and Citadel were informed that such payoff was needed in order to

conclude a refinance of the then-existing debt that Hawaiian Host intended to effectuate

the last week of October and before the "Forbearance Agreement" then in effect was set

to expire.  Despite such demands, FHB and Citadel refused to substantively reply and

more than two weeks passed before any substantive response was received.  As of at least

October 28, 2020, neither had provided a complete or accurate payoff demand or

explanation of the payment of all or portions of the debt from the sale of Hawaiian Host's

Los Angeles property and assets.

b.      Citadel failed or refused to timely provide the required interest

payment notices, which are expressly required under the loans it purportedly acquired,

and later claimed that they were unable to calculate them as Citadel had never acted as a

lender and did not understand how to calculate Libor-based interest.

c.      FHB, in its October 1st "Notice of Debt Sale", specifically

identified itself as both a lender and Agent of Citadel.  Yet, Ms. Blakeney of FHB

admitted to refusing to respond to Hawaiian Host's payoff demand requests and other

inquiries.

d.      FHB, apparently aware of its misconduct through Ms.

Blakeney in first refusing to provide payoff amounts or mandatory documentation and

later concocting frivolous objections, directed its counsel on October 28, 2020 to advise

Hawaiian Host's counsel that, contrary to what it initially claimed, FHB was only a

33

"limited" agent for Citadel. Counsel, of course, failed to explain in any way what FHB's "agency" was in fact limited to.

e.      FHB was given the original share certificates of Hawaiian Host's subsidiaries, including Hawaiian Host Honolulu, LLC, Mauna Loa Macadamia Nut Corporation, and Hawaiian Host Candies of L.A., Inc. as additional security for certain loans. Demand for their whereabouts was made on October 14, 2020. FHB and Citadel refused to respond or disclose who held such stock certificates given that FHB and Citadel each claimed to own part of the loans secured by such certificates. On October 26, 2020, FHB claimed that the certificates were "now" in the possession of Citadel, but Citadel has refused to confirm such fact.

f.      On October 26, 2020, Hawaiian Host Candies of L.A., Inc. ("HHLA"), a wholly-owned subsidiary of Hawaiian Host, sold its Los Angeles manufacturing facility to a third party, with all net proceeds from the sale being disbursed to FHB. Neither FHB nor Citadel has provided any information on how those sale proceeds were applied to the loan obligations nor when the stock certificates for HHLA will be returned to Hawaiian Host.

g.      FHB and Citadel refused to answer Hawaiian Host's inquiry of October 14, 2020 as to who possessed the original notes, given that FHB claimed to have sold the majority of such notes to Citadel on October 1, 2020. On October 26, 2020, FHB sent a communication claiming that the notes were "now" in the possession of Citadel, but Citadel has refused to confirm it possesses such notes.

34

h.      In connection with Hawaiian Host's intended payoff of the

loans, Hawaiian Host promptly provided drafts of the release and termination documents

which would be required to close on the refinance and retire the loans to FHB's counsel

on this matter, Ted Pettit.  Mr. Pettit was specifically advised in writing by attorney

Darren Conley on October 15, 2020, to notify Ms. Blakeney that he, as counsel to FHB,

had received these so that they could be processed in the ordinary course, which is

typically a matter of days.  After no response was received from FHB or its counsel and

after repeated demand was made directly and through Title Guaranty Escrow Services for

response and comment, Ms. Blakeney sent a communication claiming that Hawaiian Host

had acted improperly by sending the release documents to Mr. Pettit, that he has not been

retained by FHB on this matter (despite FHB specifically designating him as its sole

counsel in a written agreement with Hawaiian Host from just weeks earlier), and that

FHB would need to receive the release documents directly.  Of course, Ms. Blakeney

promptly "assigned" the work to Mr. Pettit but the delay prevented the refinancing of the

loans as Hawaiian Host had planned thereby causing the Forbearance Agreement to

expire and allow Citadel, as the new owner of the loans, to put Hawaiian Host in default

from and after November 1, 2020 and to foreclose or convert its assets and businesses.

i.      FHB violated the applicable loan documents, including,

without limitation, the Credit Agreement, when it purportedly reassigned certain

collateral to Citadel in connection with its sale of certain interests in the loans to Citadel

by way of an amendment.  Among other things, (i) Section 12.05 of the Credit

Agreement states that the party against whom an amendment is to be enforced must agree

in writing to such amendment, and FHB not only did not request such agreement, it concealed such amendment from Hawaiian Host, (ii) the Deeds of Trust securing certain California property could not be assigned except by amendment for which the consent of the borrower and mortgagor is required, neither of which was requested or obtained, and (iii) the proceeds generated from the property sales were applied in violation of the Credit Agreement and applicable law, for FHB's benefit.

        j.     FHB and Citadel refused to provide copies of the collateral assignment documents, which are essential to accomplish the refinance of the loans and release of such collateral instruments.

        88.    Each of the acts, separately or taken together, has made it impossible for Hawaiian Host to refinance and pay off such loans, obtain the return of its stock certificates, and cause the release of its collateral.  This was done with the purpose or effect of preventing Hawaiian Host from paying off the loans prior to the expiration of the Forbearance Agreement in effect and which expires on October 31, 2020, with the purpose or effect, or both, of allowing Citadel to declare a default under the loans and to collect interest, fees and charges it is not entitled and/or to further its efforts to effectuate a hostile takeover of Hawaiian Host or its assets and businesses.

        89.    FHB is continuing to work with and for Citadel in oppressing Hawaiian Host to coerce and compel it to give up its company to Citadel.  These actions are causing continuing, irreparable harm to Hawaiian Host and must stop immediately.

## COUNT 1
**Breach of the Confidentiality Agreement**
**(Against the Citadel Entities)**

90.     Hawaiian Host realleges and incorporates by reference all of the foregoing allegations as though fully set forth herein.

91.     The Confidentiality Agreement is an enforceable contract.

92.     Hawaiian Host performed all of its obligations under the Confidentiality Agreement.

93.     As alleged in detail above, Citadel intentionally breached the agreement by, among other things, using the confidential and non-public information it acquired from Hawaiian Host to evaluate, underwrite, formulate an agreement, decide upon, and acquire the FHB loans.

94.     Without the information that was disclosed pursuant to the Confidentiality Agreement, it would have been impossible for Citadel to evaluate, underwrite, formulate an agreement, decide upon, and/or complete any transaction involving Hawaiian Host (including the purchase of FHB's loans to Hawaiian Host).

95.     Citadel's acquisition of the collateral interests in and to Hawaiian Host's assets and subsidiaries constitutes an acquisition of an interest in or to Hawaiian Host, which outcome is prohibited under the Confidentiality Agreement except with the consent of Hawaiian Host which has not been given.

96.     Hawaiian Host has been harmed by Citadel's breaches, for which it is entitled to damages in an amount to be proven at trial.

97.     Any and all of Citadel's purported collateral interests in and to Hawaiian Host and its assets and subsidiaries should be immediately and permanently disallowed and terminated.

## COUNT 2
### Tortious Interference With Contract
### (Against FHB)

98.     Hawaiian Host realleges and incorporates by reference all of the foregoing allegations as though fully set forth herein.

99.     The Confidentiality Agreement is an enforceable contract between Citadel and Hawaiian Host.

100.    FHB had knowledge of the Confidentiality Agreement.

101.    As alleged in detail above, FHB intentionally induced Citadel to breach the Confidentiality Agreement and acquire the FHB loans over the objection of Hawaiian Host.

102.    FHB was without justification in intentionally inducing Citadel to breach its agreement.

103.    Citadel breached the Confidentiality Agreement.

104.    Hawaiian Host has been harmed by FHB's conduct, for which it is entitled to damages in an amount to be proven at trial.

## COUNT 3
### Tortious Interference With Prospective Business Opportunity
### (Against the Citadel Entities and FHB)

105.    Hawaiian Host realleges and incorporates by reference all of the foregoing allegations as though fully set forth herein.

106.    Hawaiian Host's proposed agreement with HHML constituted a prospective advantage or expectancy sufficiently definite, specific, and capable of acceptance in the sense that there was a reasonable probability of it maturing into a future economic benefit.

107.    Citadel and FHB had knowledge of the proposed agreement with HHML.

108.    As alleged in more detail above, Citadel and FHB had a purposeful intent to interfere with the proposed agreement between Hawaiian Host and HHML, and did in fact interfere with the relationship between Hawaiian Host and HHML.

109.    Citadel and FHB caused an impairment of the relationship between Hawaiian Host and HHML.

110.    Hawaiian Host has been harmed by Citadel and FHB's conduct, for which it is entitled to damages in an amount to be proven at trial.

**COUNT 4**
**Violation of Hawai'i Revised Statutes Section 480-2,**
**Unfair Methods of Competition**
**(Against All Defendants)**

111.    Hawaiian Host realleges and incorporates by reference all of the foregoing allegations as though fully set forth herein.

112.    As discussed above, Hawaiian Host disclosed confidential business information to Citadel.  Hawaiian Host only disclosed this information because Citadel entered into the Confidentiality Agreement.

113.    FHB was aware of the existence of the Confidentiality Agreement from the outset of the transaction; indeed, a copy was provided to one of its directors, who in turn provided it to FHB's attorneys.

114.    As discussed in detail above, Defendants conspired to use Hawaiian Host's confidential information to allow Citadel to purchase the FHB loans, and to block HHML from purchasing the loans, in violation of the Confidentiality Agreement.

115.    In doing so, FHB sold the obligations to their preferred customer, Citadel, which was working with a member of FHB's Board of Directors, to the substantial detriment of Hawaiian Host and HHML.

116.    By utilizing Hawaiian Host's confidential information to purchase the FHB loans, breaching the Confidentiality agreement, thwarting Hawaiian Host's ability to work with partners other than FHB's preferred client, and engaging in the myriad additional misconduct alleged above, Defendants gained an unfair competitive advantage over potential competitors.

117.    The foregoing conduct constitutes an unfair method of competition.

118.    As a result of Defendants' actions, Hawaiian Host has been injured in its business and there has been injury to competition generally, such as the injury to other investors or purchasers in Hawaiian Host (including HHML).

### COUNT 5
### Unjust Enrichment
### (Against Citadel Parties)

119.    Hawaiian Host realleges and incorporates by reference all of the foregoing allegations as though fully set forth herein.

120.    Citadel acquired Hawaiian Host's loans at a substantial discount to par.

121.    Citadel relied upon the confidential information it received from Hawaiian Host in evaluating, underwriting, formulating an agreement, deciding upon, and acquiring the FHB loans, including but not limited to in making its determination when and on what terms to acquire Hawaiian Host's loans.

122.    Citadel must disgorge to Hawaiian Host all of the financial benefit it has received or will receive as a result of its actions, including without limitation all interest it may collect or seek to collect as well as any fees, costs or other charges it seeks to impose upon Hawaiian Host.

123.    Citadel must disgorge to Hawaiian Host any consideration it has received or will receive from Hawaiian Host in connection with the loans, including, without limitation, repayment of any portion of the principal amount of the loans.

124.    Citadel's lien on and collateral interests in and to the assets of Hawaiian Host and its subsidiaries must be declared null and void and otherwise disallowed.

## <u>COUNT 6</u>
## Declaratory Relief
## (Against All Parties)

125.    Hawaiian Host realleges and incorporates by reference all of the foregoing allegations as though fully set forth herein.

126.    An actual, imminent or threatened controversy exists between Hawaiian Host, Citadel, and FHB, and/or antagonistic claims are present between the

parties involved that indicate imminent and inevitable litigation, and a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.

127.    As alleged in detail above, the Confidentiality Agreement prevented Citadel from entering into any transaction involving Hawaiian Host, its business, or its assets without the approval of Hawaiian Host.  Among other things, the Confidentiality Agreement requires that Citadel "will not use the Evaluation Material of the Disclosing Party in connection with **any transaction** or proposed transaction to which the Disclosing Party does not give its written approval."  (emphasis added).

128.    In violation of the Confidentiality Agreement, Citadel used Hawaiian Host's confidential and non-public information to evaluate, underwrite, formulate an agreement, decide upon, and acquire the FHB loans.

129.    Hawaiian Host is entitled to a declaration that any and all security or other collateral interest that Citadel acquired from FHB related to Hawaiian Host was in violation of the Confidentiality Agreement.

130.    Hawaiian Host is further entitled to a declaration disallowing, terminating, or voiding any security or other collateral interest that Citadel purports to have obtained that is related to Hawaiian Host, including but in no way limited to any security interest in Hawaiian Host's personal property, real property, assets, accounts, receivables, stocks, business, or collateral of any kind or type whatsoever.

## <u>COUNT 7</u>
## Injunctive Relief
## (Against All Parties)

131.    Hawaiian Host realleges and incorporates by reference all of the foregoing allegations as though fully set forth herein.

132.    As alleged in detail above, the Confidentiality Agreement prevented Citadel from entering into any transaction involving Hawaiian Host, its business, or its assets without the approval of Hawaiian Host.  Among other things, the Confidentiality Agreement requires that Citadel "will not use the Evaluation Material of the Disclosing Party in connection with **any transaction** or proposed transaction to which the Disclosing Party does not give its written approval."  (Emphasis added.)

133.    In violation of the Confidentiality Agreement, Citadel used Hawaiian Host's confidential and non-public information to evaluate, underwrite, formulate an agreement, decide upon, and acquire the FHB loans.

134.    Hawaiian Host is entitled to injunctive relief preventing Citadel from taking any action that would impair, reduce, encumber, or affect, in any way, any and all security or other collateral interest that Citadel purportedly acquired from FHB related to Hawaiian Host.  Such injunctive relief would include, but in no way be limited to, preventing the transfer, sale, or foreclosure upon and of Hawaiian Host's personal property, real property, assets, accounts, receivables, stocks, business, or collateral of any kind or type whatsoever.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully prays for judgment against Defendants as follows:

1.      For an award of special and general damages in Hawaiian Host's favor and against Defendants in an amount to be determined at trial.

2.      For an order disgorging all unjust enrichments received by any Defendant in amounts to be determined at trial and/or the disallowance or cancellation of any and all collateral interests Citadel asserts in and to Hawaiian Host, its assets and subsidiaries.

3.      For an order disallowing or terminating any and all collateral interests in and to Hawaiian Host, its assets and subsidiaries that may be held by any Defendant.

4.      For attorneys' fees and costs incurred in this suit, to the extent such fees are allowed by law.

5.      For interest on pecuniary losses from the date of occurrence of such losses.

6.      For declaratory relief, as alleged above.

7.      For injunctive relief, as alleged above.

8.      For treble damages and/or punitive damages in Hawaiian Host's favor in an amount to be determined at trial.

9.      For an order discharging Hawaiian Host and its affiliates from any liability to Citadel or FHB under the loans at issue.

10.    For such other and further relief as this Court deems just.

DATED: Honolulu, Hawaiʻi, October 31, 2020.


/s/Joachim P. Cox
JOACHIM P. COX
RANDALL C. WHATTOFF
KAMALA S. HAAKE

Attorneys for Plaintiff
HAWAIIAN HOST INC.

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAIʻI

| | |
|---|---|
| HAWAIIAN HOST, INC., | CIVIL NO. _____ |
| Plaintiff, | DEMAND FOR JURY TRIAL |
| vs. | |
| FIRST HAWAIIAN BANK, CITADEL PACIFIC, LTD., CITADEL FOOD GROUP HAWAII LLC, AND CITADEL WINDBREAK, LLC; JOHN DOES 1–10, JANE DOES 1–10, DOE CORPORATIONS 1–10, DOE LIMITED LIABILITY COMPANIES 1–10, AND DOE PARTNERSHIPS 1–10, | |
| Defendants. | |

## DEMAND FOR JURY TRIAL

Plaintiff HAWAIIAN HOST, INC. by and through their attorneys, Cox Fricke LLP, pursuant to the provisions of Rule 38 of the Hawaiʻi Rules of Civil Procedures, hereby demand a trial by jury on all issues so triable in the action filed by Plaintiff herein.

DATED: Honolulu, Hawaiʻi, October 31, 2020.

/s/Joachim P. Cox
_____
JOACHIM P. COX
RANDALL C. WHATTOFF
KAMALA S. HAAKE

Attorneys for Plaintiff
HAWAIIAN HOST INC.

| STATE OF HAWAI'I<br>CIRCUIT COURT OF THE<br>FIRST CIRCUIT | SUMMONS<br>TO ANSWER CIVIL COMPLAINT | CASE NUMBER |
|---|---|---|

| PLAINTIFF | VS. | DEFENDANT(S) |
|---|---|---|
| HAWAIIAN HOST, INC. | | FIRST HAWAIIAN BANK, CITADEL PACIFIC, LTD., CITADEL FOOD GROUP HAWAII LLC, AND CITADEL WINDBREAK, LLC; JOHN DOES 1–10, JANE DOES 1–10, DOE CORPORATIONS 1–10, DOE LIMITED LIABILITY COMPANIES 1–10, AND DOE PARTNERSHIPS 1–10 |

PLAINTIFF'S NAME & ADDRESS, TEL. NO.

JOACHIM P. COX        7520-0
RANDALL C. WHATTOFF   9487-0
KAMALA S. HAAKE       9515-0
Cox Fricke LLP
800 Bethel Street, Suite 1800, Honolulu, HI 96813, Telephone: (808) 585-9440

**TO THE ABOVE-NAMED DEFENDANT(S)**

You are hereby summoned and required to file with the court and serve upon

Joachim P. Cox, Randall C. Whattoff, and Kamala S. Haake
Cox Fricke LLP, 800 Bethel Street, Suite 600, Honolulu, HI 96813

,

plaintiff's attorney, whose address is stated above, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRY OF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

| The original document is filed in the Judiciary's electronic case management system which is accessible via eCourt Kokua at: http://www.courts.state.hi.us | Effective Date of 28-Oct-2019<br>Signed by: /s/ Patsy Nakamoto<br>Clerk, 1st Circuit, State of Hawai'i |  |
|---|---|---|

 In accordance with the Americans with Disabilities Act, and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the Circuit Court Administration Office on OAHU- Phone No. 808-539-4400, TTY 808-539-4853, FAX 539-4402, at least ten (10) working days prior to your hearing or appointment date.

# EXHIBIT C

# AIG

AIG General Insurance
Financial Lines Claims
175 Water Street
New York, NY 10038
www.aig.com

Nelly Anderson
Complex Claims Director
Financial Institutions

T  212 458 4605
F  866 248 9059
Nelly.anderson@aig.com

Correspondence Address:
AIG General Insurance
Financial Lines Claims
P.O. Box 25947
Shawnee Mission, KS 66225

January 14, 2021

**<u>VIA EMAIL ONLY</u>** – gmcdonald@fhb.com
Gwen McDonald
First Hawaiian Bank
99 Bishop Street, 9th Floor
Honolulu, HI 96813

| | |
|---|---|
| **Insured:** | **First Hawaiian Inc.** |
| **Matter:** | **Hawaiian Host, Inc.** |
| **Claim No.:** | **0572356606US** |
| **Policy No.:** | **01-701-30-68** |

Dear Ms. McDonald:

AIG Claims Inc. is the claims administrator handling claims arising under Financial Institution Professional Liability Insurance Policy 01-766-56-08 (the "Policy") issued to First Hawaiian Inc. fka BankWest Corp. ("First Hawaiian") by AIG Specialty Insurance Company ("AIG Specialty"), a member underwriting company of AIG General Insurance, Inc. ("AIG"). I am the Complex Claims Director handling this matter. Accordingly, please address all future correspondence to me.

The purpose of this letter is to advise First Hawaiian about AIG Specialty's coverage position, as explained below.

We would like you to know that we appreciate you as a customer and are committed to working closely with you in the defense of this matter. We expect that you may have questions after reading this letter regarding our position and the practical impact of the reservation of rights. Please feel free to contact me regarding any questions about our coverage position as well as to discuss a plan of action for the subject claim.

In considering your request for coverage, we have reviewed the insurance policy referenced above, as well as the allegations asserted. No other policies were considered. If you assert a right to coverage under another policy issued by any other member company of AIG, please submit notice pursuant to the notice provisions contained in that policy.

## I.    The Complaint

Please know that our analysis of this claim does not imply any validity to the allegations made in the Complaint.

We are in receipt of a Complaint dated October 31, 2020, (the "Complaint") in the Circuit Court for the First Circuit, State of Hawaii, filed by Hawaiian Host, Inc.

**EXHIBIT C**



("Plaintiff") against First Hawaiian Bank, Citadel Pacific, Ltd., Citadel Food Group Hawaii LLC, and Citadel Windbreak, LLC; John Does 1-10, Jane Does 1-10, DOE Corporations 1-10, DOE Limited Liability Companies 1-10, and DOE Partnerships 1-10 (collectively, the "Defendants").

Plaintiff is the largest manufacturer of chocolate macadamia nuts in the world. Plaintiff claims that for years, First Hawaiian Bank ("FHB") has been its primary creditor, issuing loans and collecting fees. By mid-2020, FHB held $75,000,000 in debt in the Plaintiff, of which FHB was the lender of $60,000,000 and acted as an agent for Central Pacific Bank, which held through a participated interest, $15,000,000. Seeking to reorganize and restructure in 2019 and 2020, Hawaiian Host sought potential investors who could contribute new capital to continue its business. Plaintiff further discussed a Chapter 11 restructuring with FHB, as Plaintiff's only secured creditor and banker, wherein FHB would need to agree to provide debtor-in-possession financing or agree to allow another creditor to receive priority for its advances during the pendency of the bankruptcy. FHB did not agree to such reorganization plan.

In July of 2020, FHB requested that Plaintiff enter into discussions with Citadel entities, a client of FHB and a well-financed operating company, regarding an investment by Citadel or acquisition of Plaintiff's business. Prior to negotiations and disclosures of financial and business information, Plaintiff required that the Citadel entities enter into a confidentiality agreement. Don Horner, a board of director of FHB and a prior CEO, also disclosed that he intended to participate as an investor through Citadel in the investment. Plaintiff objected to such involvement as being improper, and was then told that there would be no participation in the transaction from any FHB insider. After the disclosures, Citadel proposed a "Non-Binding Offer" on August 5, 2020. The proposed offer was materially less than Plaintiff's debt to FHB and would require FHB to forgive some of the debt balance, which Citadel would be responsible for negotiating with FHB. Soon thereafter, Citadel materially changed the terms of their offer, and Plaintiff rejected the new terms. Plaintiff started negotiations with another investor, however, FHB refused to proceed with the new investor. Instead, FHB continued to negotiate with Citadel.

Plaintiff alleges that, in breach of the confidentiality agreement, Citadel and FHB conspired to sell the loans to Citadel at a discount so that Citadel could obtain a substantial collateral interest in Plaintiff's assets and then full ownership of the assets on terms that were unacceptable to Plaintiff. On October 1, 2020, FHB provided notice that it had sold the debt to Citadel over Plaintiff's objections and that FHB would continue to hold some of the debt and also be an agent for Citadel. Plaintiff alleges that FHB further engaged in activities to prevent Plaintiff from refinancing or paying off the debt, and also violating its own credit agreements.

Plaintiff brings causes of action for breach of the confidentiality agreement by the Citadel entities, Tortious Interference with Contract against First Hawaiian Bank, Tortious Interference with Prospective Business Opportunity against the citadel



entities and First Hawaiian Bank, Violation of Hawaii revised statutes section 480-2 Unfair Methods of Competition against all Defendants, unjust enrichment against the citadel entities, and declaratory and injunctive relief against all parties.

Plaintiff seeks a declaratory judgement, an order disallowing and terminating all collateral interests in and to Hawaiian Host, injunctive relief, special and general damages, disgorgement, treble damages, interest on pecuniary losses, attorneys' fees, costs, and interest.

## II.    The Policy

Marsh initially reported this matter on November 9, 2020, enclosing a copy of the Complaint under the Policy. AIG Specialty issued the Policy to First Hawaiian effective from September 1, 2020 to September 1, 2021.  By way of general summary, subject to its terms, conditions, and exclusions, the Policy contains a Limit of Liability of $10,000,000 (Ten Million Dollars) in the aggregate for all Loss, subject to a Retention of $1,000,000 (One Million Dollars) per Endorsement 3 and a separate Retention of $5,000,000 for specified Lending Acts per Endorsement 34. The Policy is a "claims-made and reported" insurance policy providing certain coverage for Claims that are first made against the Insured and reported in the Policy Period.

## III.    Coverage Analysis

As an initial matter, the Complaint is made against First Hawaiian Bank, which we understand is an Insured under the Policy. It does not appear that any of the other Defendants are covered entities under the Policy. If you believe that this understanding is incorrect, please notify us at your earliest convenience.

The Insuring Agreement found in Clause 1 provides, in relevant part, that the Policy shall pay the Loss of an Insured arising from a Claim for any actual or alleged Wrongful Act of any Insured in the rendering or failure to render Professional Services. Loss includes damages, judgments, settlements, and Defense Costs. A Claim is defined in Clause 2(a) of the Policy and Endorsement 18 as a written demand for monetary or non-monetary relief. Professional Services are defined in Clause 2(i) of the Policy and Endorsement 12, in relevant part, as those services of the Company permitted by law or regulation pursuant to an agreement with a customer or client, as long as such service is rendered on behalf of the customer or client in return for a fee, commission or other compensation. Endorsement 34, Lender Liability Extension, provides coverage for certain specified Lending Acts. A Lending Act is defined, in relevant part, as any act performed for a customer or client relating to an extension of credit, refusal to extend credit, or an agreement related to an extension of credit. A Wrongful Act is defined in Clause 2(k) of the Policy and Endorsement 14 as any actual or alleged act, error, or omission in the rendering of or failure to render Professional Services. It appears that the Complaint qualifies as a Claim as it is a written demand for monetary and non-monetary relief,



and that it alleges a Wrongful Act against First Hawaiian in its rendering of Professional Services in relation to a Lending Act. Therefore, AIG Specialty will accept the Complaint for coverage subject to a reservation of rights as further explained below. We note that per Endorsement 34, the Retention applicable to Lending Acts is Five Million ($5,000,000) Dollars.

We direct your attention to Clause 4 of the Policy for potentially applicable exclusions.

Exclusion (a), as amended by Endorsement 15, states that the Insurer shall not be liable to make any payment for Loss in connection with any Claim alleging, arising out of, based upon or attributable to any conflict of interest or the gaining in fact of any profit or advantage to which an insured was not legally entitled or (b) the committing in fact of any criminal or deliberate fraudulent act, subject to a final adjudication. Given the allegations of tortious interference with economic relations and unjust enrichment, we note the potential applicability of this Exclusion. We further note that Plaintiff seeks disgorgement of all unjust enrichments of all Defendants, which is not covered Loss.

We note that the Definition of Loss in Clause 2(g) of the Policy, as amended by Endorsement 10 and 11, does not include the cost of complying with any settlement or award for non-monetary relief, civil or criminal fines or penalties imposed by law, any amounts for which the Insured are not financially liable, or matters which may be deemed uninsurable under the law pursuant to which this Policy is construed, or that portion of the settlement or award relating to fees and commissions. Given allegations that the Defendants have violated certain statutes and also Plaintiff's request for declaratory relief, we note the potential applicability of this portion of the Policy.

We further note the potential applicability of Endorsement 34, Lender Liability Extension, which deletes exclusion N, and also excludes coverage for Claims arising out of, alleging, or in any way involving, directly or indirectly, any in fact willful violation of laws or regulations relating to extensions or denials of credit, when established through final adjudication.

Per Endorsement 23, although the Insurer assumes no duty to defend under the Policy, we also note that it has the right to effectively associate with the Insured in its defense of any Claim that appears reasonably likely to involve the Insurer. In addition, only Defense Costs incurred with our consent are covered under the Policy. We expressly reserve all rights in this regard. Please provide us with the name of the defense firm in this action along with their rates and proposed budget for this matter. Please note that any Defense Costs incurred prior to our receipt of the Complaint would not be covered under the Policy and would not be credited toward the retention.



Per Endorsement 25, we note that the Policy is excess to any other valid and collectible insurance, including Mortgage Impairment Policy B1180D170001/007 and B111SP171623 issued by Lloyd's Underwriters.

If you have any other insurance policies, which may respond to this claim asserted, you should notify that carrier immediately.

AIG Specialty's coverage position is based on the information presently available to us. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions or other provisions of the Policy, or any other policies of insurance issued by AIG Specialty or any of its affiliates. AIG Specialty expressly reserves all of its rights under the Policy, at law or in equity, including but not limited to the right to recoup its payments if appropriate and the right to assert additional defenses to any claims for coverage if subsequent information indicates that such action is warranted. Should you have any additional information that you feel would either cause us to review our position or would assist us in our investigation or determination, we ask that you advise us as soon as possible. Also, if you are served with any additional demands or complaints or pleadings, please forward them to us immediately, so that we can review our coverage position.

In closing, allow me to reiterate that we value you as a customer and encourage you to contact us should you have any questions or concerns regarding the contents of this letter. Thank you for your cooperation in this matter.

Very truly yours,

Nelly Anderson

Nelly Anderson

cc. Sanford.l.victor@marsh.com;

| **STATE OF HAWAIʻI**<br>CIRCUIT COURT OF THE<br>FIRST CIRCUIT | **SUMMONS**<br>TO ANSWER  CIVIL COMPLAINT / |
|---|---|

**CASE NUMBER**

**PLAINTIFF'S NAME & ADDRESS, TEL. NO.**

**FIRST HAWAIIAN BANK**

c/o DEELEY KING PANG & VAN ETTEN LLP

Alan Van Etten 1279

Tristan S.D. Andres  10066

1003 Bishop Street, Suite 1550

Honolulu, Hawaii  96813

Tel: (808) 533-1751; Emails: ave@dkpvlaw.com; ta@dkpvlaw.com

| PLAINTIFF<br><br>FIRST HAWAIIAN BANK | VS. | DEFENDANT(S)<br><br>AIG SPECIALTY INSURANCE COMPANY |
|---|---|---|

**TO THE ABOVE-NAMED DEFENDANT(S)**

You are hereby summoned and required to filed with the court and serve upon:

**FIRST HAWAIIAN BANK**

c/o DEELEY KING PANG & VAN ETTEN LLP

Alan Van Etten, Esq.

Tristan S.D. Andres, Esq.

1003 Bishop Street, Suite 1550, Honolulu, Hawaii  96813

Emails: ave@dkpvlaw.com; ta@dkpvlaw.com

plaintiff, as indicated above/whose address is stated above, an Answer to the Complaint For Declaratory  Judgment;

 Exhibits A-C; Summons To Answer Civil Complaint          , which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRYOF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

| The original document is filed in the Judiciary's electronic case management system which is accessible via eCourt Kokua at: http:/www.courts.state.hi.us | **Effective Date of 1-DEC-2021**<br>**Signed by: /s/ Patsy Nakamoto**<br>**Clerk, 1st Circuit, State of Hawaiʻi** |  |
|---|---|---|

 If you need an accommodation for a disability when participating in a court program, service, or activity, please contact the ADA Coordinator of the XX Circuit as soon as possible to allow the court time to provide an accommodation. Phone No. 808-539-4400, TTY 808-539-4853, FAX 808-539-4402 or Send a e-mail to:  adarequest@courts.hawaii.gov. The court will try to provide, but cannot guarantee, your requested auxiliary aid, service or accommodation.

**DEELEY KING PANG & VAN ETTEN**
ALAN VAN ETTEN        1279
TRISTAN S.D. ANDRES      10066
1003 Bishop Street, Suite 1550
Honolulu, Hawaii 96813
Telephone:    (808) 533-1751
Facsimile:    (808) 599-2908
E-mail:      ave@dkpvlaw.com
          ta@dkpvlaw.com

Attorneys for Plaintiff
FIRST HAWAIIAN BANK

**Electronically Filed**
**FIRST CIRCUIT**
**1CCV-25-0001011**
**23-JUL-2025**
**04:39 PM**
**Dkt. 16 DEC**

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAIʻI

| | |
|---|---|
| FIRST HAWAIIAN BANK, <br><br> Plaintiff, <br> vs. <br> AIG SPECIALTY INSURANCE COMPANY, <br> Defendant. | **CIVIL NO. 1CCV-25-001011** <br> (Declaratory Relief) <br><br> **SUPPLEMENTAL DECLARATION OF ALAN VAN ETTEN IN SUPPORT OF PLAINTIFF FIRST HAWAIIAN BANK'S MOTION TO ADMIT WILLIAM T. UM AS COUNSEL PRO HAC VICE (FILED JUNE 30, 2025); EXHIBIT "1"; NOTICE OF CONTINUED HEARING; CERTIFICATE OF SERVICE** <br><br> <u>**Continued Hearing:**</u> <br><br> **Date: July 24, 2025** <br> **Time: 8:45 a.m.** <br> Judge: The Hon. Taryn R. Tomasa <br><br> <u>Previous Hearing Held:</u> <br> Date: July 22, 2025 <br> Time: 9:00 a.m. <br> Judge: The Hon. Taryn R. Tomasa |

**SUPPLEMENTAL DECLARATION OF ALAN VAN ETTEN IN SUPPORT OF
PLAINTIFF FIRST HAWAIIAN BANK'S MOTION TO ADMIT WILLIAM T. UM AS
<u>COUNSEL PRO HAC VICE (FILED JUNE 30, 2025);</u>**

I, Alan Van Etten, declare as follows:

1.      I am an attorney duly licensed to practice law in the State of Hawaiʻi, and a partner

with the law firm Deeley King Pang & Van Etten. I am one of the attorneys representing Plaintiff

First Hawaiian Bank in the above captioned case. I have personal knowledge of the matters set forth in this Declaration, and, if called to testify, I could and would competently testify thereto.

2.      Pursuant to the Court's direction at the hearing on this matter on Tuesday, July 22, 2025, I make this Supplemental Declaration in support of Plaintiff First Hawaiian Bank's Motion to Admit William T. Um *Pro Hac Vice* to appear and participate in the above captioned matter as co-counsel with my law firm for Plaintiff First Hawaiian Bank.

3.      With this Court's permission, Mr. Um attended Tuesday's hearing by Zoom. I am informed by Mr. Um that, following this Court's direction at Tuesday's hearing, Mr. Um immediately emailed Mark A. Silverstein, counsel for defendant AIG SPECIALTY INSURANCE COMPANY ("AIG") to ask him whether AIG has a position regarding whether this Motion to Admit William T. Um Pro Hac Vice should be granted.

4.      The very next day, viz, today, July 23, 2025 I received an email from Mr. Um stating he have received a call from Hawaii attorney David A. Nakashima, Esq., who informed him that he has been retained by AIG as counsel for this matter and that AIG had no objection to Mr. Um's Pro Hac Vice application.

5.      Later today, I personally called Mr. Nakashima who confirmed that he had been retained by AIG as counsel for this matter and that AIG has no objection to Mr. Um's Pro Hac Vice application.

6.      Thereafter, I received via email a document entitled "Updated Declaration of William T. Um" that is attached to this Declaration as Exhibit "1".

7.      I respectfully request that the Court enter an Order admitting William T. Um *pro hac vice* for all further proceedings in this case.

2

I, Alan Van Etten, declare under penalty of law that the foregoing is true and correct to the best of my knowledge and belief.

DATED Honolulu, Hawai 'i, July 23, 2025.

/s/ *Alan Van Etten*
ALAN VAN ETTEN, ESQ.

# EXHIBIT 1

**DEELEY KING PANG & VAN ETTEN**
ALAN VAN ETTEN          1279
TRISTAN S.D. ANDRES      10066
1003 Bishop Street, Suite 1550
Honolulu, Hawaii 96813
Telephone:      (808) 533-1751
Facsimile:      (808) 599-2908
E-mail:          ave@dkpvlaw.com
                 ta@dkpvlaw.com

Attorneys for Plaintiff
FIRST HAWAIIAN BANK

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI`I

| | |
|---|---|
| FIRST HAWAIIAN BANK,<br><br>             Plaintiff,<br><br>     vs.<br><br>AIG SPECIALTY INSURANCE COMPANY,<br><br>             Defendant. | **CIVIL NO. 1CCV-25-001011**<br><br>(Declaratory Relief)<br><br><br>**UPDATED DECLARATION OF WILLIAM T. UM** |

<u>**DECLARATION OF WILLIAM T. UM**</u>

   I, William T. Um, declare as follows:

   1.      I am competent to testify to all matters herein, and make this declaration upon personal knowledge. If called as a witness, I could and would competently testify as to the matters stated herein.

   2.      I am submitting this declaration in connection with the above captioned case, in support of my Motion for *Pro Hac Vice* Admission, which requests that I be admitted *pro hac vice*

EXHIBIT 1

in this matter to appear and participate in the litigation on behalf of Plaintiff First Hawaiian Bank as co-counsel with the law firm Deeley King Pang & Van Etten.

    3.    I make the following representations pursuant to Rule 1.9 of the Rules of the Supreme Court of the State of Hawaiʻi:

    a.    <u>Rule 1.9(b)(2)(A).</u> I am a partner with the law firm of Jassy Vick Carolan LLP ("Jassy Vick Carolan"). My email address is <u>wum@jassyvick.com</u>.

My business address is:

> Jassy Vick Carolan LLP
> 355 S. Grand Ave. Suite 2450
> Los Angeles, CA 90071

    b.    <u>Rule 1.9(b)(2)(B).</u> I have been admitted to practice law in the following courts on the dates noted: (1) California Supreme Court, December 9, 1993; (2) United States District Court, Central District of California, December 9, 1993; (3) United States District Court, Northern District of California, December 17, 2013; (4) United States Court of Appeals for the Ninth Circuit, July 16, 2017; (5) United States District Court, Southern District of Texas, admitted *pro hac vice* 2018; (6) United States District Court, District of Columbia, admitted *pro hac vice* 2018; (7) United States District Court, Southern District of West Virginia, admitted *pro hac vice* 2019; United States District Court, Southern District of New York, admitted *pro hac vice* 2021; (8) United States Court of Appeals for the Fifth Circuit, February 8, 2021; (8) United States Supreme Court, October 31, 2022. I attest that I am currently in good standing in the above jurisdictions.

    c.    <u>Rule 1.9(b)(2)(C).</u> I am not currently, nor have I ever been, suspended or disbarred from the practice of law before any court or otherwise disciplined by any court.

d.      Rule 1.9(b)(2)(D). I have not yet sought or been granted admission *pro hac vice* in any matters before this Court.

e.      Rule 1.9(b)(2)(E). I have not made any appearances as counsel in Hawai'i during the preceding five years.

f.      Rule 1.9(b)(2)(F). If the Court grants my *pro hac vice* admission, I will comply with all applicable Hawai'i statutes, laws, and rules of the courts, including the Hawai'i Rules of Professional Conduct and Guidelines of Professional Courtesy and Civility for Hawai'i Lawyers.

g.      Rule 1.9(b)(2)(G). If admitted, I understand that I am subject to all applicable Hawai'i statutes, laws, and rules of the court, and the Hawai'i disciplinary process with respect to any acts or omissions occurring during representation pursuant to Rule 1.9 of the Rules of the Supreme Court of the State of Hawai'i.

h.      Rule 1.9(b)(2)(H). Jassy Vick Carolan is a foreign limited liability partnership that transacts business in interstate commerce. The firm does not have any office in the State of Hawai'i, and claims exemption from registration under Hawai'i Revised Statutes § 425-162(a)(10).

i.      Rule 1.9(b)(2)(I). Jassy Vick Carolan's general excise tax number issued by the Department of Taxation of the State of Hawaii is GE-157-785-8560-01. I affirm that Jassy Vick Carolan will pay all state income and general excise taxes due for all business activities in the State of Hawai'i.

j.      Rule 1.9(b)(2)(J).  I designate Alan Van Etten (1279) as local counsel and as agent for service of Hawai'i disciplinary process.

4.     On July 22, 2025, I sent an email to Mark Silverstein, Esq., Complex Claims Director - Financial Lines Claims at AIG, and the attorney who I have been dealing with regarding the insurance claim that is the subject of this lawsuit.  I advised him about the Court's request to secure AIG's position regarding my *pro hac vice* application.

5.     On July 23, 2025 at 8:26 am HST, I received a call from attorney David Nakashima, who confirmed that he has been retained by AIG as counsel for this matter and he stated that AIG has no objection to my *pro hac vice* application.

6.     For the foregoing reasons, I respectfully request that the Court enter an Order admitting me to practice *pro hac vice* for all further proceedings in this case.

I, William T. Um, declare under penalty of law that the foregoing is true and correct to the best of my knowledge and belief.


DATED: Los Angeles, CA, July 23, 2025

_____
WILLIAM T. UM, ESQ.

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAIʻI

| | |
|---|---|
| FIRST HAWAIIAN BANK,<br><br>              Plaintiff,<br><br>    vs.<br><br>AIG SPECIALTY INSURANCE<br>COMPANY,<br><br>              Defendant. | CIVIL NO. 1CCV-25-001011<br><br>(Declaratory Relief)<br><br>**NOTICE OF CONTINUED HEARING**<br><br>Date: July 24, 2025<br>Time: 8:45 AM<br>Judge: The Hon. Taryn R. Tomasa<br><br>Trial: Not set |

**NOTICE OF CONTINUED HEARING**

**TO: COUNSEL OF RECORD**

NOTICE IS HEREBY GIVEN that a continued hearing on PLAINTIFF FIRST HAWAIIAN BANK'S MOTION TO ADMIT WILLIAM T. UM AS COUNSEL *PRO HAC VICE,* shall come before the Honorable Taryn R. Tomasa, Judge of the above-entitled Court, on July 24, 2025 at 8:45 a.m., at her courtroom located at Kauikeaouli Hale, 1111 Alakea Street, Courtroom 5C, Honolulu, Hawaii 96813, or as soon thereafter as counsel may be heard.

DATED: Honolulu, Hawaiʻi, July 23, 2025.

/s/ *Alan Van Etten*
ALAN VAN ETTEN, ESQ.
TRISTAN S.D. ANDRES, ESQ.
Attorneys for Plaintiff

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI`I

| | |
|---|---|
| FIRST HAWAIIAN BANK,<br><br>                              Plaintiff,<br><br>        vs.<br><br>AIG SPECIALTY INSURANCE COMPANY,<br><br>                              Defendant. | **CIVIL NO. 1CCV-25-001011**<br><br>(Declaratory Relief)<br><br><br>**CERTIFICATE OF SERVICE**<br><br><br><br>Judge: <u>The Hon. Taryn R. Tomasa</u> |

## <u>CERTIFICATE OF SERVICE</u>

Although David A. Nakashima, Esq., has not entered a formal appearance in this matter, he has agreed, as related in the documents filed herewith, to accept service and will be representing the Defendant in this matter.  A true and correct copy of the foregoing document and a copy of the file stamped Complaint in this matter is being served upon him via email from my office on this date.

DATED: Honolulu, Hawai ʻi, July 23, 2025.

/s/ *Alan Van Etten*
ALAN VAN ETTEN, ESQ.
TRISTAN S.D. ANDRES, ESQ.
Attorneys for Plaintiff